Reset Form

NO. 21-4

In The

# United States Court of Appeals

For The Fourth Circuit

United States of America

v.

John Westley Black, III

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA AT MARTINSBURG

MEMORANDUM OPENING BRIEF

L. Richard Walker, AFPD
Federal Public Defender Office
230 W. Pike Street, Suite 360
Clarksburg, WV 26301
(304)918-6068
richard_walker@fd.org

Nicholas J. Compton, AFPD
Federal Public Defender Office
65 Foxcroft Avenue, Suite 202
Martinsburg, WV 25401
(304)350-6516
nicholas_compton@fd.org

Counsel for Appellant

# TABLE OF CONTENTS

INTRODUCTION.................................................................................1

STATEMENT OF JURISDICTION....................................................1

ISSUE ON APPEAL ............................................................................2

STATEMENT OF THE CASE .............................................................2

STANDARD OF REVIEW ..................................................................14

ARGUMENT.......................................................................................14

    A.  THE BAIL REFORM ACT PROVIDES THAT DEFENDANTS GENERALLY SHOULD BE   RELEASED WHILE THEY ARE AWAITING TRIAL.......................................14

    B.  THERE IS NO REBUTTABLE PRESUMPTION OF DETENTION IN THIS CASE. ....16

    C.  THE SPECIFIC NATURE AND CIRCUMSTANCES OF THE OFFENSES, AS THEY RELATE TO   MR. BLACK, DO NOT SUPPORT A CONCLUSION OF PRETRIAL DETENTION.......................................................................................17

    D.  THE DISTRICT COURT'S ORDER FAILED TO MAKE A FINDING THAT THE WEIGHT OF THE   EVIDENCE AGAINST MR. BLACK IS STRONG BECAUSE IT IS NOT......................................................................................20

    E.  THE HISTORY AND CHARACTERISTICS OF MR. BLACK SUPPORT RELEASE.22

    F.  MR. BLACK DOES NOT PRESENT A DANGER TO THE COMMUNITY. .............26

    G.  THE DISTRICT COURT'S ORDER FAILED TO STATE WITH PARTICULARITY THE REASONS   NO CONDITION OR COMBINATION OF CONDITIONS WILL REASONABLY ASSURE THE   SAFETY OF OTHER PERSONS AND THE COMMUNITY IF MR. BLACK IS RELEASED.......................................................27

CONCLUSION ...................................................................................30

RELIEF REQUESTED ......................................................................31

**Cases**

United States v. Bradly,   2009 WL 1338719   (W.D. North Carolina, May 12, 2009) ................................................................................27

United States v. Byrd, 969 F.2d at 109, (5th Cir. 1992) ..........................................18

United States v. Chen, 820 F.Supp. 1205 (N.D. Cal, June 18, 1992) .....................22

United States v. Clark, 865 F.2d 1433 (4th Cir. 1989) ...........................................14

United States v. DeBeir, 16 F.Supp.2d 592 (D.Md.1998) ........................................18

United States v. Goforth, 546 F.3d 712 (4th Cir. 2008) ..........................................14

United States v. Goodman, 145 Fed.Appx. 282 (10th Cir. 2005) ...........................31

United States v. Hansen, 108 F. App'x 331 (6th Cir. 2004) .....................................15

United States v. Hazime, 762 F.2d 34 (6th Cir. 1985) .............................................16

United States v. Kills Enemy, 3 F.3d 1201 (8th Cir.1993) .......................................19

United States v. King, 849 F.2d 485 (11th Cir. 1988) ..............................................17

United States v. Orta, 760 F.2d 887, 892 (8th Cir. 1985) ........................................15

United States v. Patriarca, 948 F.2d 789 (1st Cir. 1991) .........................................29

United States v. Riccardi, 2002 WL 1402232, at *1 (D.Kan.2002) .......................18

United States v. Robinson, 710 F.Supp.2d 1065, 1070 (D.N. Mariana Is., May 11, 2010) ................................................................................25

United States v. Sabhnani, 493 F.3d 63 (2d Cir. 2007) ...........................................16

United States v. Salerno, 481 U.S. 739 (1987) ................................. 15, 19, 30, 31

United States v. Sanchez-Martinez, 2013 WL 3662871 (D.Colo. July 12, 2013) ..24

United States v. Scott, 450 F.3d 863 (9th Cir. 2006)................................................20

United States v. Shakur, 817 F.2d 189 (2d Cir. 1987)............................................16

United States v. Simms, 128 F. App'x 314 (4th Cir. 2005) ...................................17

United States v. Stewart, 19 F.App'x 46 (4th Cir. 2001) ................................ 15, 16

United States v. Swanquist, 125 F.3d 573 (7th Cir. 1997) .....................................31

United States v. Townsend, 897 F.2d 989 (9th Cir. 1990) .....................................25

**Statutes**

§ 3142(e)(2)(A) ..........................................................................................................19

§ 3142(e)(2)(B) ..........................................................................................................19

§ 3142(e)(2)(C) ..........................................................................................................19

§ 3142(f)(1) .................................................................................................................19

18 U.S.C. § (e)(3) .......................................................................................................19

18 U.S.C. § 2 ................................................................................................................5

18 U.S.C. § 3142 .......................................................................................................17

18 U.S.C. § 3142 (j) ...................................................................................................21

18 U.S.C. § 3142(e) ...................................................................................................18

18 U.S.C. § 3142(e)(2) ....................................................................................... 18, 19

18 U.S.C. § 3142(f) ....................................................................................................19

18 U.S.C. § 3142(g) ...................................................................................................18

iii

18 U.S.C. § 3142(i) ........................................................................................31

18 U.S.C. § 3145(c) .....................................................................................5, 31

18 U.S.C. §§ 1201(a)(1) ..................................................................................5

18 U.S.C. §1201(a)(1) .....................................................................................5

18 U.S.C. §1201(c) ...........................................................................................5

18 U.S.C. §1512(c)(1) ......................................................................................5

28 U.S.C. § 1291 ..............................................................................................5

3142(e)(3)........................................................................................................19

**Rules**

Fed.R.App.P. 9(a)(1) ......................................................................................31

## INTRODUCTION

Comes now, the Appellant, John Westley Black, III, by and through counsel L. Richard Walker, First Assistant Federal Public Defender, and Nicholas J. Compton, Assistant Federal Public Defender, and files this Memorandum Opening Brief contesting the Order of the District Court, App. 179-185,[1] affirming the Detention Order issued by the U.S. Magistrate Court.   App. 123-126.   Mr. Black is a twenty-three-year-old man from Taneytown, Carroll County, Maryland.   He has strong ties to his community and no prior criminal convictions.   His personal history and characteristics, as well as the weight of the evidence against him, support his release.   Mr. Black has been found not to pose a serious risk of flight. In this Memorandum Brief, Mr. Black contends that he is also not a danger to the community and respectfully requests a review of the Order wherein the District Court makes such a finding.

## STATEMENT OF JURISDICTION

On November 17, 2020, a grand jury sitting in the Northern District of West Virginia at Martinsburg returned a nine-count indictment against Mr. Black and three other co-defendants.   App. 1-20.   Mr. Black is named in the following three counts of the indictment:   Count One, conspiracy to commit kidnapping in

---

[1] "App." Refers to the appendix to this memorandum opening brief, filed electronically as an attachment to the filing entry for the brief.

violation of 18 U.S.C. §§ 1201(a)(1) and 1201(c); Count Two, aiding and abetting kidnapping resulting in death in violation of 18 U.S.C. §§ 2 and 1201(a)(1); and Count Three, aiding and abetting corrupt destruction of an object in violation of 18 U.S.C. §§ 2 and 1512(c)(1).

Because these charges constitute offenses against the United States, the district court has original jurisdiction pursuant to 18 U.S.C. § 3231.   This is an appeal from the District Court's Order Affirming the Magistrate Court's Detention Order issued on February 26, 2021.   Mr. Black timely noticed his appeal on March 5, 2021.   App. 186-187.   The United States Court of Appeals for the Fourth Circuit has jurisdiction pursuant to 18 U.S.C. § 3145(c) and 28 U.S.C. § 1291.

## ISSUE ON APPEAL

Whether the District Court erred in finding that Mr. Black was a danger to the community and that no condition or combination of conditions would reasonably assure the safety of the community if Mr. Black were released, and thus affirming the Detention Order of the Magistrate Court.

## STATEMENT OF THE CASE

The United States **alleges** that the following occurred on the evening of March 17, 2020:

Monroe Merrell, David Sanford, Emily Day, Danielle Tyler, Mr. Black, and

2

two juveniles traveled from Carroll County, Maryland, to a party in Falling Waters, West Virginia.   After the party, the group traveled to Westminster, Maryland, to the residence of Sanford and Day. Sanford and Day initially went inside the residence, and then a short time later granted permission for the rest of the group to enter.   Mr. Black entered the residence and remained in the front room.   Two other individuals were already in the residence—another resident named Heather Grogg and her friend, Jonathan Riddle.   An argument ensued between Sanford, Merrell, and Riddle over payment for drugs.   The argument began in the back kitchen, soon turned physical, and spilled into the front room.   Merrell and Sanford punched and kicked Riddle and then stabbing him with a knife.   Once Riddle ceased putting up a fight, Merrell and Sanford tied his arms and legs with pieces of a torn bedsheet.   Riddle was then placed in the trunk of his own car. Merrell got in the driver's seat of Riddle's car and ordered Mr. Black to sit in the passenger seat.   Meanwhile, Sanford and the two juveniles entered a second vehicle.   Both vehicles then drove to rural Rippon, West Virginia.   Day remained at the residence.   On a back road next to a wooded area in Rippon, Sanford and Merrell removed Riddle from the trunk of the car and carried him approximately 40 feet into the woods.   Sanford and Merrell then set Riddle's body on fire. Afterwards, the group then drove back towards Carroll County, Maryland.   On the way, Merrell drove Riddle's car into a field near Brunswick, Maryland.   Merrell

3

and Mr. Black exited the vehicle, and Merrell set it ablaze.   The group then returned to Westminster and Mr. Black ultimately returned to his home in Taneytown, Maryland, early on the morning of March 18, 2020.   Riddle's body was found in the woods later that day.[2]

On November 17, 2020, a grand jury sitting in Martinsburg, West Virginia, returned a nine-count indictment charging Mr. Black with three offenses relating to the alleged kidnapping resulting in death of Jonathan Riddle.   Count One charges Sanford, Merrell, and Mr. Black with conspiracy to commit kidnapping.   App. 1-2.   Count Two charges Sanford, Merrell, and Mr. Black with aiding and abetting kidnapping resulting in death.   App. 3.   Count Three charges Sanford, Merrell, and Mr. Black with aiding and abetting the corrupt destruction of an object.[3]  App. 4.   Mr. Black was initially arrested on April 15, 2020.   He remained in the custody of the State of West Virginia until November 20, 2020, when he made his

---

[2]  Again, the information in the preceding paragraphs represents Defense Counsels' understanding of the allegations against Mr. Black and the co-defendants.   We do no suggest that any of these allegations are true or accurate.

[3]  Defense Counsel have analyzed this case as being divisible into two phases. "Phase I" of the case involves the alleged beating and kidnapping of Riddle and encompasses the first three counts of the indictment—the only counts charging Mr. Black.   "Phase II" of the indictment alleges that the co-defendants in the case murdered potential witnesses Grogg and Tyler.   **The Court should note that Mr. Black had absolutely no involvement in this "Phase II" of the crime, nor has the United States made any allegation that Mr. Black participated in, or had any knowledge of, "Phase II."**

4

initial appearance on the indictment before Magistrate Judge Robert W. Trumble.

Pursuant to a motion to detain filed by the United States, App. 21-23, Mr. Black

remained incarcerated until a detention hearing could be held.   At his arraignment

on December 3, 2020, Mr. Black entered not guilty pleas to all counts against him.

His detention hearing was set on January 4, 2021.[4]

At the detention hearing, the United States called as its only witness FBI

Special Agent Ellen Duffy.   Citing statements of three witnesses,[5] Duffy testified

that Mr. Black participated in the beating and kidnapping of Riddle.   App. 31.

She asserted that Mr. Black assisted in restraining Riddle and removing him from

the residence to the back of his own vehicle.   App. 31-32.   Duffy further testified

that the witnesses claim to have observed Mr. Black removing Riddle from the

vehicle in Rippon and standing next to his burning body in the woods.   App. 32-

33.   The witnesses, according to Duffy also say they saw Mr. Black and Merrell

running from the scene of Riddle's burning vehicle in Brunswick, Maryland.

App. 33.

---

[4]  By order of the District Court, this case has been declared complex.   No trial
date has been set as of the filing of this brief.
[5]  Although not specifically named by Agent Duffy, the witnesses on whom the
United States bases its case against Mr. Black are widely known to be the two
juveniles and another adult who was present.   The direct and cross-examination of
Agent Duffy were each conducted with the understanding that all parties knew
who the witnesses were, though they were not named.

On cross-examination, Duffy acknowledged that Mr. Black did not know Riddle, nor did he have any plan to meet with him the evening of March 17, 2020. She further testified that Mr. Black had no known dispute with him.   App. 36. She also acknowledged that Mr. Black was only passing acquaintances with both Merrell and Sanford.   App. 37.   Duffy admitted that no knife was ever recovered in this case.   App. 38.   She further admitted that no DNA evidence, clothing, shoe print impressions, fingerprints, or any other items of physical evidence were recovered that linked Mr. Black to the kidnapping and death of Riddle.   App. 45-46, 48.   No search warrant was ever obtained to search Mr. Black's residence. App. 46.   Duffy also stated that Mr. Black did not obtain any of the items used to tie up Riddle, transport him to Rippon, and subsequently set him on fire.   App. 39, 40.

Even more problematic to the Government's case against Mr. Black is Duffy's testimony on cross-examination related to the three witnesses who provided the extent of the alleged evidence against Mr. Black.   Duffy previously testified that the three witnesses told investigators that Mr. Black: kicked, punched, stabbed, and assisted in tying Riddle up and placing him in his own car for the drive to Rippon.   Duffy also previously testified that the two juveniles told investigators that Mr. Black was standing next to the burning body in the woods in Rippon and that he had admitted to them that he had stabbed Riddle.   On cross-

6

examination Duffy admitted that all three of these witnesses relied on by the United States were regular users of illicit drugs. App. 52. Worse still, Duffy testified that each of the three had been using drugs and drinking the night of the alleged crime. App. 52-53. Even more troubling, Duffy admitted that two of the three witnesses had been untruthful with investigators in the course of giving their statements. App. 54-55. She also acknowledged that none of the three witnesses had been indicted in this case even though the two juveniles punched and kicked Riddle and participated in his transport to Rippon where he was set ablaze, and the third witness had cleaned the crime scene at the residence, preventing law enforcement from gathering crucial evidence. App. 55-59.

During her cross-examination, Duffy acknowledged that Mr. Black denied kicking, punching, or stabbing Riddle. App. 44. He further denied to her that he had any involvement in tying up Riddle or placing him in his own car. App. 44. Lastly, he denied being in the woods with Sanford and Merrell while they burned Riddle's body. Rather, all Mr. Black acknowledged to her was standing by the vehicle. App. 45. Indeed, Mr. Black has consistently admitted that he was merely present when the events in the indictment were taking place. He has consistently denied participating in those events.

In addition to Duffy, the United States also proffered the Pre-Trial Services Report, which recommended that Mr. Black be detained. App. 62. In response,

7

Counsel for Mr. Black noted that the pending Maryland warrant listed in Paragraph 5 of the Report was based on the same misconduct charged in the federal indictment.   App. 65.   Counsel also noted that Mr. Black's family had made plans to seek treatment for him to address the substance abuse and mental health history listed in the Report.   App. 65.   Counsel further argued that Mr. Black's mental health history—ADHD—does not make him a danger to the community.   App. 65.   Lastly, Counsel for Mr. Black argued against the Pre-Trial Officer's conclusions that the weight of the evidence against Mr. Black was strong and that his prior criminal history—all of which had been dismissed—weighed in favor of detention.   App. 66-67.

In support of his release, Mr. Black called four witnesses at the detention hearing:   (1) his mother Brenda Black; (2) his middle school principal Chris Roemer; (3) his uncle Walter Parrish; and (4) his former Sunday school teacher and mentor Rick Woodward.   Mr. Black also presented as an exhibit a letter from his pastor, Richard O. Ritenour.   App. 162.   First, Brenda testified that she and her family have lived in small, rural Taneytown, Maryland for twenty-four years. Mr. Black was born and raised there.   App. 69-70.   His parents raised Mr. Black and his sister, Bethany, in the same home in a loving and caring family.   App. 70. Mr. Black and Bethany were involved in T-ball, karate, kickboxing, and church activities growing up.   App. 71.   Brenda noted that Mr. Black was enrolled in

special education classes during his school years and participated in a program

called BEST that offered a one-on-one educational experience for students with

learning difficulties and ADHD behavioral issues.    App. 72.    In high school,

Brenda testified that Mr. Black took vocational classes and excelled at video

production.    App. 72-73.    After Mr. Black graduated from high school, Brenda

advised that he worked at a Random House warehouse with his father, and also at

an egg farm, and at McDonalds.    App. 73-74.    Brenda described Mr. Black as a

quiet, non-violent person, growing up and all through his life.    App. 78.    She

described only one known instance of Mr. Black being violent in any way—an

incident in which Mr. Black had punched a person who had just set his family's

apartment building on fire.    App. 79-80.    Brenda testified that Mr. Black has job

opportunities available to him upon his return to Taneytown, including a job with

the family's landlord cleaning and maintaining apartments.    App. 74-75.    She also

testified that Mr. Black expressed interested in being a youth pastor and had

reconnected with his church mentor.    App. 81-82.    Lastly, Brenda agreed to

essentially act as a third-party custodian—making sure Mr. Black has

transportation to and from court and meetings with pre-trial services and agreeing

to report to the court any violations of the conditions of his bond.    App. 83.

Brenda also agreed to take the steps necessary to establish Mr. Black on an

electronic monitor.    App. 84.

Second, Chris Roemer testified that he was Mr. Black's middle school principal and administered the BEST program.   Roemer confirmed that Mr. Black received special education classes growing up and that the BEST program was part of that program.   App. 87-88.   He testified that the BEST program seemed to work for Mr. Black, teaching him strategies for dealing with his frustrations and difficulties in a positive way.   App. 89.   Roemer described Mr. Black as a kind kid who could easily be led by his peers, but otherwise someone who was not mean-spirited or violent.   App. 89-90.   Roemer acknowledged that he had not been in touch with Mr. Black in 8 or 9 years but said he had reached out to Mr. Black after learning of his arrest.   App. 90, 91.   At Mr. Black's request, he provided Mr. Black with a Bible and a dictionary.   According to Roemer, Mr. Black expressed a desire to reengage with his church upon his release.   App. 90, 91.   Roemer agreed to remain in Mr. Black's life as a positive influence if Mr. Black were to be released from jail.   App. 91.

Third, Walter Parrish, Mr. Black's uncle, testified that he lived in the apartment across from Mr. Black's family in Taneytown, Maryland.   Parrish said Mr. Black was like a son to him and that he was very much involved in Mr. Black's life growing up.   App. 94.   Parrish testified that he currently works for his landlord cleaning and maintaining apartments.   He confirmed that the landlord has offered Mr. Black a job cleaning and maintaining apartments upon Mr. Black's

10

release from custody.   App. 95-96.   Parrish, like Brenda, agreed to act as a third-party custodian if Mr. Black were to be released.   App. 96.

Finally, Rick Woodward testified that he has known Mr. Black and his family for approximately 10 years.   App. 102.   Woodward and the Black family attend Bethel Church in Littlestown, Pennsylvania.   Woodward was sort of a big brother to Mr. Black.   He was Mr. Black's Sunday school teacher and youth mentor.   Woodward and his family would frequently invite Mr. Black to their house to work on cars, play games, attend car shows, and generally just spend time together.   App. 102-104.   As a Sunday school student and participant in the youth ministry, Woodward described Mr. Black as quiet and not needing extra discipline.   App. 104.   He testified that Mr. Black was not meanspirited or violent.   App. 105.   Woodward acknowledged that he did not have regular contact with Mr. Black over the last few years, but following Mr. Black's arrest, Woodward testified that he and his wife have re-established and maintained contact with Mr. Black.   App. 105-106, 109.   Woodward said that he and Mr. Black regularly discuss the Scriptures and that Mr. Black had expressed interest in becoming a youth pastor.   App. 106.   Woodward expressed an interest in maintaining contact with Mr. Black upon his release and agreed to monitor and report on Mr. Black's behavior.   App. 107.

11

On January 5, 2021, the Magistrate Court issued a Detention Order, App. 123-126, granting the United States' motion to detain and remanding Mr. Black to the custody of the U.S. Marshals.   The Magistrate Court found that the rebuttable presumption did not apply, and that Mr. Black was not a serious risk of flight. App. 124.   However, the Magistrate Court also found that the weight of the evidence against Mr. Black was strong, that he was subject to life in prison or death if convicted, that he was a regular drug user, and that he did not have stable employment.   App. 124.   The Magistrate Court concluded that Mr. Black was a danger to the community and that no bond conditions could be set to reasonably assure Mr. Black's appearance or the safety of the community.   App. 125.

On February 11, 2021, Mr. Black appealed the Magistrate Judge's Detention Order to the District Court.   App. 127-162.   Mr. Black argued that the testimony at the detention hearing showed he had strong ties to his community in Taneytown, Maryland, and that he was a non-violent person who was no danger to the community.   Mr. Black also took issue with the Magistrate Court's reliance on his prior marijuana use as a basis for detention and its conclusion that he does not have stable employment, which was contradicted by the testimony.   Lastly, Mr. Black strongly objected to the Magistrate Court's conclusion that the weight of the evidence against him—three unindicted co-conspirators, two of whom have trouble with the truth—was strong.   The United States filed its Response, App. 163-171,

12

on February 18, 2021, largely arguing that the weight of the evidence was quite strong, and that Mr. Black's criminal and substance abuse histories all made him a danger to the community.  Mr. Black filed his Reply, App. 172-178, on February 22, 2021.

The District Court conducted *de novo* review of the matter by reviewing Mr. Black's motion seeking review of the detention order, the Government's response, Mr. Black's reply, the indictment, the pretrial services report, the detention order, and a transcript of the detention hearing.  App. 181.  The District Court did not hold another hearing.  On February 26, 2021, the District Court issued an Order, App. 179-185, affirming the Magistrate Court's Detention Order.  The District Court's order noted that Mr. Black was not a serious risk of flight.  App. 181. However, the District Court found that the nature and circumstances of the offense, the weight of the evidence against Mr. Black, and Mr. Black's personal history and characteristics all weighed in favor of detention.  The District Court, citing Mr. Black's prior criminal history, his knowledge of the identities of the informants, and his tendency to be a follower, also found that Mr. Black's release from custody would pose a danger to any person or the community.  App. 182-184.  The District Court ultimately found, by clear and convincing evidence, that no condition or combination of conditions would reasonably assure the safety of the community if Mr. Black were released pending trial.  App. 185.  Based on these

13

findings, the District Court affirmed the Magistrate Court's detention order. It is

from this Order and finding of the District Court that Mr. Black now files this

appeal.

## STANDARD OF REVIEW

In an appeal from a detention order, this Court reviews legal conclusions *de

novo* and factual findings for clear error. *See United States v. Goforth*, 546 F.3d

712, 714 (4th Cir. 2008); *see also United States v. Clark*, 865 F.2d 1433, 1437 (4th

Cir. 1989) (en banc).

## ARGUMENT

A.    **The Bail Reform Act provides that defendants generally should be
      released while they are awaiting trial.**

There is a general rule of substantive due process that the government may

not detain a person prior to a judgement of guilt in a criminal trial. "In our society

liberty is the norm, and detention prior to trial or without trial is the carefully

limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). This

exception of pretrial detention is governed by the Bail Reform Act, 18 U.S.C. §

3142. Still, "[t]he structure of the [bail reform] statute mandates every form of

release be considered before detention may be imposed." *United States v. Orta*,

760 F.2d 887, 892 (8th Cir. 1985).; *see also United States v. Hansen*, 108 F. App'x

331, 332 (6th Cir. 2004).

14

Pursuant to the Bail Reform Act, the Court must consider all possible conditions of release, and impose the least restrictive conditions.   A defendant shall be detained pending trial only if the district court "finds that no condition or combination of the conditions will reasonable assure" either (1) "the appearance of the [defendant] as required" or (2) "the safety of any other person and the community."   18 U.S.C. § 3142(e); *see also United States v. Stewart*, 19 F.App'x 46, 48 (4th Cir. 2001)(unpublished).   If the rebuttable presumption under 18 U.S.C. § 3142(e)(2) does not apply, then, " [w]ith regard to the risk of flight as a basis for detention, the government must prove by a preponderance of the evidence that no combination of conditions will reasonable assure the defendants presence at the future court proceedings."   *Stewart*, 19 F. App'x at 48 (citing *United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985)).   Accordingly, under the statutory scheme, "it is only a 'limited group of offenders' who should be denied bail pending trial."   *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) (quoting *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987)).

The factors the court should consider are listed in the Bail Reform Act: (1) the nature and circumstances of the offense; (2) the weight of the evidence against the person; (3) the person's history and characteristics, including the person's character, physical and mental condition, family ties, employment, financial resources, community ties, drug abuse history, and criminal record; and (4) the

danger to the community posed by the person's release.   18 U.S.C. § 3142(g).

The government must prove dangerousness by "clear and convincing" evidence.

18 U.S.C. § 3142(f); *see United States v. Simms*, 128 F. App'x 314, 315 (4th Cir.

2005); *United States v. King*, 849 F.2d 485, 489 (11th Cir. 1988).

**B.     There is no rebuttable presumption of detention in this case.**

At the detention hearing on January 4, 2021, the United States argued that

the rebuttable presumptions in favor of detention, found in 18 U.S.C. §§ 3142(e)(2)

and (e)(3), applied to this case.   App. 111.   Undersigned counsel did not

challenge the United States' assertion during the hearing.   App. 113.   However,

following the hearing, the parties and the U.S. Magistrate Judge agreed that the

rebuttable presumption does not apply in this case.   App. 124, footnote 1.

Likewise, the district court's order did not apply a presumption of detention.   App.

181.   Accordingly, there is a statutory presumption in favor of Mr. Black's release

prior to trial.[6]   *United States v. Riccardi*, 2002 WL 1402232, at *1 (D.Kan.2002)

---

[6] Although Count 2 of the Indictment in this case carries a maximum sentence of
life imprisonment or death, Mr. Black has obviously not yet been convicted of that
offense or any other offense list in § 3142(f)(1) (See § 3142(e)(2)(A)); he is not
alleged to have committed the offense while on release for any other offense (See §
3142(e)(2)(B)); nor has less than five years elapsed since his release from prison
following a conviction for a § 3142(f)(1) offense (See § 3142(e)(2)(C)).
Furthermore, Mr. Black has not been charged with, or convicted of, any offenses
listed in § 3142(e)(3), nor has the Magistrate Judge found probable cause to
believe that Mr. Black has committed any such offense.

("By its very language, the Act demonstrates its favorable inclination toward pretrial release of federal criminal defendants."); *United States v. DeBeir*, 16 F.Supp.2d 592, 593 (D.Md.1998) ("The [Act] favors release of defendants awaiting trial.") (citing *Byrd*, 969 F.2d at 109).

## C.    The specific nature and circumstances of the offenses, as they relate to Mr. Black, do not support a conclusion of pretrial detention.

The district court's order determined that the nature and circumstances of the offense charged weigh heavily against Mr. Black.   "Despite defense counsel's best efforts to portray the Defendant as a minor participant in only one 'phase' of the criminal activity charged within the indictment, the crimes he is charged with are of the most serious nature.   To wit, conspiracy to commit kidnapping, aiding and abetting kidnapping resulting in death, and aiding and abetting corrupt destruction of object.   To be clear, these charges involve the death of another person.   Even assuming the Defendant played a 'minor role' as counsel suggests, a minor role in another person's allegedly horrendous death is a charge of the most serious nature."   App. 182.

While the Supreme Court has upheld the constitutionality of pretrial detention under the Bail Reform Act on due process grounds, the Court stressed that the statute it was upholding contained important safeguards, including the requirements that defendant be accused of a particularly serious crime and that

17

dangerousness be proved to a neutral judicial officer by clear and convincing evidence. *See Salerno*, 481 U.S. at 747, 750–52, 107 S.Ct. 2095; *cf. United States v. Kills Enemy*, 3 F.3d 1201, 1203 (8th Cir.1993) (contrasting pretrial releasees with convicted persons awaiting sentence, and noting that the latter are "no longer entitled to a presumption of innocence or presumptively entitled to [their] freedom"). "Neither *Salerno* nor any other case authorizes detaining someone in jail while awaiting trial . . . *based merely on the fact of arrest for a particular crime*." *United States v. Scott*, 450 F.3d 863, 875 (9th Cir. 2006) (emphasis added). The charge, whatever it may be, is merely an allegation and the Bail Reform act does nothing to limit the presumption of innocence. 18 U.S.C. § 3142 (j). "Thus, the Supreme Court upheld the constitutionality of a bail system where pretrial defendants could be detained only if the need to detain them was demonstrated on an individualized basis." *Scott*, 450 F.3d at 875.

Here, while the charged offenses are serious, the district court's order overstates the nature and circumstances of the offenses as they relate to Mr. Black specifically. The order ignores Mr. Black's minor role, dismisses his presumption of innocence, and disregards the obvious defense of mere presence.

To begin, Mr. Black denies all charges. He has done so repeatedly. This started when, during an interview with law enforcement, he specifically denied beating, stabbing and kidnapping Riddle. App. 44. The government does not

even allege that Mr. Black was the person who lit Riddle on fire, which is casually and erroneously assumed by the district court's order.

In addition, this is not a case where Mr. Black is artfully portrayed by his counsel to have a minor role.   Rather, the government's evidence presented at the detention hearing *proves* that Mr. Black had a minor role, if he had any role at all. Mr. Black did not know Riddle.   Mr. Black did not have a quarrel with Riddle. Mr. Black did not know Riddle would appear at the home of co-defendant David Sanford.   Mr. Black did not know there would be a fight.   No witness observed Mr. Black with a knife, much less stabbing Riddle.   Mr. Black did not secure the materials to restrain Riddle.   Mr. Black did not secure a vehicle to transport Riddle and Mr. Black did not drive.   Mr. Black did not plan the route from Westminster, Maryland, to a wooded area near Rippon, West Virginia, and Mr. Black did not make the decision to leave Riddle there.   Mr. Black did not obtain any gasoline or any other accelerants and no witness claimed to see Mr. Black light Riddle on fire or see Mr. Black light Riddle's vehicle on fire.   App. 33, 36-40.

Obviously, it is extremely unfortunate and disastrous, really, that Mr. Black arrived at David Sanford's home that night a fight took place.   Mr. Black never should have gone to West Virginia after the fight that night.   That said, Mr. Black's mere presence at the alleged crime scenes in Westminster, Maryland, and Rippon, West Virginia, does not render Mr. Black guilty of any charged offense.

19

**D.     The district court's order failed to make a finding that the weight of the evidence against Mr. Black is strong because it is not.**

The district court's order considered the weight of the evidence, but it did *not* make a finding that the evidence against Mr. Black was strong.   App. 182.   It is not.   *See United States v. Chen*, 820 F.Supp. 1205, 1208 (N.D. Cal, June 18, 1992) ("Although the weight of the evidence is considered 'the least important of the various factors' this is only true if the weight of the evidence is used to buttress a decision to detain the defendant [and] [i]f the evidence against a defendant is weak, that becomes an important factor favoring release.") (internal citation omitted).

The district court's order noted that "[t]he weight of evidence against the Defendant was sufficient for a grand jury to indict him on the aforementioned charges."   App. 182.   This is totally irrelevant to the question of detention and the weight of the evidence under the Bail Reform Act.   If this were the standard for evaluating evidence against a defendant facing pretrial detention, then this factor would be applied against a defendant in every case.   In fact, the indictment itself does nothing more than trigger detention proceedings in a limited class of cases.

Further, the district court's order observed that "the case agent testified that three witnesses described some of the Defendant's involvement in this case. Witnesses said that the Defendant beat the victim, assisted in burning his car, rode

20

with a co-defendant in the victim's car—while the victim was in the trunk—and told two witnesses that he stabbed the victim."[7] App. 182.  Counsel for Mr. Black cross- examined the case agent about the three witnesses at the evidentiary hearing. Based on the responses, the statements of these cooperators and unindicted co-conspirators are not credible.  These individuals use drugs.  These individuals were on drugs and drinking the night of the incident.  They are wildly culpable in the alleged conspiracy.  Two of them gave less than truthful statements to law enforcement and another obstructed justice by cleaning up the crime scene.  App. 52-59.  They incriminated Mr. Black in unsworn statements to law enforcement officers who were interrogating the witnesses under the threat of prosecution. Under all of the circumstances, the information the witnesses provided is a far cry from persuasive and credible evidence.

Truly, the case against Mr. Black is vastly different than the overwhelming majority of federal prosecutions to the extent that there is no video capturing the fight with Riddle, the alleged kidnapping, or Riddle's transportation to West Virginia.  There is no physical evidence linking Mr. Black to the codefendant's home in Westminster, Maryland, or the crime scene in Rippon, West Virginia. App. 45-49.  Likewise, Mr. Black never made an admission to law enforcement

---

[7]  The government's position is that the evidence does not support a finding that the victim was in the trunk.

that he committed or agreed to commit any of the overt acts articulated in the

indictment.   App. 43-45.   In sum, a jury may acquit Mr. Black and he should not

be forced to remain incarcerated for years in a complex case involving multiple co-

defendants until there is an opportunity to contest the charges and present his

defense at trial.

**E.     The history and characteristics of Mr. Black support release.**

The district court's order interprets Mr. Black's relatively normal history and

characteristics in the light most favorable to government.   This approach is

improper.   As indicated, the Bail Reform Act favors pretrial release and "the court

must resolve all doubts regarding the propriety of release in the defendant's favor."

*United States v. Sanchez-Martinez*, 2013 WL 3662871 (D.Colo. July 12, 2013).

In fact, the record establishes that Mr. Black's history and characteristics

are a credit to him and clearly support release.   First, the district court's order

claims that "[a]lthough the Defendant does have ties to his community in Carroll

County, Maryland, he has no ties to any community within the Northern District of

West Virginia."   App. 183.   This is of no moment.   Flight risk is not an issue in

this case.   The district court's order indicated, "[a]s an initial matter" that "the

Government did not argue, and the underlying detention order did not find, that the

Defendant poses a serious risk of flight by a preponderance of the evidence."

Accordingly, the focus of the district court's order involves "whether the

22

Defendant poses a danger to any person in the community."

Nevertheless, Mr. Black is not required to prove that he has ties to the Northern District of West Virginia in order to be released as a matter of law. App. 181. "Ties to the community" means both the community where charges are brought and the community where defendant normally resides. *See United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) ("If it were only the community in which the indictment was brought, a defendant who had deep ties in Boston, for example, might be denied bail if indicted in New Haven."); *United States v. Robinson*, 710 F.Supp.2d 1065, 1070 (D.N. Mariana Is., May 11, 2010) (same). Mr. Black has strong ties to Carroll County, Maryland, which is about one hour away from the courthouse where he will stand trial. Without question, Mr. Black cannot be considered a flight risk.

Second, the district court claims that Mr. Black's employment history is "incredibly sporadic." App. 183. Mr. Black disagrees with this assessment of the evidence in the record. Mr. Black is a very young person. He graduated from Westminster High School in 2016, at age 18. He was arrested in April 2020, at age 22. Mr. Black held five jobs prior to his arrest in April 2020. It is not unusual for a young person to change jobs for various reasons. Certainly, this is not cause for alarm or indicative of danger. Mr. Black has a documented history of employment and, when he was arrested, Mr. Black was employed at McDonalds

23

Restaurant in his hometown.   App. 73-74

Notably, Mr. Black has been incarcerated for almost one year.   Yet, with his family's help, he has been able to line up a job as a maintenance worker along with his uncle, Walter Parrish, working for their landlord.   App. 74-75.   Mr. Parrish testified that he confirmed a position with the landlord and that Mr. Black will clean apartments, conduct repairs, and assist with plumbing, electrical, dry wall and carpentry.   App. 95.   Clearly, this is pro-social activity that weighs in favor of release.   There are no negatives relative to Mr. Black's employment.

Third, the district court's order is critical of Mr. Black's regular use of marijuana.   App. 183.   While we undoubtedly counsel Mr. Black to refrain from marijuana, it is equally obvious that his prior use of marijuana does not make him dangerous.   Counsel for Mr. Black explained in pleadings filed with the district court that, at the time of his arrest, he used marijuana daily, while simultaneously suffering from a serious anxiety disorder.   App. 134.   The district court's order failed to consider that there is surely much more to Mr. Black's use of marijuana than recreation and that it most likely minimized the symptoms of his mental health disorders.   Similarly, the district court's order failed to credit Mr. Black for not using marijuana for months and finding other ways to manage his anxiety.

Critically, there are no drugs in Mr. Black's home.   App. 82-83. Furthermore, if he is released, Mr. Black will be working with his uncle, Walter

24

Parrish, doing maintenance work at properties belonging to their landlord.   App.

74-75.   Mr. Parrish has pledged to supervise Mr. Black, counsel him, and, if

necessary, report any drug use to undersigned counsel and the U.S. Department of

Probation.   App. 96.   Mr. Black's family plans to coordinate necessary treatment

for Mr. Black and our law office will assist, as needed.   App. 82.   As explained to

the district court, counsel for Mr. Black have recruited a staff member in our law

office with experience connecting clients with mental health professionals and

drug treatment professionals in this district and in other districts.   App. 135.   With

all this support for Mr. Black from a substance abuse and mental health

perspective, the risk of dangerous drug use upon release is low.

Finally, Mr. Black has never been convicted of a criminal offense.   App.

195.   Ordinarily, this is a leading reason for granting release.   *See, e.g., United

States v. Bradly*, 2009 WL 1338719 (W.D. North Carolina, May 12, 2009)

(ordering release of woman who stabbed her husband in the chest because she had

no prior criminal history, lifelong connections to the Cherokee area, and numerous

family members that lived close to her committed to assisting her in anyway

necessary).   Still, the district court's order states that "the Defendant's actions

after a fire at his residence are concerning."   App. 183.   This relates to a highly

unusual situation in Mr. Black's past.   When Mr. Black was approximately 16, he

saved a man in his apartment building from an arson.   Mr. Black knew the

25

individual who he believed intentionally started the fire.   When the suspect

appeared at the scene of the arson, Mr. Black confronted and punched the

perpetrator in front of one of the police officers responding to the arson.   App. 78-

80.

The district court's order extrapolates vigorously.   It suggests that based

upon this isolated and unusual incident, six years ago, Mr. Black is, therefore,

predisposed to attack witnesses in this case.   App. 183-184.   This is wildly

speculative.   Mr. Black has not been charged with tampering with witnesses.

There is no evidence in the record suggesting that Mr. Black would tamper with or

harm a witness. Mr. Black has no history of doing so.   In addition, it is virtually

impossible for witness tampering or intimidation to occur in the future because

there are safeguards in place already.   The district court issued a protective order

prohibiting the disclosure of materials to Mr. Black which may reveal the

addresses of potential witnesses.   App. 188-190.   Therefore, the additional step of

depriving Mr. Black of his liberty is entirely unnecessary.

## F.    **Mr. Black does not present a danger to the community.**

The district court's order finds that "the nature and seriousness of the danger

to any person or the community that would be posed by [Mr. Black's] release [] is

apparent . . . ."   Specifically, it states "[t]here are already indicted charges of

witness intimidation and tampering resulting in the death of more than one witness

in this case.   Notably, this Defendant was not charged with those crimes.

However, counsel's argument that Mr. Black is just a follower, and testimony to

support this argument, further convinces this Court that the Defendant poses a very

real danger to other witnesses in this case and the community at large."   App. 184.

Again, Mr. Black has no prior criminal convictions.   App. 195.   Mr. Black

has no history of tampering with or harming witnesses.   There is no evidence that

he has attempted to do so in the past.   This claim is not supported by the record in

this case, at all, and, being so wildly speculative, it should cause this Court to

reverse the district court's order and mandate Mr. Black's release.   *See United*

*States v. Patriarca*, 948 F.2d 789, 795 (1st Cir. 1991) (affirming order of pretrial

release for leader of Mafia crime family where "although *in theory* a Mafia Boss

was an intimidating and highly dangerous character, the government had not

demonstrated that *this Boss* posed a significant danger, or at least a danger that

could not be overcome by appropriate conditions.") (emphasis in original).

**G.    The district court's order failed to state with particularity the reasons
no condition or combination of conditions will reasonably assure the
safety of other persons and the community if Mr. Black is released.**

"Judicial decisions are reasoned decisions."   *United States v. Rita*, 551 U.S.

338, 356 (2007).   After finding Mr. Black to be a danger, the district court failed

to adequately articulate why no condition or combination of conditions will

27

reasonably assure the safety of other persons and the community if released.   App.
185.   This is an error, which requires a remand for a fully developed order, at the
very least.

An important procedural safeguard of the Bail Reform Act is that the district
court "include written findings of fact and a written statement of the reasons for a
decision to detain."   *Salerno*, 481 U.S. at 752 (citing 18 U.S.C. § 3142(i));
Fed.R.App.P. 9(a)(1) ("The district court must state in writing, or orally on the
record, the reasons for an order regarding the release or detention of a defendant in
a criminal case").   The written-order safeguard is meant "to ensure that the
reasons underlying a detention order are articulated with sufficient clarity to permit
appellate review."   *United States v. Goodman*, 145 Fed.Appx. 282, 284 (10th Cir.
2005) (unpublished).   *Salerno* cites "[t]he Act's review provisions, § 3145(c),
[which] provide for immediate appellate review of the detention decision," as
another of the BRA's safeguards.   481 U.S. at 752.   "Although the standards for
what suffices as a statement of reasons are not subject to rigid definition . . . a
statement of reasons encompasses more than a mere recitation of the statutory
language followed by nothing more than a conclusory statement that the applicable
factors have (or have not) been met."   *United States v. Swanquist*, 125 F.3d 573,
576 (7th Cir. 1997).

28

Here, the district court provided a brief statement about whether any condition or combination of conditions will reasonably assure the safety of other persons and the community, but it was not a meaningful statement. It was not a particularized statement and the statement failed to explain *why* no conditions -- including a myriad of available stringent conditions -- could not possibly render other people and the community safe from Mr. Black.

On approximately one half of a page, the district court stated that the weight of the evidence is strong; Mr. Black is subject to life in prison or death if convicted; Mr. Black is a regular drug user who lacks stable employment; the crimes charged are very serious; the nature and consequences of the alleged crimes are very serious; and the identity of witnesses is known and, therefore, they are risk. App. 185. This is merely a restatement of the reasons the district court relied upon to find Mr. Black is a danger in the first place! This brief statement does *nothing* to explain *why*, for example, a carefully crafted release plan, home incarceration, electronic monitoring, third-party custodians, a good and honest job supervised by his uncle, frequent drug testing, drug treatment, mental health treatment, restricted phone use, restricted internet use, search conditions, and other standard and special conditions could not reasonably limit the risk of Mr. Black's release.

29

To be sure, counsel for Mr. Black suggested a thoughtful release plan along these lines with knowledge that -- with the exception of travel to and from work with his uncle -- the conditions would create a virtual jail for Mr. Black in his home.   App. 82-84.   The district court is required to consider the well-known possibilities together with those proposed by the parties.   It is required to look for an alternative to incarceration and ponder the least restrictive conditions possible. Then, the district court must state, at least briefly, that it has considered all the available conditions individually and in combination and explain the reasons why none of it can work.   The district court failed to do so.   In fact, the district court's order did not even come close.   As a result, it failed to comply with this safeguard of the Bail Reform Act and deprived this Court of the ability to conduct a meaningful review.

## CONCLUSION

For the reasons stated above, this Court should reverse the ruling of the district court denying release on bond to Mr. Black pending trial.

## RELIEF REQUESTED

Mr. Black asks this Court to reverse the Order of District Court affirming the Magistrate Court's detention order and remand the case to the District Court for further proceedings on the question of release or detention.

Respectfully submitted,

**JOHN WESTLEY BLACK, III**

By:     /s/ L. Richard Walker
        L. Richard Walker, Esq.
        Senior Litigator
        Office of the Federal Public Defender
        Attorney for Appellant
        Federal Public Defender Office
        230 West Pike Street, Suite 360
        Clarksburg, WV 26302
        Tel. (304) 622-3823
        Fax. (304) 622-4631

By:     s/ Nicholas J. Compton
        Nicholas J. Compton
        Assistant Federal Public Defender
        Office of the Federal Public Defender
        Attorney for Appellant
        Federal Public Defender Office
        651 Foxcroft Avenue, Suite 202
        Martinsburg, WV 25401
        Tel: (304) 260-9421
        Email: Nicholas_Compton@fd.org

<u>**CERTIFICATION OF SERVICE**</u>

I hereby certify that on March 19, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

**Kimberley D. Crockett**
**Assistant United States Attorney**
**United States Attorney's Office**
**217 West King Street, Suite 400**
**Martinsburg, West Virginia 25401**

By:    <u>s/ L. Richard Walker</u>
        L. Richard Walker
        WV State Bar No. 9580
        Attorney for Defendant
        Federal Public Defender Office
        230 West Pike Street, Suite 360
        Clarksburg, WV 26302
        Tel. (304) 622-3823
        Fax. (304) 622-4631

By:    <u>s/ Nicholas J. Compton</u>
        Nicholas J. Compton
        Assistant Federal Public Defender
        Office of the Federal Public Defender
        Attorney for Appellant
        Federal Public Defender Office
        651 Foxcroft Avenue, Suite 202
        Martinsburg, WV 25401
        Tel: (304) 260-9421
        Email: Nicholas_Compton@fd.org