Reset Form

**NO. 21-4**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,

APPELLEE,

**v.**

JOHN WESTLEY BLACK, III,

APPELLANT.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

# APPENDIX VOLUME I

L. Richard Walker, First Assistant
Nicholas J. Compton, AFPD
Assistant Federal Public Defenders
Federal Public Defender's Office
651 Foxcroft Avenue, Suite 202
Martinsburg, West Virginia 25401
Tel: (304) 260-9421

*Counsel for* APPELLANT

Kimberley D. Crockett, AUSA
United States Attorney's Office
217 West King Street, Suite 400
Martinsburg, West Virginia 25401
Tel: (304) 267-0590

*Counsel for* APPELLEE

# APPENDIX VOLUME I

## TABLE OF CONTENTS

Indictment .................................................................................... 000001-000020

Government Motion for Detention Hearing ..................................... 000021-000023

Order of Temporary Detention ........................................................ 000024-000024

Detention Hearing Transcript ......................................................... 000025-000122

Detention Order............................................................................. 000123-000126

Appellant Motion for Review of Detention Order........................... 000127-000162

Government Response to Motion for Review .................................. 000163-000171

Appellant Reply to Government Response...................................... 000172-000178

Order Affirming Detention Order................................................... 000179-000185

Appellant Notice of Appeal ........................................................... 000186-000187

Protective Order ............................................................................ 000188-000190



FILED

NOV 1 7 2020

U.S. DISTRICT COURT-WVND
MARTINSBURG, WV 25401

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| | |
| **v.** | Criminal No.   3:20CR46 |
| | |
| **MONROE MERRELL,** | Violations:   18 U.S.C. § 2 |
| **DAVID RAY SANFORD, JR.,** | 18 U.S.C. § 3 |
| **JEFFREY CRAIG SMITH, JR.,** | 18 U.S.C. § 373(a) |
| **JOHN WESTLEY BLACK, III** | 18 U.S.C. § 1201(a)(1) |
| | 18 U.S.C. § 1201(c) |
| **Defendants.** | 18 U.S.C. § 1512(a)(1)(C) |
| | 18 U.S.C. § 1512(b)(3) |
| | 18 U.S.C. § 1512(c)(1) |
| | 18 U.S.C. § 1512(k) |
| | 18 U.S.C. § 3292(d)(4) |
| | 18 U.S.C. § 3591(a) |
| | 18 U.S.C. § 3592(c) |
| | 18 U.S.C. § 3592(d) |

## INDICTMENT

The Grand Jury charges that:

## COUNT ONE

(Conspiracy to Commit Kidnapping)

From March 17, 2020 to March 18, 2020, in Jefferson County, within the Northern District of West Virginia and elsewhere, defendants, **MONROE MERRELL, DAVID RAY SANFORD, JR., JOHN WESTLEY BLACK, III,** and others, did knowingly and unlawfully, combine, confederate, and agree to seize, kidnap, abduct, and carry away J.R. and cause him to be transported in interstate commerce resulting in death, in violation of Title 18, United States Code, Section 1201(a)(1).

1

000001

In furtherance of the conspiracy and to affect the object of the conspiracy, the following overt acts, among others, were committed within the Northern District of West Virginia, and elsewhere:

### Overt Acts

1. From March 17, 2020 to March 18, 2020, **MONROE MERRELL, DAVID RAY SANFORD, JR., JOHN WESTLEY BLACK, III,** and others, attacked J.R. in a residence located in Carroll County, Maryland.

2. From March 17, 2020 to March 18, 2020, **MONROE MERRELL, DAVID RAY SANFORD, JR., JOHN WESTLEY BLACK, III,** and others, restricted J.R. by tying his hands and feet, and restrained his escape.

3. On or about March 18, 2020, **MONROE MERRELL, JOHN WESTLEY BLACK, III** and others, transported J.R., while he was restrained, in his 2019 Black Ford Fusion with a Maryland tag 7EB7392, across state lines from the State of Maryland, through the Commonwealth of Virginia, and then into the State of West Virginia.

4. From March 17, 2020 to March 18, 2020, **MONROE MERRELL, DAVID RAY SANFORD, JR., JOHN WESTLEY BLACK, III,** and others, inflicted injuries upon J.R. causing his death.

5. On or about March 18, 2020, **MONROE MERRELL, DAVID RAY SANFORD, JR., JOHN WESTLEY BLACK, III,** and others, set fire to the body of J.R.

All in violation of Title 18, United States Code, Section 1201(c).

000002

## <u>COUNT TWO</u>

(Aiding and Abetting Kidnapping Resulting in Death)

From on or about March 17, 2020 to March 18, 2020, in Jefferson County, within the Northern District of West Virginia and elsewhere, defendants, **MONROE MERRELL, DAVID RAY SANFORD, JR., JOHN WESTLEY BLACK, III,** and others, aided and abetted by one another, did knowingly and unlawfully, seize, confine, inveigle, kidnap, abduct, and carry away J.R., and otherwise held him for their own purpose and benefit; and in so doing, willfully transported him in interstate commerce from the State of Maryland to the State of West Virginia, and said kidnapping resulted in the death of J.R.; in violation of Title 18, United States Code, Sections 1201(a)(1) and 2.

000003

## COUNT THREE

(Aiding and Abetting Corrupt Destruction of Object)

On or about March 18, 2020, in Jefferson County, within the Northern District of West

Virginia, the defendants, **MONROE MERRELL, DAVID RAY SANFORD, JR.,**

**JOHN WESTLEY BLACK, III,** and others, aided and abetted by one another, did

corruptly alter, destroy, mutilate, and conceal a 2019 Black Ford Fusion with a Maryland tag

7EB7392, operated by J.R., with intent to impair the object's integrity or availability for use in an

official proceeding, in violation of Title 18, United States Code, Sections 1512(c)(1) and 2.

000004

## **COUNT FOUR**

(Accessory After the Fact)

On or between March 18, 2020 and April 7, 2020, in Jefferson County, within the Northern District of West Virginia and elsewhere, **JEFFREY CRAIG SMITH, JR.**, knowing that an offense against the United States had been committed, to wit, Kidnapping Resulting in Death as charged in Count Two, did receive, relieve, comfort, and assist the offenders, Monroe Merrell and David Sanford, Jr., in order to hinder and prevent the offender's apprehension, trial, and punishment, in violation of Title 18, United States Code, Section 3.

000005

## COUNT FIVE

(Conspiracy to Commit Tampering with a Witness Causing Death)

From on or about April 6, 2020 to April 9, 2020, in Berkeley County, within the Northern District of West Virginia, the defendants, **MONROE MERRELL, DAVID RAY SANFORD, JR., JEFFREY CRAIG SMITH, JR.,** and others, did knowingly and unlawfully, combine, confederate, and agree to kill D.T. and H.G., witnesses to the commission of a federal offense, to prevent the communication to law enforcement of information relating to the commission of that Federal offense, in violation of Title 18, United States Code, Section 1512(a)(1)(C).

In furtherance of the conspiracy and to affect the object of the conspiracy, the following overt acts, among others, were committed within the Northern District of West Virginia, and elsewhere:

### Overt Acts

1. On or about April 6, 2020, defendants, **MONROE MERRELL** and **DAVID RAY SANFORD, JR.**, and others, determined to kill D.T. and H.G. to insure they did not communicate information to law enforcement about a Federal offense.

2. On or about April 6, 2020, defendants, **DAVID RAY SANFORD, JR., JEFFREY CRAIG SMITH, JR.**, and others, transported D.T. and H.G. from the State of Maryland to Berkeley County, West Virginia to kill them.

3. On or about April 6, 2020, defendants, **MONROE .MERRELL, DAVID RAY SANFORD, JR.**, and others, drugged D.T. and H.G. to incapacitate and kill them.

4. On or about April 7, 2020, defendants, **MONROE MERRELL, JEFFREY CRAIG SMITH, JR.**, and others, killed H.G. in Berkeley County, West Virginia.

6

000006

5. On or about April 7, 2020, defendant, **DAVID RAY SANFORD, JR.**, killed D.T. in Berkeley County, West Virginia.

6. From on or between April 7, 2020 to April 9, 2020, defendants, **MONROE MERRELL**, and others, burned the bodies of D.T. and H.G.

7. On or about April 9, 2020, defendants, **MONROE MERRELL**, and others, discarded the ash-remains of D.T. and H.G.

All in violation of Title 18, United States Code, Section 1512(k).

000007

## COUNT SIX

(Aiding and Abetting Tampering with a Witness Causing Death)

From April 6, 2020 to April 7, 2020, in Berkeley County, within the Northern District of West Virginia, the defendants, **MONROE MERRELL, DAVID RAY SANFORD, JR., JEFFREY CRAIG SMITH, JR.**, and others, aided and abetted by one another, killed D.T. with the intent to prevent the communication to law enforcement of information related to the Kidnapping Resulting in Death, as charged in Count Two, in violation of Title 18, United States Code, Sections 1512(a)(1)(C) and 2.

000008

## COUNT SEVEN

(Aiding and Abetting Tampering with Witness Causing Death)

From April 6, 2020 to April 7, 2020, in Berkeley County, within the Northern District of West Virginia, the defendants, **MONROE MERRELL, DAVID RAY SANFORD, JR., JEFFREY CRAIG SMITH, JR.**, and others, aided and abetted by one another, killed H.G. with the intent to prevent the communication to law enforcement information related to the Kidnapping Resulting in Death, as charged in Count Two, in violation of Title 18, United States Code, Sections 1512(a)(1)(C) and 2.

000009

**COUNT EIGHT**

(Aiding and Abetting Intimidation of a Witness by Threats)

From April 6, 2020 to April 7, 2020, in Berkeley County, within the Northern District of West Virginia, the defendants, **MONROE MERRELL** and **DAVID RAY SANFORD, JR.,** aided and abetted by one another, did intentionally use intimidation, threats and corrupt persuasion with intent to induce a person, referred to herein as Jane Doe, to prevent the communication to law enforcement officer information relating to the commission of Tampering with Witness Causing Death, as charged in Counts Six and Seven; all in violation of Title 18, United States Code, Sections 1512(b)(3) and 2.

000010

## COUNT NINE

(Solicitation to Commit a Crime of Violence)

From April 6, 2020, to April 24, 2020, within Berkeley County, within the Northern District of West Virginia and elsewhere, the defendant, **MONROE MERRELL**, with the intent that Jeffrey Craig Smith, Jr. and others engage in conduct constituting a felony that has as an element of the use, attempted use, and threatened use of physical force against a person, referred to herein as Jane Doe, in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, did solicit, command, induce and endeavor to persuade Jeffrey Craig Smith, Jr. and others to murder a person, referred to herein as Jane Doe, in violation of Title 18, United States Code, Section 1512(a)(1)(C); all in violation of Title 18, United States Code, Section 373(a).

000011

## NOTICE OF SPECIAL FINDINGS

1. The Grand Jury repeats and realleges the accusations of this Indictment.  The Defendant,

   **MONROE MERRELL**:

   A. Was 18 years of age or older at the time of the commission of the offenses (18 U.S.C. § 1201(a)(1) and 18 U.S.C. 1512(a)(1)(C));

   B. Intentionally killed J.R., as charged in Count Two, Aiding and Abetting Kidnapping Resulting in Death (18 U.S.C. § 3591(a)(2)(A));

   C. Intentionally inflicted serious bodily injury that resulted in the death of J.R. as charged in Count Two, Aiding and Abetting Kidnapping Resulting in Death (18 U.S.C. § 3591(a)(2)(B));

   D. Intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim, J.R., died as a direct result of the act or acts as charged in Count Two, Aiding and Abetting Kidnapping Resulting in Death (18 U.S.C. 3591(a)(2)(C));

   E. Intentionally and specifically engaged in an act of violence against J.R. knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim, J.R., died as a result of the act as charged in Count Two, Aiding and Abetting Kidnapping Resulting in Death (18 U.S.C. § 3591(a)(2)(D));

   F. Has caused the death of J.R. during the commission of a violation of 18 U.S.C. § 1201 (Kidnapping), as charged in Count Two, Aiding and Abetting Kidnapping Resulting in Death (18 U.S.C. § 3592(c)(1));

000012

G. Has killed J.R. in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim, as charged in Count Two, Aiding and Abetting Kidnapping Resulting in Death (18 U.S.C. § 3592(c)(6));

H. Has killed J.R. after substantial planning and premeditation to cause his death, as charged in Count One, Conspiracy to Commit Kidnapping, and Count Two, Aiding and Abetting Kidnapping Resulting in Death (18 U.S.C. § 3592(c)(9));

I. Intentionally participated in an act against D.T., contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim, D.T., died as a direct result of the act or acts, as charged in Count Five, Conspiracy to Commit Tampering with Witness Causing Death, and Count Six, Aiding and Abetting Tampering with Witness Causing Death (18 U.S.C. 3591(a)(2)(C));

J. Has killed D.T. after substantial planning and premeditation to cause her death, as charged in Count Five, Conspiracy to Commit Tampering with Witness Causing Death (18 U.S.C. § 3592(c)(9));

K. Intentionally participated in an act against H.G., contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim, H.G., died as a direct result as charged in Count Five, Conspiracy to Commit Tampering with Witness Causing Death, and Count Seven, Aiding and Abetting Tampering with Witness Causing Death (18 U.S.C. 3591(a)(2)(C));

L. Has killed H.G. in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim, as charged in Count Seven, Aiding

13

000013

Abetting Tampering with Witness Causing Death (18 U.S.C. § 3592(c)(6));

M. Has killed H.G. after substantial planning and premeditation to cause her death as charged in Count Five, Conspiracy to Commit Tampering with Witness Causing Death, and Count Seven, Aiding and Abetting Tampering with Witness Causing Death (18 U.S.C. § 3592(c)(9));

N. Intentionally killed or attempted to kill more than one person in a single criminal episode, as charged in Count Five, Conspiracy to Commit Tampering with Witness Causing Death, and Counts Six and Seven, Aiding and Abetting Tampering with Witness, D.T. and H.G., Causing Death (18 U.S.C. § 3592(c)(16));

O. Has used a firearm or knowingly directed, advised, authorized, and assisted another to use a firearm to threaten, intimidate, assault, or injure a person, H.G., in furtherance of a continuing criminal enterprise of which the offense was a part, as charged in Count Seven, Aiding and Abetting Tampering with Witness Causing Death (18 U.S.C. § 3292(d)(4));

2. The Grand Jury repeats and realleges the accusations of this Indictment. The Defendant, **DAVID RAY SANFORD, JR.**:

A. Was 18 years of age or older at the time of the commission of the offenses (18 U.S.C. § 1201(a)(1) and 18 U.S.C. 1512(a)(1)(C));

B. Intentionally killed J.R., as charged in Count Two, Aiding and Abetting Kidnapping Resulting in Death (18 U.S.C. § 3591(a)(2)(A));

C. Intentionally inflicted serious bodily injury that resulted in the death of J.R., as charged in Count Two, Aiding and Abetting Kidnapping Resulting in Death (18 U.S.C. §

14

3591(a)(2)(B));

D. Intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim, J.R., died as a direct result of the act or acts, as charged in Count Two, Aiding and Abetting Kidnapping Resulting in Death (18 U.S.C. 3591(a)(2)(C));

E. Intentionally and specifically engaged in an act of violence against J.R. knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim, J.R., died as a result of the act, as charged in Count Two, Aiding and Abetting Kidnapping Resulting in Death (18 U.S.C. § 3591(a)(2)(D));

F. Has caused the death of J.R. during the commission of a violation of 18 U.S.C. § 1201 (Kidnapping), as charged in Count Two, Aiding and Abetting Kidnapping Resulting in Death (18 U.S.C. § 3592(c)(1));

G. Has killed J.R. in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim, as charged in Count Two, Aiding and Abetting Kidnapping Resulting in Death (18 U.S.C. § 3592(c)(6));

H. Has killed J.R. after substantial planning and premeditation to cause his death, as charged in Count One, Conspiracy to Commit Kidnapping, and Count Two, Aiding and Abetting Kidnapping Resulting in Death (18 U.S.C. § 3592(c)(9));

I. Intentionally killed D.T., as charged in Count Six, Aiding and Abetting Tampering with Witness Causing Death (18 U.S.C. § 3591(a)(2)(A));

J. Intentionally participated in an act against D.T., contemplating that the life of a person

15

would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim, D.T., died as a direct result of the act or acts, as charged in Count Five, Conspiracy to Commit Tampering with Witness Causing Death, and Count Six, Aiding and Abetting Tampering with Witness Causing Death (18 U.S.C. 3591(a)(2)(C));

K.  Intentionally and specifically engaged in an act of violence against D.T. knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim, D.T., died as a result of the act, as charged in Count Six, Aiding and Abetting Tampering with Witness Causing Death (18 U.S.C. § 3591(a)(2)(D));

L.  Has killed D.T. after substantial planning and premeditation to cause her death, as charged in Count Five, Conspiracy to Commit Tampering with Witness Causing Death, and Count Six, Aiding and Abetting Tampering with Witness Causing Death (18 U.S.C. § 3592(c)(9));

M.  Intentionally participated in an act against H.G., contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim, H.G., died as a direct result, as charged in Count Seven, Aiding and Abetting Tampering with Witness Causing Death (18 U.S.C. 3591(a)(2)(C));

N.  Has killed H.G. after substantial planning and premeditation to cause her death, as charged in Count Five, Conspiracy to Commit Tampering with Witness Causing Death (18 U.S.C. § 3592(c)(9));

O.  Intentionally killed or attempted to kill more than one person in a single criminal

16

episode, as charged in Count Five, Conspiracy to Commit Tampering with Witness Causing Death, and Counts Six and Seven, Aiding and Abetting Tampering with Witnesses, D.T. and H.G, Causing Death (18 U.S.C. § 3592(c)(16));

3. The Grand Jury repeats and realleges the accusations of this Indictment.  The Defendant, **JEFFREY CRAIG SMITH, JR.**:

A.  Was 18 years of age or older at the time of the commission of the offenses (18 U.S.C. 1512(a)(1)(C));

B.  Has killed D.T. after substantial planning and premeditation to cause her death, as charged in Count Five, Conspiracy to Commit Tampering with Witness Causing Death (18 U.S.C. § 3592(c)(9));

C.  Intentionally participated in an act against H.G., contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim, H.G., died as a direct result, as charged in Count Five, Conspiracy to Commit Tampering with Witness Causing Death, and Count Seven, Aiding and Abetting Tampering with Witness Causing Death (18 U.S.C. 3591(a)(2)(C));

D.  Intentionally and specifically engaged in an act of violence against H.G. knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim, H.G., died as a result of the act, as charged in Count Seven, Aiding and Abetting Tampering with Witness Causing Death (18 U.S.C. § 3591(a)(2)(D));

E.  Has killed H.G. in an especially heinous, cruel, or depraved manner in that it involved

000017

torture or serious physical abuse to the victim, as charged in Count Seven, Aiding

Abetting Tampering with Witness Causing Death (18 U.S.C. § 3592(c)(6));

F. Has killed H.G. after substantial planning and premeditation to cause her death, as

charged in Count Five, Conspiracy to Commit Tampering with Witness Causing Death,

and Count Seven, Aiding and Abetting Tampering with Witness Causing Death (18

U.S.C. § 3592(c)(9));

G. Intentionally killed or attempted to kill more than one person in a single criminal

episode, as charged in Count Five, Conspiracy to Commit Tampering with Witness

Causing Death, and Counts Six and Seven, Aiding and Abetting Tampering with

Witness, D.T. and H.G., Causing Death (18 U.S.C. § 3592(c)(16));

H. Has used a firearm or knowingly directed, advised, authorized, and assisted another to

use a firearm to threaten, intimidate, assault, or injure a person, H.G., in furtherance of

a continuing criminal enterprise of which the offense was a part, as charged in Count

Seven, Aiding and Abetting Tampering with Witness Causing Death (18 U.S.C. §

3292(d)(4));


4. The Grand Jury repeats and realleges the accusations of this Indictment. The Defendant,

**JOHN WESTLEY BLACK, III**:

A. Was 18 years of age or older at the time of the commission of the offenses (18 U.S.C.

§ 1201(a)(1);

B. Intentionally killed J.R., as charged in Count Two, Aiding and Abetting Kidnapping

Resulting in Death (18 U.S.C. § 3591(a)(2)(A));

C. Intentionally inflicted serious bodily injury that resulted in the death of J.R., as charged

18

USCA4 Appeal: 21-4      Doc: 7-2      Filed: 03/19/2021      Pg: 21 of 192

in Count Two, Aiding and Abetting Kidnapping Resulting in Death (18 U.S.C. § 3591(a)(2)(B));

D. Intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim, J.R., died as a direct result of the act or acts, as charged in Count Two, Aiding and Abetting Kidnapping Resulting in Death (18 U.S.C. 3591(a)(2)(C));

E. Intentionally and specifically engaged in an act of violence against J.R. knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim, J.R., died as a result of the act, as charged in Count Two, Aiding and Abetting Kidnapping Resulting in Death (18 U.S.C. § 3591(a)(2)(D));

F. Has caused the death of J.R. during the commission of a violation of 18 U.S.C. § 1201 (Kidnapping), as charged in Count Two, Aiding and Abetting Kidnapping Resulting in Death (18 U.S.C. § 3592(c)(1));

G. Has killed J.R. in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim, as charged in Count Two, Aiding and Abetting Kidnapping Resulting in Death (18 U.S.C. § 3592(c)(6)); and

000019

H.  Has killed J.R. after substantial planning and premeditation to cause his death, as charged in Count One, Conspiracy to Commit Kidnapping, and Count Two, Aiding and Abetting Kidnapping Resulting in Death (18 U.S.C. § 3592(c)(9)).

A True Bill,

 /s/_____
Grand Jury Foreperson
(Signature on File)

/s/_____
WILLIAM J. POWELL
United States Attorney

Kimberley D. Crockett
Assistant United States Attorney

20

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**MARTINSBURG**

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

**v.**                                                    **Criminal No. 3:20CR46-4**

**JOHN WESTLEY BLACK,**

       **Defendant.**

<u>**MOTION FOR DETENTION HEARING**</u>

The United States moves for pretrial detention of defendant pursuant to 18

U.S.C. Section 3142(e) and (f).

1.   Eligibility of Case.   This case is eligible for a detention order because the

case involves (check all that apply):

       \_\_\_\_\_  a crime of violence, a violation of section 1591, or an
       offense listed in section 2332b(g)(5)(B) for which a
       maximum term of imprisonment of 10 years or more is prescribed;

       <u>X</u>\_\_  an offense for which the maximum sentence is life imprisonment or
       death;

       \_\_\_  an offense for which a maximum term of imprisonment of ten years
       or more is prescribed in the Controlled Substances Act (21 U.S.C.
       801 et seq.), the Controlled Substances Import and Export Act (21
       U.S.C. 951 et seq.), or chapter 705 of title 46;

       \_\_\_\_\_  any felony if such person has been convicted of two or more
       offenses described in subparagraphs (A) through (C) of Title 18
       U.S.C. Section 3142(f)(1), or two or more State or local offenses
       that would have been offenses described in subparagraphs (A)
       through (C) of this paragraph if a circumstance giving rise to
       Federal jurisdiction had existed, or a combination of such offenses;
       or

_____ any felony that is not otherwise a crime of violence that involves a minor victim or that involves the possession or use of a firearm or destructive device (as those terms are defined in section 921), or any other dangerous weapon, or involves a failure to register under section 2250 of title 18, United States Code;

___X___ Serious risk defendant will flee;

___X___ Serious risk obstruction of justice

2.   Reason for Detention.   The court should detain defendant because there

are no conditions of release which will reasonably assure (check one or both):

___X___   Defendant's appearance as required

___X___   Safety of any other person and the community

3.   Rebuttable Presumption.

A rebuttable presumption arises that no condition or combination of conditions

will reasonably assure the safety of any other person and the community because:

_____ a) the defendant has been convicted of a Federal offense that is described in Title 18 U.S.C. Section 3142(f)(1), or of a State or local offense that would have been an offense described in subsection (f)(1) of this section if a circumstance giving rise to Federal jurisdiction had existed; b) the offense was committed while the defendant was on release pending trial for a Federal, State, or local offense; and c) a period of not more than five years has elapsed since the date of conviction, or the release of the defendant from imprisonment, for that offense whichever is later.

A rebuttable presumption arises that that no condition or combination of

conditions will reasonably assure the appearance of the person as required and the

safety of the community because the defendant committed:

__   an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46;

_____ an offense under section 924(c), 956(a), or 2332b of this title;

___ an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed;

_____ an offense under chapter 77 of this title for which a maximum term of imprisonment of 20 years or more is prescribed; or

_____ an offense involving a minor victim under section 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425 of this title.

4.  Time for Detention Hearing.   The United States requests the court conduct

the detention hearing

_____  At first appearance

__X__   After continuance of __3__ days (not more than 3)

5.  Other Matters: _____

DATED: November 20, 2020

/s/ Kimberley D. Crockett
Kimberley D. Crockett
Assistant United States Attorney
217 West King Street, Suite 400
Martinsburg, WV   25401
Telephone: (304) 262-0590

000023

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,
                Plaintiff,

v.                                      Criminal No. 3:20CR46-4

JOHN WESTLEY BLACK,
                Defendant.

ORDER OF TEMPORARY DETENTION
PENDING HEARING PURSUANT TO BAIL REFORM ACT

Upon motion of the United States of America, it is

**ORDERED** that a detention hearing be set at the earliest possible time after the

defendant has had an opportunity to confer with counsel.

Pending this hearing, the defendant shall be held in the custody of the United

States Marshal and produced at the hearing.

**DATED:** 11/20/2020

_____
UNITED STATES MAGISTRATE JUDGE

000024

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

 3

 4   United States of America,

 5                      Plaintiff,

 6   vs.                      Criminal Action No. 3:20-cr-46

 7   John Black,

 8                      Defendant.

 9

10          Proceedings had in the Detention Hearing in the

11   above-styled action on January 4, 2021, before the Honorable

12   Robert W. Trumble, Magistrate Judge, at Martinsburg, West

13   Virginia.

14

15   APPEARANCES:

16   On behalf of the United States of America:

17          Mr. Jeffrey A. Finucane
            Assistant United States Attorney
18          United States Attorney's Office
            217 West King Street, Ste. 400
19          Martinsburg, West Virginia 25401

20   On behalf of the defendant:

21          Mr. Nicholas Compton
            Assistant Federal Public Defender
22          Federal Public Defender's Office
            651 Foxcroft, Ste. 202
23          Martinsburg, West Virginia 25401

24   The defendant was present in person.

25   Proceedings reported by means of digital recording; transcript
     produced by official court reporter.
```

2

```
 1   APPEARANCES (Continued)

 2   On behalf of the defendant (by video):

 3           Mr. L. Richard Walker
             Assistant Federal Public Defender
 4           Federal Public Defender's Office
             The Huntington Bank Bldg.
 5           230 W. Pike Street, Ste. 360
             Clarksburg, WV 26302

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

INDEX TO WITNESSES

PAGE

TESTIMONY OF SPECIAL AGENT ELLEN DUFFY

   Direct Examination by Mr. Finucane            6

   Cross Examination by Mr. Walker              11

   Redirect Examination by Mr. Finucane         37

TESTIMONY OF BRENDA BLACK

   Direct Examination by Mr. Walker             44

TESTIMONY OF CHRIS ROEMER

   Direct Examination by Mr. Compton            62

   Cross Examination by Mr. Finucane            67

TESTIMONY OF WALTER PARRISH II

   Direct Examination by Mr. Compton            69

   Cross Examination by Mr. Finucane            73

TESTIMONY OF RICK WOODWARD

   Direct Examination by Mr. Compton            78

   Cross Examination by Mr. Finucane            84

   Redirect Examination by Mr. Compton          86

4

```
1              (Digitally-recorded proceedings in open court.)

2                    (January 4, 2021, 1:34 P.M.)

3                              - - -

4              THE COURT:  Good afternoon, everyone.  Please be

5     seated.

6          All right.  Tara, would you call the case for me, please.

7              THE CLERK:  This is the case of the United States of

8     America versus John Westley Black III, Criminal No. 3:20-cr-46,

9     defendant 4.

10         The Government is represented by counsel, Jeffrey Finucane,

11    Assistant United States Attorney.  The defendant is present in

12    person and by counsel Nicholas Compton and Richard Walker via

13    video.

14         Are the parties ready to proceed?

15             MR. FINUCANE:  The United States is ready.

16             MR. COMPTON:  Mr. Black is ready, Your Honor.

17             THE COURT:  All right.  Good afternoon, everyone.

18    We're scheduled -- the sole matter for this afternoon we're

19    scheduled for is a detention hearing in this matter.  And as an

20    initial issue, I noticed that Mr. Walker is participating by

21    video conferencing.  He's filed a motion and an order that's

22    been entered as to that.  I don't know who else we have

23    participating by video conference, but I'm going to caution you

24    that you're not to -- I'd like you to silence your microphone

25    and mute your microphone, and also there's no reason for you to
```

5

1  participate by video.  You can observe us, but you do not
2  necessarily need to have your video camera on.  So would you
3  please turn off your video camera.  Thank you.
4      Now, I have the video conferencing waiver that appears to
5  be signed by the defendant in this case.
6      Mr. Compton, I'm going to address my questions to you since
7  you're here in the courtroom.  Have you discussed the purpose
8  of this video conferencing waiver with your client?
9              MR. COMPTON:  Yes, Your Honor.
10             THE COURT:  And the purpose of course is to allow
11 your co-counsel, Mr. Walker, to participate by video, and your
12 client has agreed with this; is that correct?
13             MR. COMPTON:  That's correct, Your Honor.
14             THE COURT:  And, Mr. Black, you understand that
15 Mr. Walker is appearing by video today for this hearing.
16 Although you have Mr. Compton in the courtroom with you, you've
17 agreed to allow this hearing to go forward with Mr. Walker
18 participating by video?
19             THE DEFENDANT:  Yes, sir.
20             THE COURT:  And you've signed this video conferencing
21 waiver accordingly; correct?
22             THE DEFENDANT:  Yes, sir.
23             THE COURT:  All right.  I find that the video
24 conferencing waiver has been properly executed and direct that
25 it be filed.

6

1      All right.  The purpose for this hearing today and the sole

2 purpose of this hearing is a detention hearing.  So if the

3 parties are ready to proceed, Mr. Finucane, you may proceed,

4 sir.

5          MR. FINUCANE:  Thank you, Your Honor.  The Government

6 would like to briefly call Agent Duffy to testify.

7      (The witness was sworn in.)

8          MR. FINUCANE:  And, Your Honor, with the Court's

9 permission should we stay here behind --

10          THE COURT:  You can stay.  Just make sure you speak

11 clearly and speak into the microphone so we have a clear

12 record.

13          MR. FINUCANE:  Thank you, Your Honor.

14                    DIRECT EXAMINATION

15 BY MR. FINUCANE:

16 Q.  Good afternoon, Agent Duffy.  This is going to be fairly

17 brief.  Could you introduce yourself -- your name, your current

18 unit of assignment -- to the Court.

19 A.  Ellen Duffy.  I'm a special agent with FBI, and I'm

20 assigned to the Martinsburg Resident Agency of the Pittsburgh

21 Division.

22 Q.  And you are familiar with the indictment as to John Black?

23 A.  Yes, I am.

24 Q.  The indictment in this matter contains nine counts.  Do you

25 understand Counts 1, 2, and 3 are the only counts that relate

1  to John Black; is that right?

2  A.  Yes.

3  Q.  Count 1 charges Mr. Black with conspiracy to commit

4  kidnapping and Count 2 with aiding and abetting kidnapping

5  resulting in death.  Could you explain to the Court the

6  facts -- the facts of the offense as they relate to Mr. Black

7  in these counts?

8  A.  Yes.  Mr. Black, according to our investigation,

9  participated in the beating and kidnapping of Jonathan Riddle.

10 As you've said, kidnapping resulting in death.  According to

11 multiple witnesses that were present at the scene of the

12 beating of Mr. Riddle, Mr. Black kicked and punched Mr. Riddle

13 during the initial assault at the Westminster apartment.

14 Q.  And did the investigation tell you what the reason for the

15 initial assault was?

16 A.  Mr. Riddle, according to our investigation, was in a

17 dispute with a resident of the apartment where the assault

18 occurred over a small amount of drugs.

19 Q.  And was -- and the resident was Monroe Merrell?

20 A.  The resident at the initial beginning of the assault was

21 Heather Grogg.  Monroe Merrell and David Sanford were also

22 present and involved in the assault.

23 Q.  And after the kicking and beating of Mr. Riddle began, what

24 was Mr. Black's -- Mr. Black's role only as it continued?

25 A.  According to one of the witnesses on the scene, Mr. Black

8

1  assisted with restraining Mr. Riddle.  He was tied up and then
2  carried to his vehicle and driven to West Virginia.
3  Q.  And just for the record, how was Mr. Riddle tied?
4  A.  He was restrained with cuttings from a blanket that was on
5  the couch in the apartment.
6  Q.  And were his hands tied together and his feet tied
7  separately?
8  A.  Yes.  He was essentially hog-tied.
9  Q.  And at the time -- you said that Mr. Black assisted in
10 placing Mr. Riddle in the vehicle.  What happened next?
11 A.  Mr. Black rode with Monroe Merrell along with the bound
12 victim in the victim's vehicle.  He was transported to
13 West Virginia where, according to two witnesses on scene,
14 Mr. Black assisted with removing Mr. Riddle from his vehicle
15 and moving him into the woods where his body was lit on fire.
16 Q.  Could you explain to the Court the duration from the time
17 that the assault began until Mr. Riddle's body was lit on fire
18 in the field and where Mr. Black was during that time?
19 A.  The -- we know that the assault was going on in the early
20 morning hours.  Mr. Riddle was texting his mother at 12:41 A.M.
21 on March 18th, and then we know that Mr. Riddle's vehicle
22 passed into West Virginia at 4:05 A.M. and would have continued
23 to the destination where he was set on fire.  And during that
24 transport, Mr. Black was in the victim, Mr. Riddle's, vehicle.
25 Q.  So a duration of at least four hours?

9

```
1   A.   Yes.
2   Q.   You said they arrived to a field; lit Mr. Riddle's body on
3   fire.   Where was Mr. Black at that time?
4   A.   According to the witnesses, he assisted in removing -- he
5   was -- would have assisted in removing Mr. Riddle from the
6   vehicle, and he was standing -- he was seen standing near the
7   flames that were burning on Mr. Riddle's body.
8   Q.   Count 3 of the indictment charges Mr. Black, Mr. Merrell,
9   and Mr. Sanford with aiding and abetting corruption -- I'm
10  sorry -- aiding and abetting corrupt destruction of an object.
11  What are the facts of that charge?
12  A.   After Mr. Riddle's body was set on fire, his vehicle was
13  driven to Maryland and lit on fire in a field where it was
14  later recovered by the Frederick County, Maryland Sheriff's
15  Office.   And, again, the two witnesses on scene described
16  Mr. Black as running with Monroe Merrell from the scene of the
17  burning vehicle back to the other vehicle that was involved in
18  this incident.
19  Q.   After Mr. Black was arrested, was he ever interviewed?
20  A.   Yes, he was.
21  Q.   And do you recall the date of the first time he was
22  interviewed?
23  A.   April 14th.
24  Q.   And during the first time he was interviewed, was he
25  truthful with officers?
```

1  A.  No, he wasn't.

2  Q.  And what was the nature of the untruthfulness?

3  A.  He essentially described a version of the events of the

4  night Mr. Riddle was killed without describing any assault

5  whatsoever and essentially described having a few drinks and

6  leaving the apartment and did not describe any of the events of

7  that night.

8  Q.  And was he interviewed a second time?

9  A.  Yes, he was.

10 Q.  And when was that?

11 A.  April 20th I believe, sir.

12 Q.  And was he truthful at that time?

13 A.  At that time, Mr. Black provided many more details,

14 including stating that he was present at the scene of

15 Mr. Riddle's beating and kidnapping.  However, he contradicted

16 what the other witnesses said about his own involvement and

17 said that his involvement was merely holding the door open

18 essentially as Mr. Riddle was let out of the apartment.

19 Q.  One of the factors the Court should consider under 18, 3141

20 is the weight of the evidence against the defendant.  Could you

21 comment on the weight of the evidence against Mr. Black?

22 A.  As I said, there are three witnesses that were on scene at

23 the time of the assault and kidnapping of Mr. Riddle who

24 described Mr. Black as kicking and punching Mr. Riddle, and

25 those witnesses also did describe much more consistently their

1  own involvement in Mr. Riddle's beating and kidnapping.

2  Q.  And, Agent Duffy, is there anything else that you think the

3  Court needs to know regarding the facts of this case

4  specifically as to Mr. Black?

5  A.  There are some additional factors that the investigation

6  revealed regarding Mr. Black destroying clothing, burning that

7  in his yard, and a few other things; but I'll limit it to that

8  at this point.

9          MR. FINUCANE:  All right.  Thank you, Your Honor.  At

10 this time, the Government has nothing further to offer.

11          THE COURT:  Thank you, Mr. Finucane.

12    Mr. Compton or Mr. Walker, who's -- either one of you going

13 to cross examine?

14     MR. COMPTON:  Mr. Walker is going to handle this.

15          THE COURT:  All right.  Mr. Walker.

16          MR. WALKER:  Yes, Judge.  Thank you very much.  Good

17 afternoon.

18                    CROSS EXAMINATION

19 BY MR. WALKER:

20 Q.  Agent Duffy, can you hear -- let's start out with some

21 basic questions.  Can you see me and can you hear me?

22 A.  Yes, I can.

23 Q.  Excellent.  And we know one another.  We've discussed this

24 case before.  So there's not really a need for me to introduce

25 myself, but you know I represent John Black?

1  A.  Yes, I do.

2  Q.  Okay.  I want to ask you some questions first about the

3  nature and circumstances of the offense.  You explained the

4  basic contours of the Government's investigation against

5  Mr. Black in your testimony; is that right?

6  A.  Yes.

7  Q.  Okay.  And you can tell us that prior to the alleged

8  incident in this case, it's your determination that Mr. Black

9  had no relationship with Mr. Riddle?

10 A.  Correct.

11 Q.  And on the evening of the incident, Mr. Black did not have

12 a plan to meet Mr. Riddle at David Sanford's house?

13 A.  That's correct.

14 Q.  Okay.  Mr. Black didn't know that Mr. Riddle would be at

15 Mr. Sanford's house as far as you could determine?

16 A.  That's correct.

17 Q.  Okay.  Is it accurate to say that Mr. Black did not have a

18 long-standing relationship with Monroe Merrell?

19 A.  That's correct.  It was a relatively brief relationship at

20 that point.

21 Q.  Same goes for the relationship between Mr. Black and

22 Mr. David Sanford?

23 A.  Yes.  That's correct.

24 Q.  Okay.  Would it be accurate to say that they were

25 acquaintances at that point?

1   A.   Yes, I think that would be appropriate.

2   Q.   Okay.  And, you know, the bigger picture here was that on

3   the night -- the night of this incident, Mr. Black -- his

4   original intention was to go to a party with Mr. Merrell,

5   Mr. Sanford, and some others?

6   A.   Yes.

7   Q.   Okay.  Then, in fact, they did go to a party, but prior to

8   this incident?

9   A.   Are you asking if they went to a party, sir?

10  Q.   Yes.  They did go to a party prior to this incident at

11  David Sanford's house?

12  A.   Yes.  That's correct.

13  Q.   Okay.  And John Black was not armed?

14  A.   Not to my knowledge.

15  Q.   Okay.  John Black was not in possession of any controlled

16  substances?

17  A.   I'm not sure.

18  Q.   Oh, you don't know?

19  A.   No.

20  Q.   Okay.  John Black, as far as you could tell, wasn't

21  involved in any other criminal activity that night prior to the

22  fight with Riddle or the attack of Riddle, however you want to

23  characterize it?

24  A.   I believe during the night there may have been some

25  underage drinking and drug use.  I don't know exactly what

1  Mr. Black's role in that was.

2  Q.  Okay.  Certainly you never determined that John Black had

3  an ax to grind with Mr. Riddle?

4  A.  That's correct.

5  Q.  Okay.  Certainly John Black didn't know there would be a

6  fight with Mr. Riddle that night?

7  A.  Prior to arriving at the apartment that's correct.

8  Q.  And emphatically, you know, I would like to know, Mr. Black

9  did not stab Mr. Riddle.

10  A.  I'm sorry.  Are you asking me if he stabbed Mr. Riddle?

11  Q.  Yeah.  Is that right?

12  A.  He told two witnesses that he did stab Riddle.

13  Q.  Now, no witness observed that?

14  A.  That's correct.

15  Q.  Okay.  So that was sort of a statement that was attributed

16  to him after the fact?

17  A.  Yes.  Two witnesses advised that Mr. Black told them that

18  he had stabbed Mr. Riddle.  One witness specifically said that

19  Mr. Black had said he had stabbed him four times.  The other

20  witness didn't identify the number of stab wounds that

21  Mr. Black had done.

22  Q.  Did you find a knife?

23  A.  No.  The knife or knives used during this incident were not

24  recovered.

25  Q.  Okay.  Now, did Mr. Black acquire any of the materials to

15

1  restrain Mr. Riddle?

2  A.  He did not acquire them -- it was a bed sheet that was in

3  the living room that was used.

4  Q.  Okay.  And was it Mr. Black's idea to grab that bed sheet

5  and use it to restrain Mr. Riddle?

6  A.  No.

7  Q.  Okay.  Did Mr. Black acquire a vehicle to transport

8  Mr. Riddle?

9  A.  Mr. Riddle's own vehicle was used, and it was driven by

10  Monroe Merrell.

11  Q.  Okay.  And was that Mr. Black's plan to utilize that

12  vehicle?  Did he introduce that element into this case?

13  A.  I don't know exactly whose idea, sir, but I -- so I just

14  know that it was -- I believe the intention was that victim's

15  vehicle was used so that it would also be able to be destroyed

16  as it ultimately was.

17  Q.  Did Mr. Black possess the keys to Mr. Riddle's vehicle at

18  any point?

19  A.  Not to my knowledge.

20  Q.  Okay.  Did Mr. Black drive Mr. Riddle's car at any point in

21  time?

22  A.  No.  As I said, it was driven by Monroe Merrell.

23  Q.  Okay.  Did Mr. Black have a unique familiarity with the

24  Eastern Panhandle of West Virginia?

25  A.  I don't know, sir.

1   Q.  Did Mr. Black know the country roads and the farmland where
2   Mr. Riddle's body was taken?
3   A.  I don't know.
4   Q.  Okay.  Did you learn whether Mr. Black planned that trip or
5   whether Mr. Black planned or helped plan the trip to
6   West Virginia?
7   A.  No, I don't or I didn't.
8   Q.  Did Mr. -- sure.  Did Mr. Black know that he was at any
9   point in West Virginia or going to West Virginia?
10  A.  I don't know if he knew.
11  Q.  Okay.  Did Mr. Black purchase gasoline to support the trip
12  to West Virginia?
13  A.  Not to my knowledge, no, sir.
14  Q.  Okay.  Did he -- you know, did he purchase gasoline or any
15  other items that were necessary to commit the crime as you have
16  alleged it occurred?
17  A.  No.  I believe the only item that was necessary to be
18  purchased was the gasoline which was purchased by another
19  individual involved in the incident.
20  Q.  Okay.  Now, I want to ask you about some of the questions
21  that you asked Mr. Black during your interviews.  You testified
22  that there were two interviews with Mr. Black?
23  A.  Yes.  One that I was present at and one that colleagues
24  were present at.
25  Q.  Okay.  And you have recordings of both of those

1  interviews?

2  A.  Yes.

3  Q.  Okay.  And of course you permitted me to review those as

4  well; right?

5  A.  Yes.

6  Q.  Okay.  Now, the first interview, was it successful?

7  A.  Could you explain what you mean by that?

8  Q.  Did Mr. Black agree to be interviewed during the first

9  interview?  I mean there was a conversation, but was there an

10 actual interview?

11 A.  There was a brief interview.  I believe it was

12 approximately 20 minutes in length perhaps if I gave a rough

13 estimate.

14 Q.  Did he agree -- did -- was -- did he agree to the interview

15 or was it a conversation about having an interview?  I mean how

16 would you explain that for the judge?  You know what I'm

17 getting at?  Maybe reasonable people could disagree, but could

18 you just explain to the judge how that went and sort of the

19 limitations of it?

20 A.  Yes, I can.  He was placed under arrest and transported to

21 the police station.  At that time, I introduced myself along

22 with a member of the Maryland State Police Homicide Unit.

23 Mr. Black was very upset, emotional.  We suggested that he try

24 to calm himself down.  I then read him Miranda from a form.  He

25 signed and agreed to the Miranda waiver.  A brief interview was

1  conducted.  Like I said, I would doubt it lasted more than 20

2  minutes or so at which time he invoked his right to an

3  attorney, and the interview was concluded.

4  Q.  Okay.  Were you able to ask all the questions that you

5  wanted to ask?

6  A.  No.

7  Q.  Okay.  And a lot of that is because he was upset?

8  A.  No.  I would have -- feel he was sufficiently calm, I would

9  have continued if he had not invoked his constitutional

10  rights --

11  Q.  Okay.

12  A.  -- which we respected.

13  Q.  Okay.  Could we agree it's sort of a partial interview?

14  A.  If you'd like to call it that, yes, sir.  I would have

15  continued if --

16  Q.  Okay.

17  A.  -- there hadn't been other issues.

18  Q.  But that's a fair characterization of it?

19  A.  Yes.

20  Q.  Okay.  Very good.  And during the second interview -- well,

21  you weren't at that second interview, but you'll agree it was

22  much more thorough?

23  A.  It was -- yes, it was.

24  Q.  And Mr. Black had fully collected himself?

25  A.  I don't recall his demeanor during that interview, but

1  several days had passed, yes.

2  Q.  And, you know, he wasn't crying and, you know, outwardly

3  emotional during the second interview like he was during the

4  first?

5  A.  Yes.  That's correct.  Certainly not to the same extent.

6  Q.  Right.  He may have been upset, but he was lucid and could

7  articulate and could answer questions, and it seemed like he

8  was understanding your questions and that kind of thing?

9  A.  Yes.  I wouldn't --

10  Q.  They weren't -- they weren't your questions but the

11  questions that were asked?

12  A.  Yes.

13  Q.  Okay.  And during that interview, the second interview, he

14  provided a version of events?

15  A.  Yes.

16  Q.  Of course that version of events is different from what

17  other witnesses have said; right?

18  A.  Yes, it is.

19  Q.  But it certainly wasn't a full version of what took place?

20  A.  I wouldn't necessarily characterize it as full.

21  Q.  Because you believe that there are some omissions?

22  A.  Yes, I do.

23  Q.  Right.  And I'll get to that.  But during that interview,

24  Mr. Black -- he denied some things, didn't he?

25  A.  Yes.

1   Q.  He denied or at the very least did not agree that he kicked

2   and beat Mr. Riddle in the home of David Sanford?

3   A.  If you're asking me, yes, he did deny those things.

4   Q.  Right.  These are all questions.

5   A.  Okay.

6   Q.  Yeah.  He denied or at least he never agreed that he

7   assisted in restraining Mr. Riddle?

8   A.  That's correct.

9   Q.  Okay.  He was there, but he never agreed, and he did not

10  admit to you that he restrained Mr. Riddle?

11  A.  If you're asking me if that's what his statement to us was

12  that day that's correct.

13  Q.  Right.  He certainly never stated that he stabbed

14  Mr. Riddle at any point in time; right?

15  A.  That's correct.

16  Q.  He never indicated that he had a weapon or had a knife at

17  any point in time; right?

18  A.  Yes.  I can't recall if he was asked that.  If he was

19  carrying a pocketknife.  I don't recall if he was asked that.

20  Q.  Okay.  And finally Mr. Black was questioned about what

21  occurred in Rippon, West Virginia, when the body of Mr. Riddle

22  was removed from the vehicle and placed into the woods; right?

23  He was questioned about that?

24  A.  Yes, he was.

25  Q.  And he flatly denied removing Mr. Riddle's body and

1  assisting with the transportation or carrying of the body into

2  the woods?

3  A.  Yes, he did.

4  Q.  Okay.  And he told you that he was never in the woods with

5  anyone else and certainly didn't inflict any harm or damage on

6  Mr. Riddle's body, much less burn the body in the woods?

7  A.  I believe his statement was that he was standing near the

8  other vehicle that was parked at the scene at the time.

9  Q.  Which we can interpret to mean that he never went into the

10  woods?

11  A.  Yes.

12  Q.  And it was in the woods where the body was burned?

13  A.  Yes.

14  Q.  Okay.  Was there any physical evidence -- footprint for

15  example or DNA evidence that was gathered by your team -- in

16  the woods indicating that Mr. Black could have been in the

17  woods?

18  A.  There were footprint impressions taken and never linked

19  to any pair of shoes.  We did, as I said, learn that clothing

20  and shoes from that day had been burned at Mr. Black's

21  residence.

22  Q.  Mr. Black tell you that?

23  A.  I believe he did.  I know that other witnesses told us

24  that, and I believe -- I'm trying to recall if the source of

25  that was Mr. Black telling us that or if it was overheard on

1  jail phone calls, sir.  I don't recall.

2  Q.  Okay.  But you never sought a search warrant for

3  Mr. Black's home?

4  A.  I did not, sir, no.

5  Q.  Okay.  Any other physical evidence -- was there any other

6  physical evidence that could be used to link Mr. Black to the

7  woods for lack of a better way to explain it?

8  A.  No, sir.

9  Q.  Okay.  Nothing that was -- there was a lot of junk in the

10 woods; right?

11 A.  Could you be more specific?

12 Q.  Yeah.  Right.  I mean there were tools in the woods and

13 other items and garbage, that kind of thing, all through that

14 area; right?

15 A.  There were a number of tools recovered near Mr. Riddle's

16 body, yes.

17 Q.  Okay.  And nothing about the tools or any of the garbage or

18 any other items that were in the woods linked up with Mr. Black

19 specifically?

20 A.  That's correct.

21 Q.  Okay.  There was also a farm fence, a barbed wire fence,

22 between the road and the wooded area where Mr. Riddle's body

23 was recovered; right?

24 A.  Yes.

25 Q.  So the fence was intact when law enforcement responded to

1    that crime scene; right?
2    A.   The fence was -- it's -- as you said, it was a wire fence.
3    Q.   Right.
4    A.   And I believe there was a section that was bent.  I don't
5    know that it was cut per se.
6    Q.   Right.  Right.  So there was a bent portion of the fence,
7    and your investigators determined that it was near that bent
8    portion of the fence that the body was carried and brought into
9    the woods.  You have to go over the fence to get into the
10   woods; right?
11   A.   Yes, I believe so.  I wasn't present at the scene that day,
12   but I believe that's a fair description.
13   Q.   And you've seen pictures?
14   A.   Yes, I have.
15   Q.   Okay.  Now today if you go there, the fence is there;
16   right?
17   A.   I haven't been there recently, sir.
18   Q.   Okay.  But you do know that whatever fence existed was --
19   had been altered by law enforcement so that portions of the
20   fence, the barbed wire, could be retained by law enforcement,
21   inspected, and tested; right?
22   A.   Yes.
23   Q.   So if the fence is still there today -- which I'll just
24   proffer that a couple months ago I went there, okay, with
25   Mr. Compton.  The fence is still there, but there's a portion,

1   about a foot or two, that's cut; right?

2   A.  A portion of the fence was removed by law enforcement for

3   analysis.

4   Q.  Right.  So has that portion of the fence been analyzed?

5   A.  I'm trying to recall the exact details of the lab report

6   from the state police.  I believe it has, and I believe it had

7   Mr. Riddle's blood on it.

8   Q.  Okay.  Did it --

9   A.  However, I'm --

10  Q.  Was it --

11  A.  I'm just going to say I'm trying from memory.  There were

12  numerous items analyzed, and that's the best I can recall,

13  sir.

14  Q.  Fair enough.  Has there been any indication that

15  Mr. Black's DNA or any fibers from any clothing belonging to

16  Mr. Black were on that fence, that barbed wire fence?

17  A.  No.  The only DNA results in this case have contained

18  multiple profiles of DNA that could not be distinguished from

19  each other.

20  Q.  Okay.  And I just asked that because when you go over a

21  barbed wire fence, you touch it sometimes.  You could touch it;

22  right?

23  A.  If you were to go over it or through it, I do think you

24  would touch it, yes.

25  Q.  Just based on the height of it and the distance between the

1  lines of barbed wire.  And naturally if it's a metal object, it

2  has sharp edges on it, it's very possible that DNA can be left

3  on there.  Someone could cut them -- cut theirselves on the

4  fence.  Maybe not badly, but just in the process of crossing

5  that fence it's possible someone could be cut.

6  A.  I'm sorry.  Could you rephrase that, sir?

7  Q.  You would be surprised to find some DNA on the pieces of

8  the fence where the body was carried?

9  A.  Did you say I would not?  I'm sorry.  I couldn't really

10  hear you, sir.  Did you ask me if I would not be surprised?

11  Q.  Right.

12  A.  I would not have been surprised had we found it.  I'm not

13  surprised we didn't either.

14  Q.  Okay.  Okay.  Now, you testified about -- and by the way,

15  I'm not going to ask you to identify any witnesses here.  Okay.

16  But I do want to ask you about the weight of the evidence.  And

17  you testified that there were multiple witnesses who observed

18  Mr. Black involved in aspects of this offense or aspects of

19  these offenses.

20  A.  Yes.

21  Q.  Okay.  When you say multiple, how many -- how many

22  witnesses -- how many eyewitnesses are you relying upon in

23  order to develop and further this investigation, this

24  prosecution?

25  A.  Eyewitnesses to Mr. Riddle's beating and kidnapping?

1  Q.  To Mr. Black's conduct -- alleged conduct.  Yeah, I mean

2  basically we're talking about the same thing here, but how many

3  eyewitnesses to that incident in Sanford's home?  Let's start

4  there.

5  A.  Three eyewitness to that incident, sir.

6  Q.  Okay.  And these individuals, are they related to

7  Mr. Black?

8  A.  Not to my knowledge.  Biologically related, sir?

9  Q.  Yeah.  By family or biologically?

10  A.  No, not to my knowledge, sir.

11  Q.  Okay.  Do any of these three witnesses have any

12  relationship with Mr. Black?

13  A.  Prior friends of Mr. Black's.

14  Q.  So of the three, how many were friends with Mr. Black?

15  A.  Two.

16  Q.  Okay.  And were any of the witnesses -- did any of the

17  witnesses have a relationship to any of the other defendants

18  charged in the indictment?

19          MR. FINUCANE:  Your Honor, at this point, we'd like

20  to object.  I think we're just starting to guess for who the

21  names are.  I don't know how the relevance to a detention

22  hearing of the question.

23          THE COURT:  Mr. Walker, this is a detention hearing.

24  And there's been a great deal of latitude that's been given

25  thus far as to your line of questions.  I understand the

1  purpose of your question is to determine the weight of the

2  evidence, but to the extent that we get into issues that aren't

3  necessary for the Court's determination as to detention, which

4  is specifically the purpose for this hearing, I'm going to ask

5  you to move along with your questioning, please.

6          MR. WALKER:  Judge, may I make a proffer for the

7  purposes of the record -- I would like to ask these questions.

8  I will respect the Court's ruling, but I would like to make a

9  proffer as to what I think the answers to my questions would be

10 in the event that this is later reviewed by another court.

11         THE COURT:  Certainly.  You may make a proffer.  You

12 also have the opportunity to present whatever evidence and

13 witnesses that you'd like to present, Mr. Walker.

14         MR. WALKER:  Okay.  Judge, I believe that the agent

15 would testify in response to these questions that two of the

16 known eyewitnesses were friends with Mr. Black.  One of those

17 two witnesses was a brother of one of the defendants in the

18 indictment.  The third witness in this case, who has been

19 mentioned at the home of Sanford, did not have any relationship

20 with Mr. Black of any significance and was the significant

21 other of Mr. Sanford and the mother of Mr. Sanford's children.

22 So I'll leave it at that, Judge.

23         THE COURT:  All right.  Thank you, Mr. Walker.

24         MR. WALKER:  Of course, Judge.

25 BY MR. WALKER:

28

1   Q.   Now, Agent Duffy, were these witnesses drug users?

2   A.   Do you mean have -- like have they ever used drugs or

3   regular drug users?

4   Q.   Well, let's start with did any of these witnesses ever use

5   drugs?

6   A.   Yes.

7   Q.   Okay.  All three of them?

8   A.   I would say so, sir.

9   Q.   Okay.  And were any of the witnesses regular drug users?

10  And when I say drug, I mean users of an illegal substance.

11  A.   Yes.

12  Q.   Okay.  And what kinds of drugs did they use?

13  A.   I'm thinking of marijuana and marijuana wax, sir.

14  Q.   Okay.  Is -- I honestly do not know the answer to this

15  question.  Is marijuana for recreational use legal in the state

16  of Maryland?

17  A.   The manner in which the people involved were using drugs

18  was not legal, sir.

19  Q.   I understand.  So they didn't have a prescription for

20  marijuana for example?

21  A.   I don't know the details, sir, of who had what, but I'm

22  just saying, to answer your question, I believe there was some

23  illegal drug use among those three people.

24  Q.   Okay.  Okay.  Illicit.  All right.  Now, were they -- were

25  any of those three witnesses using drugs on the night of the

1  incident with Mr. Riddle at Sanford's home?

2  A.  I'm doing my best to recall, sir.  I believe they

3  described -- may have described smoking marijuana that evening,

4  but I'm not certain.

5  Q.  Were they drunk?

6  A.  At least two described specifically not being drunk.  I

7  don't believe --

8  Q.  They had been to --

9  A.  I don't believe any of those three were drunk, no.

10 Q.  Okay.  But they had been to a party, and they were drinking

11 that night?  Two of them at least had been to a party or all

12 three?  You tell me.

13 A.  Yes.  All three, along with Mr. Black, had gone to the

14 party.

15 Q.  And they were drinking at the party?

16 A.  That -- yes, sir.

17 Q.  Okay.  Now, were these three witnesses -- any of these

18 three witnesses, were they known to law enforcement prior to

19 this incident?

20 A.  Could you explain that?  I'm not sure how to answer your

21 question.

22 Q.  Had any of these three witnesses who were at Sanford's

23 house, had they provided reliable information to law

24 enforcement in the past?

25 A.  Not to my knowledge.

1  Q.  Okay.  Did law enforcement or did you know anything about

2  them?  I mean did you look into their background?  Have you

3  vetted these people?

4  A.  I'm sorry.  Are you asking if I've looked into them since

5  the time of this case?

6  Q.  You didn't know about them prior to this incident?  They

7  weren't --

8  A.  That's --

9  Q.  -- on your radar?

10  A.  That's correct, sir.

11  Q.  Okay.  Without giving me a lot of details -- it's not

12  necessary -- do they have criminal histories?

13  A.  I don't believe so.  I'm struggling to recall specifically

14  of one.  However, if that person does, it was relatively minor

15  criminal history.

16  Q.  Okay.  And did they make any statements to you that were

17  inconsistent with their ultimate interviews?  I mean did they

18  ever contradict themselves and give you reason to doubt their

19  credibility?

20  A.  I'm trying to answer for all three.  One -- nothing that

21  they ultimately provided led me not to believe their

22  credibility.  Two of the witnesses -- one witness initially

23  provided a very brief non-truthful statement prior to their

24  cooperation, and the other provided or maybe omitted a few

25  things early in an interview which by the end of the interview,

1  they had been entirely truthful about.

2  Q.  Okay.  Okay.  Now, were all three of these witnesses -- did

3  they admit to being involved in the assault and kidnapping of

4  Mr. Riddle?

5  A.  It depends what you mean by involved, sir.  I'm not sure

6  how to answer that question.

7  Q.  Okay.  Did any of the three witnesses, based on your

8  investigation, punch or kick Mr. Riddle?

9  A.  Yes.  And they did -- they did make those statements

10 regarding themselves.

11 Q.  Okay.

12 A.  Two of the witnesses.

13 Q.  Okay.  The two juveniles?

14        MR. FINUCANE:  Just object for the record, Your

15 Honor.  It's just another -- it's an unnecessary identifying

16 statement.  It doesn't matter.  But I would say that I -- we

17 would object just for the record.

18        THE COURT:  All right, Mr. Walker.  There's been an

19 objection.  Is it necessary to identify who these

20 individuals -- we're not going to identify who these

21 individuals are at this time.  You've already indicated that,

22 and the Court is going to hold to that.  So let's move along

23 with your questions.  This is a detention hearing.  Let me

24 remind the parties of that again.  This is not the trial today

25 so move along, please.

1            MR. WALKER:  No problem, Judge.  I will say that our

2   position -- to place this into a little bit of context, Judge,

3   our position is that the weight of the evidence is a critical

4   factor in the Court's review today.  I don't think there's a

5   dispute about that between the parties.  And it's my intention,

6   as you probably have gathered, to probe that and allow the

7   Court to have a full understanding of the weight of the

8   evidence and obviously make the necessary record.  So that's

9   just if you're wondering where I'm going with this and the

10  purpose behind my questions.  But it doesn't matter.  I won't

11  try to identify -- I know who the witnesses are.  We all know

12  who the witnesses are, but I'm not identifying them just

13  because it's not necessary today.  Sort of as a courtesy I

14  think to the Government and to those individuals.

15  BY MR. WALKER:

16  Q.  Well, let me ask you, Agent Duffy, are you aware or have

17  you determined that any of the three witnesses suffer from a

18  mental health disorder?

19            MR. FINUCANE:  Your Honor, we object.  Is this

20  necessary?

21            THE COURT:  Mr. Walker, is the purpose of the

22  question concerning someone's mental health conditions?

23            MR. WALKER:  The purpose of the question is to

24  determine the credibility of the eyewitnesses and if any of the

25  witnesses suffer from a major mental illness or were at the

1  time suffering from the effects of a major mental illness.  And

2  it's our position that potentially that could have a bearing on

3  credibility which in turn can help the Court assess the weight

4  of the evidence.  So we just want to know about that.

5           MR. FINUCANE:  Your Honor, it's such a broad question

6  that encompasses so many --

7           THE COURT:  I'm going to sustain the objection.

8  Let's move along.

9           MR. WALKER:  Okay.

10 BY MR. WALKER:

11 Q.  So, Agent Duffy, the three witnesses are all now

12 cooperating with the Government?

13 A.  Yes.

14 Q.  Okay.  And none of those witnesses have been indicted or

15 charged?

16          MR. FINUCANE:  Objection, Your Honor.

17          THE COURT:  What's the objection, Mr. Finucane?

18          MR. FINUCANE:  That's the Government's purview.  It's

19 not Agent Duffy's whether they're going to be charged or will

20 be charged.

21          THE COURT:  I didn't think they asked that.  They've

22 asked whether they've been charged.  She should be able to

23 answer whether they've been charged or not.

24          MR. FINUCANE:  Understood.

25          THE COURT:  Go ahead, Mr. Walker.  Proceed please.

1  BY MR. WALKER:

2  Q.  Any of the three eyewitnesses been charged?

3  A.  No, they have not.

4  Q.  Okay.

5          MR. WALKER:  Just one moment, please.

6  BY MR. WALKER:

7  Q.  Okay.  One of the eyewitnesses never came to West Virginia;

8  is that right?

9  A.  Do you mean during the course of the incident that --

10 Q.  Right.

11 A.  -- we're talking about?

12 Q.  Right.  Of course.

13 A.  Other than to attend the party.  That's correct.

14 Q.  Okay.  So after the party -- so the Court could understand,

15 it's true that the party that this group went to was in

16 West Virginia?

17 A.  Yes.  That's correct.

18 Q.  And then maybe you explained this during your testimony.

19 The group went to David Sanford's house in Maryland after the

20 party?

21 A.  That is correct.

22 Q.  Okay.  And then of course there's another trip to

23 West Virginia after the fight with Riddle where his body is

24 transported to this wooded area next to a farm field in Rippon,

25 West Virginia, which is in the Eastern Panhandle; right?

```
1  A.  Yes.
2  Q.  So the three -- my question is, of the three eyewitnesses
3  who were at Sanford's house, only two of those eyewitnesses
4  left Sanford's house and went with others to West Virginia?
5  A.  Yes.  That's correct.
6  Q.  Okay.  What did the eyewitness do who remained at the
7  residence?  What was the role there?
8          MR. FINUCANE:  Your Honor, object only to the extent
9  I'm not sure I understand the question.
10         THE COURT:  All right.  Mr. Walker, would you
11  rephrase the question, please.
12         MR. WALKER:  Okay.
13 BY MR. WALKER:
14 Q.  Two of the witnesses went to West Virginia with the body
15 and others -- of Mr. Riddle -- and one witness stayed --
16 remained at the residence?
17 A.  Yes.  The witness began cleaning the apartment and
18 eventually went to bed.
19 Q.  Okay.  You say cleaned the apartment.  Because there was
20 blood and evidence of this fight?
21 A.  I -- yes, there was.
22 Q.  Okay.  Were there drugs there as well that she discarded or
23 he or she discarded?
24 A.  I believe there were drugs at the apartment.  I don't know
25 that that person discarded them.
```

1  Q.  Okay.  Okay.  Did this all start over some dispute about
2  drugs?
3  A.  Yes, it did.
4  Q.  Okay.  Why don't you tell the Court a little bit about that
5  just so we understand how -- maybe I should have started asking
6  that or would be good to know in the beginning.  Tell us what
7  was the problem with drugs?
8  A.  As I stated, there was a dispute over a small quantity of
9  drugs or money for drugs.
10  Q.  And who was involved in that dispute?  Who were the
11  stakeholders in the drugs and the money?
12  A.  The drug -- according to our investigation, the drugs had
13  been supplied to Heather Grogg by Monroe Merrell and David
14  Sanford for sale to Mr. Riddle.
15  Q.  And what went wrong?
16  A.  Either a small amount of drugs was stolen by Mr. Riddle or
17  he was short a small amount of money to pay for drugs.
18  Q.  Okay.  And Mr. Black didn't have anything to do with that
19  drug deal?
20  A.  That's correct.
21  Q.  Other than be around?
22  A.  That's correct.
23  Q.  Okay.
24       MR. WALKER:  I don't have any further questions.
25  Thank you very much, Agent Duffy.

```
 1              THE COURT:  Mr. Finucane, any redirect?
 2              MR. FINUCANE:  Very briefly.
 3              THE COURT:  All right, sir.  Go ahead.
 4                     REDIRECT EXAMINATION
 5  BY MR. FINUCANE:
 6  Q.  Just to clarify, Agent Duffy, on cross examination you were
 7  asked a couple of questions about the two cars being driven
 8  from Westminster to Rippon, West Virginia.  The first car you
 9  said Monroe Merrell was driving; correct?  And that's --
10  A.  The victim's car.
11  Q.  That's Jonathan Riddle's car.  Who else was in the car?
12  A.  Mr. Black and Mr. Riddle.
13  Q.  And that's everybody else that was in the vehicle?
14  A.  In that vehicle, yes.
15  Q.  Okay.
16              MR. FINUCANE:  I have nothing else, Your Honor.
17              THE COURT:  Any cross examination -- any
18  additional --
19              MR. WALKER:  No, sir.
20              THE COURT:  -- cross examination?
21              MR. WALKER:  No, sir.  Thank you.
22              THE COURT:  All right.  Anything further with this
23  witness?
24              MR. FINUCANE:  No thank you, Your Honor.
25              THE COURT:  You may step down.  Thank you.
```

1          THE WITNESS:  Thank you.

2      (Witness excused.)

3          THE COURT:  Mr. Finucane, any additional witnesses or

4    evidence that you'd like to present?

5          MR. FINUCANE:  Only that the Government would proffer

6    the contents of the pretrial services report and that would be

7    it.

8          THE COURT:  Okay.  Anything --

9          MR. WALKER:  May --

10          THE COURT:  Go ahead.

11          MR. WALKER:  May I respond to that, Judge?

12          THE COURT:  Yeah.  Mr. Walker, the Government has

13    proffered the contents of the pretrial services report.

14    Ms. Beasley is in the courtroom should you choose to inquire.

15    You may inquire of her or you may respond to the proffer as to

16    the pretrial services report at this time.

17          MR. WALKER:  Judge, may I reserve the right to do

18    that toward the end of the hearing?  I would like to take one

19    last look at the report.  I would say factually it's in line

20    with our view of his background, but of course we disagreed

21    with the recommendations.  But I would like another opportunity

22    to just -- I haven't had a chance to talk with Mr. Black about

23    that.  I haven't had -- logistically haven't been able to

24    confer with Mr. Compton about the report.  So could I just have

25    a few minutes toward the end of the hearing just to touch base

1   with Mr. Compton before we respond to the report and that

2   proffer?

3           THE COURT:  Well, the way I like to do this,

4   Mr. Walker, is to allow you to respond to the Government's

5   proffer at this time.  So what I'll do is I'll give you a brief

6   recess of ten minutes in order to review that so that you're

7   prepared to make any response to the proffer.  And after you've

8   done that, then if you have any witnesses or evidence that

9   you'd like to present that you can do that if the Government

10  has completed their case.

11          MR. WALKER:  Thank you, Judge.  I've read it.  I've

12  read it.  But like I said, I would like to confer with

13  Mr. Compton before --

14          THE COURT:  All right.  You'll get -- you have ten

15  minutes.  We'll take a recess for ten minutes, and we'll come

16  back.

17          MR. WALKER:  Thank you, Judge.

18      (Recess 2:28 P.M. - 2:37 P.M.)

19          THE COURT:  All right.  Thank you.  Please be seated.

20      All right.  We'll go back on the record.  Mr. Walker,

21  before we took the recess, you'd indicated that you needed an

22  opportunity to review the pretrial services report and discuss

23  it with your client and with your co-counsel.  Have you had an

24  opportunity to do that, sir?

25          MR. COMPTON:  I don't know if he can hear --

```
1            THE COURT:  Mr. Walker?

2            MR. WALKER:  Yes, sir.

3            THE COURT:  I just indicated --

4            MR. WALKER:  Yes, sir.

5            THE COURT:  -- before we took the recess, you

6   indicated that you'd not had an opportunity or requested an

7   opportunity or maybe had not had an opportunity to discuss the

8   pretrial services report with your client or with your

9   co-counsel.  Have you now had an opportunity to do that, sir?

10           MR. WALKER:  Yes, sir.  Thank you.

11           THE COURT:  Are you prepared to respond to the

12  Government's proffer of the pretrial services report at this

13  time?

14           MR. WALKER:  Yes, sir.

15           THE COURT:  All right.  Please proceed.

16           MR. WALKER:  Judge, we do not disagree -- we agreed

17  that it would be appropriate to proceed by proffer with respect

18  to paragraphs 1 through 4 of the pretrial services report.  We

19  do not agree with paragraph 5 and 6.  Our reasoning is probably

20  evident by now, but I will just briefly state that as to

21  paragraph 5, the pending charge where active warrant is

22  referenced, Judge, for your information, is a charge in

23  Maryland for a related case.  Essentially this case.  So I

24  don't want there to be a misunderstanding or for the Court to

25  believe that there's another case out there against Mr. Black.
```

1   The pending charge/active warrant as set forth in paragraph
2   number 5, based on the information we've received from the
3   prosecutor's office in Carroll County, Maryland, is a related
4   state charge and encompasses the same conduct that could be
5   charged in the state of Maryland.
6       Of course, I think our witnesses will probably address the
7   substance abuse history and the mental health history.  While
8   we don't disagree with the diagnosis and while we don't
9   disagree with the fact that Mr. Black has regularly used
10  marijuana, what the report fails to indicate is that we have
11  plans and the family has planned to coordinate treatment for
12  Mr. Black.  And that's something that the family has agreed to
13  do.  It's something that our office has a lot of experience
14  with.  We've already recruited a member of our staff who has
15  background and has a lot of experience connecting our clients
16  with mental health professionals and drug treatment
17  professionals in this district and in other districts.  So
18  that's something that we would like to add.  And, of course, we
19  can develop that through our witnesses, but that would be a
20  counter-proffer.
21      His mental health history clearly does not make him
22  dangerous.  He suffers from ADHD.  I've referenced that some in
23  my other pleadings.  It's hard for him to process information
24  and focus, but he doesn't have any history of erratic behavior
25  or any kind of crisis because of his ADHD.

1      Paragraph 6, we agree that the nature of the instant

2    offense is very serious.  It's a violent offense, and the

3    person died.  So we don't disagree with that.  We do question

4    the weight of the evidence as I previously indicated, and we do

5    take the position that Mr. Black, even as it is alleged by the

6    Government, had a minor role in Counts 1, 2, and 3.

7      Mr. Black's history and prior criminal history that's

8    referenced in paragraph number 6, all of his prior criminal

9    history was dismissed.  It was never prosecuted.  He doesn't

10    even have a misdemeanor conviction on his record.  And, again,

11    the fugitive warrant and the pending case in Maryland that all

12    relates to this particular case as it's being addressed in

13    state court.  That's our understanding of it.

14      He doesn't have a particularly violent history at all.  In

15    fact, I think the only prior act of violence involved a very

16    unusual situation where an individual attempted to burn down

17    the apartment building where Mr. Black was living at the time,

18    and Mr. Black, prior to the fire developing, actually saved one

19    of the other residents and helped the other resident get out of

20    the house before the fire started.  And, you know, it is true,

21    Judge, that while law enforcement was responding and, you know,

22    the individuals are outside of the home concerned and reacting

23    to this fire, Mr. Black saw the person who tried to start the

24    fire, and Mr. Black punched that person.  You know, that

25    doesn't happen every day.  It was a very stressful situation.

1  He was a young person at the time.  There was no serious injury

2  or anything like that.  It was very impulsive.  That's the only

3  prior history of violence we have in this case, Judge.

4      So that's my response and my counter-proffer as it relates

5  to the bond report.  Otherwise, I do agree that there's a lot

6  of good information in there, and the probation officer worked

7  hard on it.  Thank you.

8          THE COURT:  All right.  Thank you.  Mr. Finucane.

9          MR. FINUCANE:  Your Honor, the point of the

10  proceeding that I understand us to be at was that we're just

11  considering the proffer -- whether the Court would consider it.

12  To the extent that's a counter-proffer, we don't have --

13  there's no objection whatsoever to that being introduced as a

14  counter-proffer -- the report.  Whether the Court accepts the

15  conclusions of probation or not, I think it's not relevant to

16  just whether it's being properly proffered to the Court as what

17  the probation officer is saying.  And all we're doing is

18  relaying the report from the probation officer to the Court as

19  a proffer rather than having Ms. Beasley sit there and just

20  read the entire report to the Court.

21      For one clarification, Mr. Walker is correct about the

22  conviction in above paragraph 5.  The pending warrant detainer

23  is the same underlying set of facts.  It just hasn't been

24  resolved in the state of Maryland.  They refer to it as a

25  kidnapping.  This is the same case.  So that's correct.  And to

1  the extent that's not clear in the report, we don't have a

2  problem with the Court considering that for what it's worth.

3          THE COURT:  All right.  Thank you, Mr. Finucane.  Any

4  additional witnesses or evidence that the Government would like

5  to present?

6          MR. FINUCANE:  No, Your Honor.

7          THE COURT:  All right, Mr. Walker, does the defendant

8  have any witnesses or evidence that you'd like to present on

9  behalf of the defendant as it relates to detention?

10          MR. WALKER:  Yes, sir.  We have several friends and

11  family present today.  And I would first like to call Brenda

12  Black as a witness.  That's Mr. Black's mother.

13      (The witness was sworn in.)

14          THE CLERK:  Okay.  If you'll follow me.  Please just

15  wait right here while I wipe this down.

16          THE COURT:  Mr. Walker, you may proceed.

17          MR. WALKER:  Thank you.

18                    DIRECT EXAMINATION

19  BY MR. WALKER:

20  Q.  Hi Brenda.  It's Richard Walker.  Can you hear me and can

21  you see me?

22  A.  Yes, sir.

23  Q.  Okay.  How are you doing today, ma'am?

24  A.  I'm doing fine.

25  Q.  Okay.  Now, we know each other?

```
 1  A.  Yes, sir.
 2  Q.  We've talked a little bit about this case.  I'm going to
 3  first ask you some questions about John and his connection to
 4  your community in Carroll County, Maryland.
 5  A.  Yes, sir.
 6  Q.  What town do you live in with your family?
 7  A.  Taneytown, Maryland, in Carroll County.
 8  Q.  And how long have you lived there?
 9  A.  Since I got married so it will be 24 years.
10  Q.  Okay.  And is your husband there in court with you?
11  A.  Yes, he is.
12  Q.  And that's John's dad; right?
13  A.  Correct.
14  Q.  Also known as John Black?
15  A.  Junior, yes.  Uh-huh.
16  Q.  Okay.  How far away is Taneytown, Maryland?
17  A.  From here?
18  Q.  Yeah.
19  A.  An hour and 12 minutes.
20  Q.  Okay.  And can you describe the town for the judge?  It's
21  possible that none of us have ever been there.
22  A.  Well, it's a small town.  Don't have very many street
23  lights and don't have very many stores.  I wish there was a
24  Walmart.  But it's small, and it has its problems.  There's
25  some people in there that -- some people in the town that don't
```

1  like the law I guess.  I guess you can say that.  But the

2  police officers are really nice there.  Officer (indiscernible)

3  my children since they were born.  He -- they took his

4  bicycling class.  Safety.  There's a lot of other police

5  officers there that have been very nice, and they know my son

6  very well.  The neighbors that we have --

7  Q.  Was your son --

8  A.  -- are nice.

9  Q.  I want to ask you about the neighbors, but was your son --

10  was John born and raised in Taneytown?

11  A.  Yes, sir.

12  Q.  Okay.  And how many other children do you have?

13  A.  One other.  A daughter.

14  Q.  What's her name?

15  A.  Bethany Iron (spelled phonetically) Black.

16  Q.  And how old is she?

17  A.  She's 20.

18  Q.  Okay.  Were both children raised in the same home?  Tell us

19  a little bit about what it was like for John growing up and how

20  your family did.

21  A.  Yes, they both were raised in the same home, and they loved

22  each other very much to the point where Iron (spelled

23  phonetically) -- I call my daughter Iron.  I'm sorry.  Johnny

24  always thought Iron was her baby -- his baby, not mine ever

25  since she was born.  And she was -- he was very loving and

1  caring.  Helped out with her growing up.  Helped us teach her

2  how to walk and stuff like that.  He has a heart.  We always

3  went camping every year to Yellowstone -- Jellystone Park.  And

4  we did a lot of activities.  They both were in T-ball together

5  in Carroll County.  Johnny did it for two years.  My daughter

6  did it for one year.  They both had karate classes and

7  kickboxing classes.  They were involved -- they were very

8  involved in the church where Johnny was the only boy in dance

9  class one time, and they -- and he portrayed Jesus in that

10  play.

11  Q.  What church does your family attend in Taneytown?

12  A.  Bethel Assembly of God in Littlestown, PA, which is only

13  about six minutes away from our house.

14  Q.  I see.  And how long have you and your family members been

15  members of that church?

16  A.  Since August of 2003.

17  Q.  Okay.

18  A.  Two.

19  Q.  Okay.  So how -- tell us about employment.  I mean how did

20  you support your family?  What was the arrangement?  Who was

21  working?  What kind of work did you do?

22  A.  My husband worked mostly.  I did some nursing for a while

23  until I had a seizure at work.  And I had to be let go because

24  I was a CMA/CMT, and I was certified to give out medicines and

25  work with the handicapped.  And I took care of my children at

 1  the same time.  So I made sure I made it to every one of my
 2  son's IEP meetings.  He was in special ed from kindergarten up
 3  through 12th grade.  He was in a program called the BEST
 4  Program which was a very good program.
 5  Q.  Tell us a little -- tell us a little bit about his
 6  education.  How did it -- how was it?
 7  A.  It was very good.  With Head Start he was -- he loved Head
 8  Start.  He worked -- they showed him how butterflies develop
 9  and everything.  He got to let butterflies go.  And then in
10  kindergarten he had a little bit of problem, and that's when
11  they decided to put him in a special program.  And that's when
12  they diagnosed him with ADHD, and they put him in the BEST
13  Program because he needed some one-on-one attention and stuff.
14  But he's very good with his hands.  They did some incentives
15  with him.  He had a picture he drew in third grade that was in
16  the children's museum.
17  Q.  Okay.
18  A.  It was a picture of a little old woman and man on a farm
19  with pitchfork.  And --
20  Q.  Excellent.
21  A.  -- in eighth grade, he made a cat out of a piece of wire
22  that was also in the children's museum.  In 12th grade he was
23  in vo-tech where he learned how to do video productions, and he
24  was very good at it.  He had -- that was the first time he ever
25  got straight A's in a class.  He was very good with that.  As

1  long as he's working with his hands and somebody works with

2  him, he's very good at it.  And he had a big brother at our

3  church named Rick, and he --

4  Q.  Before we get to Rick, Brenda, did he grad -- did John

5  graduate from high school in Taneytown?

6  A.  Yes, he did.  Yes, he did.  He graduated from

7  Westminster --

8  Q.  And which --

9  A.  -- High School rather --

10  Q.  Okay.

11  A.  -- because that's where the BEST Program was.

12  Q.  Okay.  And his trade -- did he learn a specific trade in

13  the vocational school there?

14  A.  Yeah.  Video productions.

15  Q.  Okay.  Now, what kind of work has he done and what do you

16  think -- if he's released, what do you think he can do?

17  A.  When he first graduated from high school, he worked at

18  Random House which is a book factory I guess you'd call it.

19  It's a warehouse where they do books and stuff.  Publish books.

20  That's what it's called.

21  Q.  Okay.  And your husband works there?

22  A.  And my husband works there, yes.  And he worked the same

23  shift as my husband.  And he did very well for a while there,

24  but then he wasn't used to change.  He was going from school to

25  work, and he wasn't used to that so he didn't stay there very

1   long.  And then he worked at an egg farm, and he worked at

2   McDonald's just before he went to jail.  He was working there.

3   I think there was one other --

4   Q.  Did he --

5   A.  -- place he worked at.

6   Q.  Did he like to work?

7   A.  He liked the fact of making money.  He liked to work, yeah.

8   He's pretty much -- he likes jobs where he has to work with his

9   hands though.  And I think that's --

10  Q.  Okay.

11  A.  -- why he told me he wanted to go back to school to finish

12  video productions.

13  Q.  Okay.  Now, what about job opportunities in your area?  I

14  mean you're familiar with that community.  It's a rural county;

15  right?

16  A.  Yeah.

17  Q.  It's a -- but there are job opportunities there?  Can you

18  tell the judge a little bit about that, please?

19  A.  Yeah, there are a lot of job opportunities.  Matter of

20  fact, he has two jobs that he may be getting when he comes

21  home.  One is with our landlord in fixing up apartments and

22  stuff like that and cleaning them up and getting them ready for

23  the next tenants.  And --

24  Q.  Now, have you had a conversation with your landlord or has

25  anyone in the family had a conversation with your landlord

1  about that possibility?

2  A.  Yes.  Both my husband and I and my brother did and --

3  because they both work -- my husband and my brother also works

4  for the landlord helping out with evictions and stuff like

5  that.

6  Q.  And cleaning and maintaining properties?

7  A.  Yes and fixing like electricity and stuff like that.

8  Q.  Okay.  So what did the landlord -- what did the landlord

9  basically say?  I mean is there a possible job out there for

10  John if he's released?

11  A.  Yes, there is.

12  Q.  Okay.  Cleaning and maintaining properties in the area?

13  A.  Exactly.  And learning some --

14  Q.  Okay.

15  A.  -- more on-hand stuff like knowing how to do the electric

16  and plumbing and stuff like that which my brother taught him

17  some of that stuff already when he remodeled my mom's bathroom.

18  He showed my bro -- my son how to do things.  He showed my son

19  how to change brakes on my car.  He knows how to change brakes

20  on the car.  He knows how to check oil.  He's very good with

21  his hands.  He's --

22  Q.  Right.  And your brother lives in the same apartment

23  building?

24  A.  Yes.  He will be moving in with us though.  We're moving

25  into another --

```
 1   Q.   I understand.   You're going to move --
 2   A.   Yeah.
 3   Q.   You're going to move to a home outside of town?
 4   A.   Yes.   And it's -- the same landlord owns it so we'll be
 5   renting from the same landlord.
 6   Q.   Okay.   That's your choice; right?
 7   A.   Yes.
 8   Q.   Okay.   And it'll be a little bit of a bigger house?
 9   A.   Yes.
10   Q.   Okay.   So you raised your son.   You worked sometimes, and
11   you were also a stay-at-home mom?
12   A.   Yes.
13   Q.   Your husband lived in the home.   He's maintained regular
14   employment at Random House, and he helped raise John.   Is that
15   an accurate statement?
16   A.   Yes.
17   Q.   I guess what we'd call a pretty normal family?
18   A.   Yes.
19   Q.   Okay.   And your brother, what's his name?
20   A.   Walter.   Walter Parrish.
21   Q.   He helped raise John?
22   A.   Yes.
23   Q.   Okay.   And he will continue -- he continues in that role as
24   a caregiver and mentor?
25   A.   Yes.
```

1  Q.  Okay.  Now, you talked a little bit about the church and

2  John having some support there and people who care about him at

3  church and people who helped him develop.  Can you tell the

4  judge a little bit about who those people are and those

5  relationships and how important they are, please?

6  A.  When we first started the church, there was a children's

7  pastor named Pastor Dan who helped him get into a big brother

8  program.  The first big brother he had was a gentleman named

9  Ben Hailstone (spelled phonetically) who graduated from college

10  and then moved on to another state.  So Rick Woodward took

11  over, and he's been working with Johnny for a long time.  He's

12  been over -- Johnny has been over to his house, and he has old

13  cars that he works on and everything.  Showed Johnny those

14  things, and they worked on models together.  And he was also in

15  the Royal Rangers program where we did pinewood derby races,

16  and we would sit and carve cars together and carve them out and

17  race them.  I think he has actually two ribbons for that.  And

18  he was in a dance class.

19  Q.  Rick Woodward was his big brother at church?

20  A.  Yes.  Also his --

21  Q.  Now is --

22  A.  -- Sunday school teacher and children's church teacher.

23  Q.  And have you -- are you still in contact with Rick?

24  A.  Yes, sir.  And he's here today.

25  Q.  I understand that.  And is it your understanding that Rick

```
1   will continue to be a friend and mentor to your son if he's
2   released from jail?
3   A.  Oh, yes.  I'm positive --
4   Q.  Okay.
5   A.  -- of that.  We're very good friends.  We're very close.
6   Q.  Okay.  Now, you've told us about John.  Does he have a
7   reputation for violence?  You heard some discussion about --
8   and testimony about violence.  I mean based on what you've seen
9   and what you know, the people you know in your community, does
10  John have a reputation as a violent person?
11  A.  No.  He's more quiet, and he's a follower instead of a
12  leader which we've been trying to teach him the opposite.
13  Q.  Okay.  Has he ever been involved in any kind of violence?
14  A.  Just that one incident with the fire at the house that you
15  were talking about earlier.
16  Q.  Well, why don't you just briefly explain that to the judge
17  because, you know, that's not the kind of thing that happens
18  every day.  And I think you'll remember the first time you told
19  me the story, I think I needed you to tell it to me again.  So
20  tell the judge about that incident and what John's reaction
21  was.
22  A.  Well, what happened that day is I went to pick him up from
23  school because he was sick.  And I took him home.  Put him to
24  bed.  And I told him I have a doctor's appointment in Frederick
25  County, and I'll be back home.  And he had a friend that came
```

1  to the door to ask him to come out, but he said he wasn't
2  feeling well so he did not come out.  And that friend stayed
3  sitting on the steps and all.  So he knew that friend was the
4  one that set the fire because of the kind of mental problem he
5  has.  But he started the fire down in the basement --
6  Q.  That person that has -- that individual has -- that
7  individual had set fires and created incidents like this in
8  your community before?
9  A.  As far as I know, he's done things like that before, yes.
10  Q.  Okay.
11  A.  I don't know his whole history.  I know a lot -- some.  I
12  just know -- don't know all of it.  But I do know that he's the
13  one that did it, and he admitted he did it.  But my son all of
14  sudden saw the smoke coming up through something in our
15  apartment, and he went downstairs.  We had an elderly gentleman
16  that lived downstairs who was deaf and couldn't hear all the
17  fire engines and police officers around.  He went in.  And he
18  tried to knock on the door, but thank goodness the door was
19  unlocked.  He was able to go in and get that gentleman and say
20  you need to come outside.  Everybody calls him Pops in that
21  building.  But him and my son were the only two in the building
22  thank goodness.  And he took him out.  And then when we were
23  standing in the back -- I had showed up at that time.  When we
24  were standing in the back, he saw the young man standing across
25  the street watching the firemen and all, and he knew it was

1    him.  So he went over across the street and punched him right

2    in front of the police officer.  And the police officer said

3    you do know -- understand that I will have to take you in

4    because you did it in front of me?  And he says yes.  And he

5    told him why he did it.  And then that boy did admit that he

6    did set the fire, and he did not press any charges because of

7    that.

8    Q.  And John was cooperative with law enforcement throughout

9    all that?

10   A.  Oh, yes, he was.  He was very cooperative.

11   Q.  How old was he at the time?

12   A.  Well, he was in the 11th or 12th grade at the time.  So he

13   was about 17, maybe 16.

14   Q.  Okay.  Anything else like that happen where John ever did

15   anything violent to anyone else or punched anyone else or

16   threatened anyone else --

17   A.  No.

18   Q.  -- that you know of in the community?  Okay.  Okay.  Has he

19   ever caused problems in the home?  I mean, you know,

20   confronting you or confronting your brother or confronting your

21   husband or any problems with his sister or anything like that?

22   A.  Oh, no.  He loves his sister very much.  He loves us very

23   much.  I mean he would have a temper, and he would go to his

24   room, but eventually he'll come out, and we'll talk about it.

25   But we can't talk to him when he's upset.

```
1   Q.  But he's not confrontational?
2   A.  No, not confrontational.
3   Q.  How about -- you mentioned the neighbors before.  How does
4   John get along with the neighbors?
5   A.  He gets along with them fine.  Mrs. Sans (spelled
6   phonetically), who lives next door and which was a school
7   teacher at one of the Carroll County schools, knows him and her
8   husband does.  He gets along with the lady in Apartment C -- in
9   Apartment C, Ms. Amber, and all.  He mostly got along with most
10  of the neighbors there.  He got along with all of them.
11  Q.  Okay.  So let's fast forward to today.  You're talking to
12  John on the phone, and he's sending you letters.  Where is he
13  at right now?  What's his view on life?  What does he want to
14  do when he gets released?
15  A.  He wants to become a youth pastor.  I got one of his
16  letters with me.  He wants to become a youth pastor and
17  continue his education in video productions.  He told me he
18  wants to go back to church with me.  And he's been reading the
19  Bible.  He's been reading more -- he's never read as much as he
20  reads now.  I think the teachers would love to have him back in
21  school because now he's reading.  But he's reading a lot which
22  surprised me because he doesn't read at home.  But he's reading
23  a lot, and he said he now understands.  And he even apologized
24  to me as being rebellious as a teenager and everything.  He's
25  very -- he's eager to get home, and he's eager to start work.
```

1    He says, Mom, I want to work.  I don't want to hang around any
2    of the people I used to hang around with.  I want to be a part
3    of the young adult class at our church which is 30 -- 18 to 30
4    year olds.  And he wants to talk to the youth to make sure they
5    don't make the same mistake that he's made.
6    Q.  Excellent.  Now, you do know that according to the
7    testimony today, John has used marijuana in the past.  Are you
8    familiar with any counselors in your area or psychologists or
9    psychiatrists who could support John and maybe start with a
10   drug treatment program?  Anything like that?
11   A.  Yeah, there's a lot of support groups in Carroll County I
12   can probably get him into, yes.  And he didn't -- he only
13   smoked pot as far as I know because he was very honest with the
14   doctor when I took him because he always has to have me in the
15   doctor's office with him so he can understand what the doctors
16   are saying.  And he was very truthful with the doctor.  And the
17   doctor said that's unusual for a teenager to be truthful with
18   the doctor when the parent is in the room, and he was very
19   truthful.
20   Q.  And did you ever see him smoke marijuana in your home?
21   A.  No, I haven't seen him do it, but I smelled it.  And that's
22   when I got on him and told him that it's not allowed in our
23   home, and he had not done it in our home since.
24   Q.  Okay.  Okay.  Now, if Mr. -- if John is released, you know,
25   they -- smoking marijuana will not be permitted on any

1  conditions of bond or release.  You understand that; right?

2  A.  Yes, sir, I understand that.  Nobody else in the family

3  does it.

4  Q.  I understand.  But if it does occur that despite treatment

5  efforts John goes back to using marijuana, would you report

6  that to my law office, and would you report that to the

7  supervising probation officer whoever that may be?

8  A.  Yes, sir.

9  Q.  Okay.  We talked a little bit about that.  You would be

10 like a supervisor of John.  You understand that; right?

11 A.  Yes, sir.

12 Q.  Okay.  And your brother and your husband.  Everyone living

13 in the home would -- is agreeable to exactly that; right?

14 A.  Yes, sir.

15 Q.  Okay.  How would John get back and forth to court?

16 A.  With me.  I'm home.  I don't have a job.  And I can get him

17 back and forth no problem at all.

18 Q.  Okay.  And the same with work?  Would you take him back and

19 forth to his job or would your brother and your dad?  How would

20 that work?

21 A.  If he's working for the landlord, he would be going back

22 and forth to work with my brother and my husband.

23 Q.  Okay.  Okay.  Now, there was -- you've been asked about a

24 landline telephone.  If you do move to a new residence, can you

25 get a landline telephone?  I mean I know it's not something you

1   can do now because you don't have it yet, but when you move,

2   would you be agreeable to setting up a landline telephone?

3   A.  Yes, I would.  I already asked my landlord if there was a

4   phone hookup there, and he said he's not sure, but it can be

5   easily installed.

6   Q.  Okay.  And of course would you help the probation office

7   establish electronic monitoring if that's what the Court

8   ordered?

9   A.  Yes, sir.

10  Q.  Okay.  Brenda, I don't have any additional questions.

11  There's a gentleman in court who represents the Government, and

12  he has a right to question you.  He may choose to do that.  So

13  please just provide him with accurate and clear information.

14  Thank you very much, Brenda.

15          MR. WALKER:  Judge, I have no further questions for

16  Mrs. Black.

17          THE COURT:  Thank you, Mr. Walker.

18      Mr. Finucane, cross examination.

19          MR. FINUCANE:  Ms. Black, thank you very much for

20  being here.

21      Your Honor, I have nothing else.

22          THE COURT:  Okay.  You may step down, ma'am.  Thank

23  you.

24          THE WITNESS:  Thank you.

25      (Witness excused.)

1          THE COURT:  Mr. Walker, do you have any additional

2   witnesses or evidence that you would like to present at this

3   time?

4          MR. WALKER:  I think I'll turn it over, so to speak,

5   to Mr. Compton to handle the remaining witnesses.  But, Judge,

6   I was reminded about the church and the minister of the church,

7   and I would like to ask the Court whether it's in receipt of a

8   letter from Mr. Black's minister.  It's something that I --

9          THE COURT:  The Court has received --

10          MR. WALKER:  It's something that --

11          THE COURT:  The Court has received the letter.

12          MR. WALKER:  Judge, I would like at this time to move

13   to make that letter a part of the record in this case, please.

14          THE COURT:  Has it been shared with the Government?

15          MR. WALKER:  Judge, when I sent it to the Court, if I

16   recall correctly, I copied Ms. Crockett, and I copied the

17   probation officer drafting the presentence investigation

18   report.  I don't have that email up in front of me, but that

19   was my intention.  That's my normal practice so I believe the

20   answer to the question is yes.  If not, then I can have another

21   copy sent immediately.

22          THE COURT:  Do we have the letter marked so that it

23   can be admitted assuming there's no objection.

24          MR. FINUCANE:  There's no objection, Your Honor.

25          THE COURT:  Do we have a version that can be marked

1  as an exhibit so that it can be admitted into evidence?

2            MR. WALKER:  I believe Mr. Compton does.

3            THE COURT:  All right.  Being no objection, what's

4  been marked as Defense Exhibit No. 1 will be admitted as to

5  Defense Exhibit No. 1.  Thank you.

6            MR. WALKER:  Thank you, Judge.

7            THE COURT:  All right.

8            MR. COMPTON:  Your Honor, at this time, we'd call

9  Chris Roemer to the stand.

10      (The witness was sworn in.)

11            THE COURT:  Tara, did you wipe this down?

12            THE CLERK:  Sorry?

13            THE COURT:  Did you wipe this down?  All right.

14  Thank you.

15      Go ahead and please be seated, sir.

16                     DIRECT EXAMINATION

17  BY MR. COMPTON:

18  Q.  Good afternoon, sir.  Can you state your name for the

19  record, please.

20  A.  Chris Roemer.

21  Q.  And what city and state do you live in, Mr. Roemer?

22  A.  I live in Finksburg, Maryland.

23  Q.  And how are you employed?

24  A.  I'm retired.

25  Q.  Retired from what?

```
1   A.   I was a middle school principal.
2   Q.   How do you know the defendant in this case, John Black?
3   A.   He attended middle school where I was the principal of the
4   school.   I was -- it was mentioned about the BEST Program.   I
5   was principal of that program.
6   Q.   And that's the -- sort of the gist of the testimony that
7   we're going to seek from you, sir.   It's my understanding that
8   the middle school that you were the principal at was not
9   Mr. Black's home middle school; is that correct?
10  A.   No, it was a regional program that Mr. Black was in.
11  Q.   Okay.  And he went to your middle school because your
12  school had the BEST Program; is that right?
13  A.   That's correct.
14  Q.   Can you explain to the Court what the BEST Program is all
15  about?
16  A.   Yeah.   The BEST Program was a special education program.
17  As I mentioned, it was a regional program so students who for a
18  variety of reasons were not meeting with sufficient success at
19  their home school would through the IEP process be placed
20  within the BEST Program.
21  Q.   And Mr. Black had an IEP; is that correct?
22  A.   Yes, he did.
23  Q.   Which is an Individualized Education Program; is that --
24  A.   Plan.
25  Q.   Plan.
```

1  A.   Yes.

2  Q.   Okay.  And those are developed for individuals who require

3  special education; is that correct?

4  A.   Correct.

5  Q.   And what -- what are some of the aspects of the BEST

6  Program?  What goes on?  What's special about that program?

7  A.   The program was associated with East Middle School, but it

8  was distinct from East Middle School.  And depending on the

9  needs of the student that the educational program could be

10 customized to include classes within East Middle School or

11 students could be self-contained within the program depending

12 on the needs of the student.  Within the BEST Program itself,

13 classes were very small.  There might be four or five students

14 in a class.  There are usually one or two one-on-one assistants

15 that would assist the instructor in the classroom.  And the

16 students in the program had a range of difficulties from

17 academic performance, some have behavioral problems, but the

18 idea of the program was to develop the skills necessary for the

19 student to ultimately be transferred back to their home school.

20 Q.   Okay.  And did Mr. Black, from what you recall, did he

21 suffer from some of these disabilities that you were talking

22 about?

23 A.   Yeah.  He was in middle school quite a while ago so --

24 Q.   Right.

25 A.   -- my recollection is more of an impression of what I

1   recall of Mr. Black.

2   Q.   Sure.

3   A.   But I recall a student that was -- that got frustrated when

4   he was unable to grasp concepts that were being taught to him,

5   and that frustration would manifest itself in different ways.

6   So our goal was to teach him the skills that he needed to

7   master in order to be successful educationally in a way that

8   was appropriate for him.  The small classroom environment and

9   the one-on-one attention that he got in the class worked for

10  Mr. Black.

11  Q.   From what you recall, did that -- did the program seem to

12  work for him?  Did it help him by the time he finished middle

13  school?

14  A.   Yeah, it did seem to help.  One of the things I recall

15  about Mr. Black is that he made valuable connections with the

16  adults that were in the program.  He used them as resources.

17  We taught him strategies for how to deal in a positive way with

18  his frustration.  So I think he mastered those strategies over

19  the course of the time that he was there.

20  Q.   Okay.  During the time that you knew him during these

21  middle school years, how would you describe his personality?

22  A.   He was a kind kid.  I think he was easily led by some of

23  his peers.  If the peers were misbehaving, he could be led to

24  follow their poor example which was something else we tried to

25  work with him on.  But I think -- I mean he was a good kid that

1  just struggled with learning, and that caused him frustration

2  which would cause him to act out at times.

3  Q.  Do you recall him being very mean spirited --

4  A.  No.

5  Q.  -- or a violent person at all?

6  A.  He was not.

7  Q.  Okay.  Now, have you had any recent contact with Mr. Black?

8  A.  Yeah.  The local paper obviously carried the trouble that

9  he was in, and I felt led to contact him and just offer

10  support.  I did that through the texting program that the

11  prison has.  And we've communicated occasionally via text.

12  Recently he asked for a Bible which I provided.  He also asked

13  for a dictionary which I found interesting which kind of

14  suggested to me that he's recognized some of the difficulties

15  that he has with language and recognized that he would need the

16  dictionary in order to understand what he was reading in the

17  Bible.  It was a study Bible.  And he communicated back to me

18  that for the first time, this particular Bible has kind of

19  helped him understand that he struggled understanding in the

20  past.  I also sent him a book about someone who had spent time

21  in prison and how his conversion kind of changed his life and

22  put him on a new path.

23  Q.  Okay.  Has he shared with you any hopes or dreams about

24  what he might want to do if he were to be released from prison?

25  A.  Yeah, he -- as Mrs. Black stated, he's mentioned to me that

1  he wants to get involved in his church.  He's mentioned to me

2  that he has ambition to be a youth pastor.  I think he's

3  looking to use his current circumstances to help other children

4  avoid some of the difficulties that he's experienced.

5  Q.  If the Court were to release him, would you be willing to

6  continue to, you know, remain in his life at this -- you know,

7  at the level that you've been at recently in order to sort of

8  help him and his family deal with the current situation?

9  A.  Certainly.  However I could be helpful, I'd be glad to.

10  Q.  Okay.

11          MR. COMPTON:  Your Honor, I think that's all the

12  questions I have.

13          THE COURT:  Thank you, Mr. Compton.

14      Mr. Finucane, any cross examination?

15          MR. FINUCANE:  Thank you, Your Honor.

16                      CROSS EXAMINATION

17  BY MR. FINUCANE:

18  Q.  Mr. Roemer, first, thank you for being here.  I'm just

19  trying to -- you said that you knew him in middle school.  Did

20  you have any regular or consistent contact with him between

21  middle school and the time you saw his name in the paper?

22  A.  None.

23  Q.  And I'm just -- I believe Mr. Black is 24.  Would you

24  estimate that at like eight or nine years?

25  A.  At least, yes.

1  Q.  At least.  You're not here offering an opinion about

2  whether he's guilty or innocent or whether he should be

3  released or not.  You're here testifying about your role in his

4  life; is that right?

5  A.  That's correct.

6  Q.  Mr. Roemer, you sound like a wonderful middle school

7  teacher, and I appreciate you being here.

8  A.  Thank you.

9           MR. FINUCANE:  That's all I have, Your Honor.

10          THE COURT:  Thank you.  Any redirect?

11          MR. COMPTON:  No, Your Honor.  May Mr. Roemer be

12  excused?

13          THE COURT:  You may be excused, sir.  Thank you.

14          THE WITNESS:  Thank you.

15     (Witness excused).

16          THE COURT:  Mr. Compton, additional witnesses or

17  evidence that you'd like to present?

18          MR. COMPTON:  Yes, Your Honor.  We would call Walter

19  Parrish.

20     (The witness was sworn in.)

21                        DIRECT EXAMINATION

22  BY MR. COMPTON:

23  Q.  Sir, can you state your name for the record, please.

24  A.  Walter Clem Parrish II.

25  Q.  And how do you know the defendant in this case, Mr. Black?

```
1   A.   He's my nephew.
2   Q.   Okay.   You are Barbara's brother, his mother's brother;
3   correct?
4   A.   Yes, sir.
5   Q.   And you were mentioned.   You were sitting in the courtroom
6   during her testimony; is that correct?
7   A.   Yes, sir.
8   Q.   Okay.   That's sort of the nature of the testimony I think
9   that we're seeking from you.   It's my understanding that you
10  are currently residing in the same apartment building as
11  Ms. Black and her family?
12  A.   Yes, sir.   We've done that several times.
13  Q.   They are in Apartment B; is that correct?
14  A.   Yes, sir.
15  Q.   And where are you?
16  A.   Apartment D.   Right across from them.
17  Q.   Across the hall?
18  A.   Yep.
19  Q.   Okay.   And it's my understanding that Ms. Black and her
20  family are going to be moving pretty soon; is that right?
21  A.   Yes, sir.
22  Q.   And you're going to be moving in with them?
23  A.   Yes, sir.
24  Q.   Okay.   That's -- what's been your relationship with Johnny
25  growing up?   Were you involved in his life?   Did you have
```

```
1   any --
2   A.  He was like a son to me.
3   Q.  Okay.  Tell the Court a little bit about that.
4   A.  Well, you know, he's -- we went to carnivals together.
5   Like my sister said, he worked for me in the bathroom.  I
6   helped him -- showed him how to redo a bathroom.  Showed him
7   how to do brakes.  You know, we played games together here and
8   there, you know.  We used to -- where I used to live, he --
9   they'd come up, and we'd sit at a bonfire and sit there and
10  talk, you know.  Just enjoyed each other.  He was a good kid.
11  Q.  Okay.  Were you involved in like raising him in any way?
12  And what I mean by that is did you look out for his interest,
13  you know, discipline him if he needed to be disciplined and
14  things --
15  A.  As much as I could, yes.
16  Q.  Okay.
17  A.  You know, because I don't want to -- never wanted to step
18  on my sister's --
19  Q.  Sure.
20  A.  You know, they are their parents, but, you know, I did
21  help.
22  Q.  Okay.  And you all have lived close -- you lived close to
23  him and his family for his entire life?
24  A.  Just about, yes.
25  Q.  Okay.  Where are you currently employed?
```

1  A.  I was employed at Random House, and he worked with me at

2  Random House.  Right now I'm having a hard time finding another

3  job because I took care of my mom for a period of time.  And I

4  had to take off so many times so they had to let me go.  So

5  right now I'm working for my landlord.

6  Q.  Okay.  And what are you doing for your landlord?

7  A.  I -- we go and if he has an eviction, we help take all the

8  stuff out.  Clean the apartment up.  Repair it.  Anything that

9  needs to be repaired -- plumbing, electric, walls.  Just about

10 anything.

11 Q.  All right.  And that's -- your landlord is the same as

12 Ms. Black's landlord; correct?

13 A.  Yes, sir.

14 Q.  She had mentioned that Johnny would be able to go work for

15 the landlord.  Would you be able to help him secure that

16 employment?

17 A.  Yes, sir.  He looked right at me and told me if he -- when

18 he gets out, he is employed, and he will be with me the whole

19 time.

20 Q.  Okay.  This is the landlord that said that to you?

21 A.  Yes, sir.

22 Q.  All right.

23 A.  He's a good man.

24 Q.  And would he be doing the same kind of work that you just

25 talked about?

1  A.  Yeah.  I'll be showing him everything.

2  Q.  Okay.  I think you heard Mr. Walker ask Ms. Black about,

3  you know, the marijuana use.  You're aware that he had --

4  A.  I am aware.

5  Q.  -- Johnny has a prior history with marijuana; correct?

6  A.  Yes, sir.

7  Q.  Would you be willing to or would you be able to supervise

8  him and ensure that he doesn't continue to engage in that

9  behavior?

10  A.  You bet.

11  Q.  And like his mom, would you be willing to report to me and

12  to his pretrial officer if he were to slip up and engage in

13  that behavior again?

14  A.  Yes, sir.

15  Q.  All right.  Is there anything else that you would like to

16  share with the judge or you would want the judge to know about

17  Johnny?

18  A.  No.  I think we've covered just about everything.  But I

19  just want to say we miss him.

20  Q.  Okay.

21          MR. COMPTON:  Your Honor, that's all the questions I

22  have.

23          THE COURT:  Thank you, Mr. Compton.

24      Mr. Finucane, cross examination.

25          MR. FINUCANE:  Thank you, Your Honor.

<u>CROSS EXAMINATION</u>

BY MR. FINUCANE:

Q.  Mr. Parrish, you said you're Mr. Black's uncle; right?

A.  Yes.

Q.  His -- your sister is his mother.  That's right?

A.  Yes, sir.

Q.  Okay.  And you had -- I think in your testimony you said you worked for Random House; is that like the book --

A.  At one point I did.  I do not now.

Q.  The book publishing; is that what it is?  Some kind of book --

A.  Yes, sir.

Q.  And then you indicated now you work for the landlord. That's Mr. Kutcher or Kutcherson (spelled phonetically)?

A.  Kutcher (spelled phonetically).

Q.  Kutcher.

A.  Yes, sir.

Q.  And that job from Mr. Kutcher, is that a full-time job or part-time job?

A.  Full time.  I'm there just about every day.

Q.  Just about every day?

A.  Yep.  The only time I'm not there is for holidays or if it's snowing real bad, I can't get nowhere because a lot of times he sends us up to York, Pennsylvania, and they get it worse than we get it sometimes.

1   Q.  And just -- the -- you had said that you had sort of a

2   day-to-day presence -- or I don't want to put words in your

3   mouth -- but you were actively involved with Mr. Black when

4   he --

5   A.  I have been.

6   Q.  -- was growing up.  And, again, I'm not putting words in

7   your mouth.

8   A.  That's fine.

9   Q.  How would you describe the relationship you had with -- you

10  know he was arrested in about April of 2019.  How would you

11  describe your relationship before -- let's say in the six

12  months leading up to the arrest?

13  A.  What do you mean by relationship with him?

14  Q.  Did you talk once a week?  Once --

15  A.  Oh, I was over there several times with his mom, and we've

16  talked to him several times, yes.

17  Q.  I'm saying before the arrest.  Not after the arrest.

18  A.  Oh before the arrest.

19  Q.  Just --

20  A.  Well, he -- just like a normal person.  He'd go to work,

21  but then he hung out with a lot of friends lately, you know.

22  And a lot of times we just sat in the back yard talking and all

23  that, you know.

24  Q.  So would it be -- again, I don't want to characterize

25  anything.  Would it be fair to say that you talked to him once

1   a week?

2   A.   More than that.  I mean every time I seen him, I would say

3   hi to him.  He'd come over and say hi to me.  Sometimes he

4   would just come over to my house and say hi.  He had told me

5   when he comes home, he wants to play me some chess.  I've

6   taught them how to play chess.

7   Q.   So would you say that you saw him every single day?

8   A.   Just about, yeah.

9   Q.   All right.

10  A.   The only time I never saw him is when he spent the night

11  with a friend, you know.

12  Q.   The allegation in this case is that an event occurred on

13  St. Patrick's Day, March 17, 2019.  You're aware of that?  That

14  that's the allegation?  I'm not asking you what happened.

15  A.   Allegation for what?

16          MR. COMPTON:  Your Honor, I think it's 2020.  So I

17  just want to make sure --

18          MR. FINUCANE:  Oh, I'm sorry.

19          MR. COMPTON:  -- we're accurate.

20          MR. FINUCANE:  I got my year wrong.

21          THE COURT:  All right, Mr. Finucane.

22  BY MR. FINUCANE:

23  Q.   St. Patrick's Day 2020.  Are you aware that the allegations

24  that Mr. Black committed a crime on March 17, 2020?

25  A.   I heard about that crime, yes.

1  Q.  Do you remember from the day -- from that date, if you

2  remember at all, until the day he was arrested, anything about

3  how he was acting?

4  A.  Well, no.  I mean he sometimes -- like when he's upset, he

5  doesn't really talk, you know.  So he'll say hi and then just

6  keep on walking sometimes, you know.  And the way I look at it,

7  I leave people alone unless they want to talk to me, you know.

8  Q.  Did anything jump out at you or change in his -- was his

9  demeanor the same or different?

10  A.  No, not really.  He just --

11  Q.  It wasn't different?  It was generally --

12  A.  He seemed --

13  Q.  -- the same?

14  A.  He seemed upset.  Maybe -- you know, just about it.  Like I

15  said, I never asked him why he was upset because that -- to me

16  I don't ask.  If they come to me, then, you know...

17  Q.  And having known him and seen him almost every day, would

18  you say he was more upset or just kind of consistently, you

19  know, moody like a young person?

20  A.  A little bit more upset than usual, yeah.

21  Q.  A little bit more upset than usual?

22  A.  Yeah.

23  Q.  Okay.  And he never asked you anything or asked you --

24  A.  No.

25  Q.  -- the problems he was having?

1   A.  And I understood why, and he told me why.  He told me

2   just...

3   Q.  I'm sorry.  Could -- I didn't get -- I didn't understand.

4   A.  He didn't want our family to be hurt which I understand.

5         MR. FINUCANE:  I'm sorry, Judge.  Can I ask again?

6         THE COURT:  Yes, sir.

7   BY MR. FINUCANE:

8   Q.  Mr. Parrish, what I understood you said is he said he

9   didn't want his family to be hurt?

10   A.  Yeah.  It's what I understand.  Okay.  He didn't tell me

11   that, but my sister told me that.  I understand that.

12   Q.  And did you take that to mean anything?

13   A.  Well, I just -- he was in some kind of trouble.  I didn't

14   know what.  You know, like I said, he's -- there's some things

15   he doesn't talk about and I understand.  That's everybody.

16   Q.  Okay.  Thank you, Mr. Parrish.

17         MR. FINUCANE:  That's all I have.

18         THE COURT:  Mr. Compton, any redirect?

19         MR. COMPTON:  I have nothing additional, Your Honor.

20   May this witness be excused?

21         THE COURT:  You may step down, sir.  Thank you.

22         THE WITNESS:  All right.  Thank you.

23     (Witness excused).

24         MR. COMPTON:  Your Honor, last call Rick Woodward.

25     (The witness was sworn in.)

```
1                        DIRECT EXAMINATION
2    BY MR. COMPTON:
3    Q.  All right, sir.  Can you state your name for the Court,
4    please.
5    A.  Yes.  Rick Woodward.
6    Q.  Mr. Woodward, where do you currently live?  City and state.
7    A.  I live in Pennsylvania in Orrtanna.  Outside of Gettysburg.
8    Q.  Okay.  Are you currently employed?
9    A.  No.  I'm retired.
10   Q.  Retired from what?
11   A.  As a machinist from General Dynamics Land Systems.
12   Q.  Okay.  And how do you know the defendant, John Black?
13   A.  I knew the defendant through -- well, I'm friends with his
14   parents, Joy and John, but I got more connected with Johnny
15   through church.  I was his Sunday -- my wife and I were his
16   Sunday school teacher.  That's where I really got to know him.
17   Q.  And that's at the Bethel Church in Pennsylvania that
18   Ms. Black testified about?
19   A.  Yeah.  That's right.
20   Q.  Okay.  And how long have you known Johnny and his family?
21   A.  Somewhere around ten years.
22   Q.  Okay.  And Ms. Black described you as sort of a big
23   brother, sort of mentor through the church; is that correct?
24   A.  Yeah.  That's correct.
25   Q.  Okay.  Can you tell the judge or describe for the judge
```

1  what that entailed and what you all did?

2  A.  Basically when you're in youth ministry, whether the child

3  is -- and he has parents, but if the church sees a need maybe

4  for some extra attention, they would come to the teachers

5  involved, which I was one of them, and approach us with, you

6  know, getting them involved like a student -- not necessarily

7  John in particular, but other students.  So I took him under my

8  wing and became friends sort of like a big brother through the

9  church.  Not technically a big brother program, but it worked

10 very similar.

11 Q.  Okay.  And what did you all do as part of this program?

12 A.  Well, my wife and I are really children oriented so we

13 invited him over just to get to know him a little better at our

14 home and just played games.  Built model cars I think was

15 mentioned earlier.  And I built old hot rods so I got him

16 involved in helping me with the cars and teaching him mechanics

17 somewhat and took him to car shows and monster truck events.

18 Stuff like that.  Just spend some time with him.  You know,

19 just -- it just -- it was a natural thing for me being in youth

20 ministry.  And he was just -- became friends actually.

21 Q.  Okay.

22         MR. COMPTON:  Your Honor, may I approach the witness?

23         THE COURT:  You may, sir.

24 BY MR. COMPTON:

25 Q.  Mr. Woodward, you provided me with some photographs --

1   A.   Yes.

2   Q.   -- earlier today; correct?

3   A.   Yes.

4   Q.   Are those the photographs you provided to me?

5   A.   Yes, they are.

6   Q.   And what is depicted in those photographs?

7   A.   Well, there's one photo of myself teaching Johnny how to

8   spray paint an old hot rod.

9   Q.   Uh-huh.

10  A.   And another picture of him standing next to the hot rod

11  when it was near completion.

12  Q.   And how old would you say Johnny is in those pictures?

13  A.   I would say probably 12 years old.

14  Q.   Okay.  And he's 23 now so --

15  A.   Yes.

16  Q.   But you've kept in contact with him and his family over the

17  course of the years?

18  A.   Yes.  That's right.

19  Q.   Okay.  What -- during the time that you've known Johnny,

20  what were your impressions of him?

21  A.   Honestly in the ministry itself, in the church setting, in

22  the classroom, he was actually more the quieter student and

23  didn't require a lot of extra discipline.

24  Q.   He did or did not?

25  A.   Did not.

1  Q.  Okay.

2  A.  One of the better students actually.

3  Q.  And you were a Sunday school teacher at the church as well

4  in addition to being the mentor big brother; right?

5  A.  That's correct.

6  Q.  Okay.  Did he seem like a violent person or a mean-spirited

7  person or was he angry?  How would you describe his

8  personality?

9  A.  Not in any way.  He was -- like I said, he was one of the

10  quieter students.  So he may rest his head on the desk which

11  was telling me he wasn't paying attention and maybe he wasn't

12  as interested in the scriptures and the teaching as maybe some

13  of the others.  But as far as -- I would describe him as just a

14  quiet child.  Maybe a little backwards but, you know, overall a

15  good student.  And when I called upon him to lift his head up

16  off the desk, he would.  He was very respectful of that.

17  Q.  You and your wife have both maintained contact with

18  Mr. Black even while he's been incarcerated; correct?

19  A.  That's correct.

20  Q.  How have you maintained contact with him?

21  A.  We would speak to him through like a 15-minute period over

22  the phone, you know.  It's the time limit that we had.  I just

23  spoke to him yesterday actually.

24  Q.  Uh-huh.  What did you all talk about?  Has he expressed any

25  thoughts or interests to you about when and if he gets out?

1  A.  Well, just yesterday -- and it showed something to me that

2  he is really into the scriptures because he talked about

3  Genesis, the scripture he was reading, and what chapter it was

4  and a little bit about the story.  And it was just spot on.  It

5  was really -- it touched my heart because, you know, we want

6  that for all of our children.  And I can see a big difference

7  in him just by conversation.  Mostly when we talked, it was

8  about scripture because, you know, that's what I'm -- you know,

9  that's just who I am, you know.

10 Q.  Right.

11 A.  Trying to reach kids, especially the younger generation,

12 with the word of God.

13 Q.  Well, you've heard the other folks testify that he talked

14 about wanting to perhaps be a youth pastor or maybe even mentor

15 younger kids.  Has he talked to you about that as well?

16 A.  Yes, he has.  Yes.  And I could actually help him in that

17 area.

18 Q.  Okay.  If the Court were to release Mr. Black, would you be

19 able to still be involved in his life as you are now?

20 A.  Absolutely.

21 Q.  Would you be willing to do that?

22 A.  No problem.  Absolutely.

23 Q.  Would you be able or be willing to serve in like sort of a

24 mentor role that you had -- that you've been served in in the

25 past with Johnny?

1   A.  Yes, I would.

2   Q.  Okay.  And I think you heard me talk with the other

3   witnesses about making sure that he's held accountable as well

4   for his actions.  Would you be able to, you know, in terms of

5   your mentorship and you friendship with him, would you be able

6   to sort of monitor his behavior and make sure he doesn't use

7   drugs or --

8   A.  Yes.

9   Q.  -- hang out with the wrong people or anything like that?

10  A.  Absolutely I would help out.

11  Q.  All right.  Would you be willing -- as we discussed with

12  the others, would you be willing to report to me or report to

13  the Court if he had made a mistake and screwed up?

14  A.  Yes, I would.

15  Q.  Do you think you would be able to do that living in

16  Gettysburg?

17  A.  Yeah.  Even an hour -- I'm retired now.  And it would be --

18  I'd be honored just to be a part of helping -- you know, get

19  this young man back to where he needs to be in society.

20  Q.  Uh-huh.  All right.

21          MR. COMPTON:  Your Honor, that's all the questions I

22  have for Mr. Woodward.  I would ask that these photos be

23  admitted for the Court's consideration.  I have shown them to

24  Mr. Finucane.  I have not marked them because Mr. Woodward

25  would like them back.  So if there's a way for the Court to

1  make a copy and then admit the copy as Defendant's Exhibit 2,

2  the pictures, I would like to return these to Mr. Woodward.

3           THE COURT:  I think we can make copies of your

4  photographs.  We'll have them marked.  How many photographs are

5  there?

6           MR. COMPTON:  There are four, and we would ask that

7  all four be Defendant's 2-A, -B, -C, and -D.

8           THE COURT:  We'll have them so marked after copies

9  are made and return the originals to the witness.

10           MR. COMPTON:  Thank you, Your Honor.

11           THE COURT:  Cross examination, Mr. Finucane?

12           MR. FINUCANE:  Thank you.

13                       CROSS EXAMINATION

14  BY MR. FINUCANE:

15  Q.  Thank you, Mr. Woodward for being here.

16  A.  You're welcome.

17  Q.  I caught at the beginning of your testimony you referred to

18  Joy and John.  Does Ms. -- does she also go -- Brenda also go

19  by Joy?

20  A.  Yeah.  It's her middle name.

21  Q.  Okay.

22  A.  Brenda Joy Black.  Yeah.

23  Q.  And earlier we heard from Mr. Roemer, a middle school

24  teacher, who described Mr. Black as easily led by his peers.

25  Is that -- would that be consistent with your assessment of

1  him?

2  A.  Yes.

3  Q.  Okay.  And then the only other question I have is sort of a

4  similar question you may have heard with Mr. Parrish.  In the

5  -- I'm sorry.  In the year let's say before March 17, 2020,

6  what was your interaction with Mr. Black like?

7  A.  Honestly, it wasn't like I was speaking to him on a regular

8  basis.  The last conversation would probably be just, you know,

9  looking for a job, you know, and maybe he had a couple

10 questions about what kind of work, you know.  Matter of fact, I

11 offered once to train him in the machine -- I have a small

12 machine shop in my home.  It's nothing -- just regular guy

13 stuff I would say.

14 Q.  Would you say that you spoke from time to time?  Not --

15 A.  Yeah.  Not --

16 Q.  -- on a regular --

17 A.  Not a lot to be honest --

18 Q.  Okay.

19 A.  -- in the last few years.

20 Q.  And in the month after March 17th, did he ever reach out to

21 you or confide in you any problems he was having?

22 A.  Now after the incident?

23 Q.  After the incident but before he was arrested.

24 A.  No, I didn't speak to him before he was arrested.  When I

25 started speaking with John is from the phone through prison,

1  you know.  Yeah.

2  Q.  Understood.  Thank you very much again, Mr. Woodward, for

3  being here.

4  A.  All right.  You're welcome.

5          THE COURT:  Any redirect, Mr. Compton?

6                    REDIRECT EXAMINATION

7  BY MR. COMPTON:

8  Q.  Well, I would just ask, Mr. Woodward, do you, like the rest

9  of the family, is part of your mentorship and supervision and

10  being involved in his life, you would be able to direct him

11  with regard to whom he hangs out with and mentor him about that

12  sort of thing and then, again, report to the Court if he is

13  perhaps doing something he's not supposed to be doing; correct?

14  A.  Yes, that's true.

15          MR. COMPTON:  That's all the questions I have.

16          THE COURT:  Mr. Finucane, anything further?

17          MR. FINUCANE:  No thank you, Your Honor.

18          THE COURT:  All right.  You can step down, sir.

19  Thank you.

20      (Witness excused.)

21          THE COURT:  All right, Mr. Compton, any additional

22  witnesses or evidence that you'd like to present, sir?

23          MR. COMPTON:  I don't have any additional witnesses,

24  Your Honor.  I would turn it back over to Mr. Walker for any

25  additional evidence or making the resting determination.

1          THE COURT:  All right.  You're both counsel.  Does
2    the defense have any additional witnesses or evidence that
3    they'd like to present at this time.
4          MR. WALKER:  Judge, this is Richard Walker.  We have
5    no additional evidence or witnesses.
6          THE COURT:  All right.  Either party desire to be
7    heard as far as argument?
8          MR. WALKER:  I would, Judge.
9          MR. FINUCANE:  Yes, Your Honor.
10          THE COURT:  Mr. Finucane?
11          MR. FINUCANE:  I would, Your Honor.
12          THE COURT:  All right.  Mr. Finucane, go ahead.  It's
13    the Government's motion.
14          MR. FINUCANE:  Your Honor, we would just direct the
15    Court that under 18 U.S.C. § 3141(e), there is a rebuttable
16    presumption, 3141(f)(1)(B), a rebuttable presumption of
17    incarceration for an offense that carries a maximum of life or
18    death.  In this case, Count 1 of the indictment carries a
19    maximum penalty of life.  Counts 2 carries a maximum penalty of
20    death.
21      I don't want to belabor the nature of the offense.  I
22    believe Agent Duffy testified to the role the Government
23    alleges Mr. Black played.  The spirited questions regarding
24    the -- you know, the validity of the witnesses.  Your Honor,
25    there are three witness.  I believe that those are trial

1  questions that the Government believes it has a strong case

2  against Mr. Black.

3      Just to briefly comment on the one letter provided to the

4  Court.  Reverend Ritenour did indicate that after 2016, he

5  didn't see Mr. Black in church anymore, and a number of the

6  witnesses had substantially more contact with Mr. Black as a

7  young man and somewhat less contact in the period leading up to

8  this incident.  The Government's case will be that there were

9  other stronger personalities at the -- around Mr. Black that

10 he -- there may be -- as I believe Mr. Roemer and Mr. Woodward

11 are both establishing, there may be mitigating factors at the

12 end of trial as to what happened.  But at this point, Your

13 Honor, it's a question of whether or not Mr. Black is a flight

14 risk and a danger to the community.

15      Here he's faced -- and, again, why this -- it's a

16 rebuttable presumption.  He's faced with a possibility of a

17 penalty of death which creates an incentive absolutely to flee

18 and why I believe that the code creates a rebuttal presumption

19 for that offense.  Additionally, again, not to belabor the

20 points in Agent Beasley's presentence report, but the

21 underlying nature of the offense is very serious.  There have

22 already been -- again, no one is accusing Mr. Black of this --

23 but as part of the overall indictment, two witnesses have been

24 murdered.  There is a concern about ongoing retaliation in this

25 case, Your Honor.  And, again, not specifically as to

1  Mr. Black, but the concern for the safety of the community is
2  certainly heightened by the nature of the crime alleged in the
3  indictment.  And for those reasons, Your Honor, we think
4  continued detention is appropriate.
5          THE COURT:  Thank you, Mr. Finucane.  Mr. Walker.
6          MR. WALKER:  Yes, Judge.  Thank you very much.
7  Obviously, we disagree on many points in this case.  I do agree
8  that there's a rebuttable presumption in this case.  And we
9  take the position that through these four or five witnesses,
10 who I think were very articulate, and they know Mr. Black very,
11 very well, we've gone well beyond rebutting the presumption.  I
12 believe that we have affirmatively established that there are
13 conditions of confinement that can ensure the safety of the
14 community and that can ensure that Mr. Black will return to
15 court if he's released by this Court.
16      Just very briefly, Judge, in terms of ties to the
17 community.  He has abundant ties to the community.  He's born
18 and raised in Carroll County, Maryland.  That is not very far
19 away at all.  I think Mrs. Black testified that it took an hour
20 and 12 minutes to get from their home to the courthouse in
21 Martinsburg.  You can take judicial notice of the fact that any
22 online map or app will tell you that it's approximately 63
23 miles from Taneytown, Maryland, to Martinsburg, West Virginia.
24      So this is essentially, you know, a county that almost
25 borders our district.  It doesn't border our district, but the

1   distance between Carroll County and the Eastern Panhandle of

2   West Virginia is not significant at all.  And he obviously went

3   to school in Carroll County.  He's worked in Carroll County.

4   His family is in Carroll County.  His home is in Carroll

5   County.  He whole life is in Carroll County.  He came to

6   West Virginia twice in this case.  So he's someone who has been

7   there.  We know where he's been, and he's someone who will

8   remain in Carroll County because that's where his life is.

9       So this is not the kind of case where someone is nomadic or

10  they've moved from district to district or been arrested in

11  various states or been on the run.  This is someone who has

12  lived a very normal and ordinary life in a very small community

13  in a rural county that quite frankly, Judge, is a lot like the

14  counties that we have here in West Virginia.  So there are many

15  ties to the community.  He has transportation to come to court.

16  So there's just no real colorable claim that he for some reason

17  wouldn't or couldn't come and appear in these proceedings.

18      There was a lot of testimony -- first, I'll say that of

19  course obstruction of justice -- there's no allegation of

20  obstruction of justice or tampering with witnesses as it

21  relates to Mr. Black.  Now, that was one of the boxes that were

22  checked in the Government's motion for detention, but I think

23  that that's been basically abandoned by the Government at this

24  point because, as Mr. Finucane said, it's perfectly accurate

25  Mr. Black has not been involved or alleged to have been

1  involved in any kind of witness tampering.  And by the way
2  that's a terrible crime.  We're fully aware of what I call
3  phase 2 of this case, and I don't minimize it for a second.
4  It's a terrible crime.  And just so that the Court is aware,
5  Mr. Black is pretty upset about what occurred in phase 2 of the
6  case because he had a relationship and was friendly with one of
7  the deceased victims.  So he's very upset about that and has
8  always been very upset about that and would never, in my
9  estimation, participate in anything similar to what occurred in
10  what I call phase 2 of the case.  So obstruction of justice,
11  tampering, that's just not even in play in this particular case
12  as is relates to Mr. Black.
13     Mr. Black's personal qualities and his characteristics are
14  very significant, and we believe that overwhelmingly they
15  support release in this case.  You've heard the testimony,
16  Judge.  He's known as a kind person, a person who is very
17  agreeable, who is a quiet person.  Certainly a nonviolent
18  person.  Someone who has no prior convictions.  No felony
19  convictions.  No misdemeanor convictions.  The only -- we
20  wanted the Court to know the good, the bad, and the ugly.  I
21  mean he does have a prior incident where he punched someone,
22  but I think the context there is very significant because he
23  was basically in the middle of an attempted arson where someone
24  who he knew attempted to burn down the building where he lived.
25  His first reaction was to save people's lives and that's

1  precisely what he did.  But it's upsetting.  It's upsetting for
2  a young person of course when someone tries to burn down your
3  home and burn down the home of others who live in the same
4  building.  And he was upset.  He reacted impulsively, and he
5  punched the perpetrator who attempted the arson.  And that's a
6  violation of law.  That's not the appropriate response.  But
7  for a young person who is responding to an emergency who is
8  obviously excited, frightened, agitated, it's not something
9  that's outside normal limits, and it's not something that a --
10 I think the Court can understand.
11     So, you know, that's it in terms of prior violence.  And
12 there was no injury there.  He cooperated with law enforcement.
13 It all happened right in front of a police officer.  So, you
14 know, that's the worst of the worst when it comes to John
15 Black, and it's a far cry from what we typically see.  It's a
16 far cry from the prior history that we see in other cases
17 before the Court.
18     Quite frankly, he comes from a very normal family.  A
19 family that is very loving, a family that is very supportive,
20 and a family that has the resources and the connections in the
21 community to get him the help that he needs.  And you can see,
22 Judge, it's very, very impressive.  They've been working with
23 their son and doing everything they can to help their son for
24 his entire life.  Mrs. Black testified, and she went -- they
25 recognized that he had a learning disorder.  She went to every

```
1   IEP meeting.  She was very involved in his education.  She was
2   a hands-on, stay-at-home mom making sure that he had the extra
3   help that he needed.  They find mentors for him.  They got
4   involved in the community.  They had him playing sports.  They
5   helped him find a skill and a trade.  He graduated from high
6   school.
7       I mean you read presentence reports.  You see cases that
8   come in.  The --
9       (Audio distortion.)
10          MR. WALKER:  -- of defendants before this Court
11  graduate from high school.  So that's a significant
12  accomplishment.  I mean you might not get a gold star for that,
13  but we have to recognize that he is different than the average
14  defendant.
15      And, you know, Judge, fast forward to today.  He is
16  involved in his own self-initiated rehabilitation program.
17  That's what the testimony supports.  He's reading.  He's asking
18  for dictionaries.  He's trying to develop.  He's trying to
19  learn.  He's studying the Bible.  He has goals that he has
20  shared with his family and with his friends.  He wants to
21  become a youth pastor.  He has a work history, and he also has
22  a job opportunity.  My office was in contact with the landlord
23  and the landlord advised us the same thing.  That, yeah,
24  there's a job opportunity here.  Possible employment for John.
25  Of course, this Court knows that no one is going to offer a job
```

1   to someone who is actually in jail; but if he's released, it's

2   something that's lined up.  There have been conversations and

3   representations made, and it's perfectly appropriate to hire

4   John Black to help with maintenance if he's released.  And we

5   think that that will happen.  If it doesn't happen, his family

6   will help him get another job.

7        Mr. Black has transportation to and from work.  He has

8   transportation to court.  Again, a very stable home

9   environment.  And what I think is very impressive, Judge, is

10  the number of positive role models in his life.  And I want to

11  thank the people who came to court today to testify and the

12  people who support him.  He has multiple mentors.  Multiple

13  mentors.  And that's very, very valuable.  And I think that

14  would be one of the keys to his success if he's released on

15  bond.

16       Plus he can get treatment in the community.  We don't deny

17  the fact that this is someone who has used marijuana regularly

18  as a young person.  And that's a crime.  It's a crime in

19  federal court.  It's a crime in Maryland if it's not done, as I

20  understand it, through medical marijuana and a prescription.

21  And, quite frankly, it's not good for your body.  So that's

22  something that he needs to change, and the family has -- the

23  testimony is that there are multiple treatment providers in the

24  area.  Multiple support groups I think was the term that was

25  actually used.  But we will -- we'll help, Judge.  We'll help

1  connect him with the psychologist.  We'll help connect him with
2  drug treatment specialists.  We'll help connect him with
3  intensive outpatient programs; and, if necessary, Judge, we'll
4  help connect him with inpatient programs so he has what he
5  needs to succeed while he's released back to the community if
6  that's what the Court is inclined to do.  We're asking you to
7  please consider that.
8      Finally, Judge, I'd like to just say a few words about the
9  case and the evidence in the case.  I've said this once
10 already.  We're well aware -- everyone is well aware of the
11 fact this is a very serious case, and we need to take the
12 charges into consideration.  And I'm sure that we will, and I'm
13 sure that you already have.  However, Judge, it also I think
14 needs to be said that even as alleged, it seems that Mr. Black
15 had a minor role in the offense.  The evidence seems to suggest
16 that he was a follower.  That he was someone who had no plan or
17 prior knowledge that any of this would take place.  He
18 certainly had no disagreement with John Riddle, and he
19 certainly had no apparent motive to do any harm to John Riddle.
20 So, you know, even if you take the Government's case at face
21 value, this is someone who had a minor role and that's
22 significant.
23      I'll also mention, you've gathered by now I'm sure, there
24 are disputed issues of fact, and there are anticipated defenses
25 in this case.  And I think finally, Judge, you know, I'll just

1    mention that in terms of the weight of the evidence, there is

2    not overwhelming evidence of guilt in this case.  It's very

3    ordinary -- having, you know, practiced in federal court on the

4    defense side for 20 years now, it's very ordinary for a federal

5    criminal case to involve overwhelming evidence of guilt.  This

6    is just not one of those cases.  And the Government hasn't

7    established that.  The Government hasn't even made that

8    argument there's overwhelming evidence of guilt.  I think we're

9    primarily dealing with witness testimony that will be disputed.

10   Witness testimony where there will be serious questions about

11   credibility.  So, again, like you said, this is not the trial;

12   but we want to make the point that this is not a case that is a

13   foregone conclusion.  This is not a case where it will

14   obviously end in adjudications of guilt.

15       So thank you so much for being patient with us and giving

16   us an opportunity to ask a lot of good questions and some hard

17   questions of all the witnesses and for hearing me out here.  We

18   think that he's very much eligible and should be released, and

19   we'll do everything we can to help develop the details there in

20   terms of home detention monitoring and facilitating it in every

21   way that we possibly can.  Thank you, Judge.

22           THE COURT:  All right.  Thank you, Counsel.

23       With that in mind, the Court is going to take the issue of

24   detention under advisement.  We'll issue a written ruling on

25   that.  So unless there's anything further that we need to

```
 1    address this afternoon, Mr. Finucane, anything from you?

 2              MR. FINUCANE:  No thank you, Your Honor.

 3              THE COURT:  Mr. Compton?

 4              MR. COMPTON:  Nothing for Mr. Black.

 5              THE COURT:  Mr. Walker -- I should have asked both of

 6    you.  Mr. Walker, Mr. Compton, anything from the defense?

 7              MR. COMPTON:  Nothing in addition.

 8              MR. WALKER:  No thank you, Judge.  No thank you.

 9              THE COURT:  All right.  With that in mind, the

10    defendant is remanded to the custody of the U.S. Marshal

11    Service, and we stand adjourned.  Thank you.

12

13                    (Hearing ended at 3:58 P.M.)

14

15

16

17

18

19

20

21

22

23

24

25
```

98

```
 1                        CERTIFICATE

 2

 3          I, Kate A. Slayden, Registered Professional Reporter

 4   and Official Court Reporter of the United States District Court

 5   for the Northern District of West Virginia, do hereby certify

 6   that the foregoing is a true and correct transcript to the best

 7   of my ability of the digitally-recorded proceedings had in the

 8   above-styled action on January 4, 2021, as transcribed by me.

 9          I certify that the transcript fees and format comply

10   with those prescribed by the Court and Judicial Conference of

11   the United States.

12          Given under my hand this 17th day of January, 2021.

13

14

15                         /s/Kate A. Slayden

16                         Kate A. Slayden, RPR, CCR
                           Official Reporter, United States
17                         District Court for the Northern
                           District of West Virginia
18

19

20

21

22

23

24

25
```

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**MARTINSBURG**

**UNITED STATES OF AMERICA,**

        Plaintiff,

**v.**

    **Case No.: 3:20CR46-4**
    **(GROH)**

**JOHN WESTLEY BLACK, III**,

        Defendant.

**DETENTION ORDER**

On January 4, 2021, came the United States of America by Jeffrey Finucane, Assistant United States Attorney, and came Defendant, JOHN WESTLEY BLACK, III, in person and by his counsel, L. Richard Walker, Assistant Federal Public Defender, by videoconferencing and Nicholas J. Compton, Assistant Federal Public Defender, in person for a hearing on the United States Motion to Detain [ECF No. 39], in accordance with the Bail Reform Act, Title 18, United States Code, Section 3142(f). The parties presented evidence and witness testimony was taken.

**A. The Standards**

Title 18, United States Code, § 3142(g) provides the specific factors that are to be considered to determine whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community. Those factors are:

1.    The nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal

000123

crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

2.     The weight of the evidence against the person;

3.      The history and characteristics of the person, including but not limited to community ties, employment, criminal history, record of court appearance or whether the person was on probation or parole at the time the current offense was committed; and

4.     The seriousness of the danger to any person or the community that would be posed by the person's release.

### B.  Findings of Fact and Conclusions of Law

On November 17, 2020, an indictment was filed against the Defendant charging him in count one (1) with  conspiracy to commit kidnapping, in violation of 18 U.S.C. 1201(a); in count two (2) with aiding and abetting kidnapping resulting in death, in violation of 18 U.S.C. 1201(a)(1) and 2; in count three (3) with aiding and abetting corrupt destruction of object in violation of 18 U.S.C. 1512(c)(1) and 2.

The Court finds as follows:

1.  The rebuttable presumption does not apply in this case.[1]

2.  Defendant is not a serious risk of flight by a preponderance of the evidence.

3.  The weight of evidence against the defendant is strong and Defendant is subject to life in prison or death if convicted. Defendant is a regular drug user and does not have stable employment.

---

[1] During the hearing the parties stated that the rebuttable presumption applied.  However, after the hearing, the parties conferred and agreed that the rebuttable presumption did not apply in this case.

000124

4. The nature and circumstances of his alleged involvement in this case show that he would be a danger to this community by clear and convincing evidence.

5. No bond conditions could be set to reasonably ensure the appearance of Defendant and the safety of the community.

## C.  Decision

Based upon the evidence presented and the above findings of fact and conclusions of law, the Government's Motion to Detain [ECF No. 39] is **GRANTED.** Accordingly, it is hereby

**ORDERED** that:

1. Defendant is hereby remanded to the custody of the United States Marshals pending further proceedings in this case;

2. Defendant be confined in a facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

3. Defendant shall be afforded a reasonable opportunity for private consultation with defense counsel;

4. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which Defendant is confined shall deliver Defendant to the United States Marshal for the purpose of an appearance in connection with a court proceeding; and

000125

5.      Any party seeking revocation or amendment of this Order shall file a

motion pursuant to 18 U.S.C. § 3145.

The Clerk of the Court is directed to provide a copy of this Order to parties who

appear pro se and all counsel of record, as applicable, as provided in the Administrative

Procedures for Electronic Case Filing in the United States District Court for the Northern

District of West Virginia.

**DATED: 1-4-2021**


_____
ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE

4

000126

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
## AT MARTINSBURG

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**V.**                                    **CRIMINAL NO. 3:20-CR-46-4**
                                          **(JUDGE GROH)**

**JOHN WESTLEY BLACK, III,**

**Defendant.**

## MR. BLACK'S MOTION FOR REVIEW OF THE DETENTION ORDER

### I.    Introduction

The Defendant, John W. Black, III, by his counsel, L. Richard Walker, Esq., and Nicholas J. Compton, Esq., respectfully files this motion requesting review of the detention order issued by the Magistrate Court in this case.  [Docket No. 82].  This is a serious case, but Mr. Black is a unique defendant with ties to the community, no prior criminal convictions, and as it is alleged by the government, a minor role in the offense.  Mr. Black respectfully requests that this Court overrule the Detention Order and release Mr. Black to his family's home in Carroll County, Maryland.

### II.    Background

Mr. Black is a twenty-three-year old man from Taneytown, Maryland.  Undersigned counsel are familiar with that part of Maryland.  Despite the proximity to Baltimore and Washington, DC, Carroll County is mostly a rural area, with small towns, two small colleges, one hospital, and a modest economy.

Mr. Black's childhood was normal.  His mother, Brenda Black, encouraged him to do his best in school and she took him to church.  The family went camping every summer.  Mr. Black

1

and his sister enjoyed riding horses and they played baseball in town with their friends.  [*See* photos attached as Exhibit 1].  There were no problems in the home such as substance abuse or domestic violence.  The only notable difficulty for the family involved Mr. Black's diagnosis of ADHD, which the family addressed at an early age.

In 2016, Mr. Black graduated from high school and started working for several local companies.  Mr. Black is a trained videographer who produced music videos on the side.  Mr. Black has his eye on a delivery job for a frozen food company, where he can make over $20 dollars an hour, and there is another job waiting for him doing maintenance work for his landlord.  [*See* e-mail attached as Exhibit 2].

For almost his entire life, Mr. Black has lived with his family.  His father, John Black, Sr., works at the Penguin Random House publishing company warehouse in nearby Westminster, Maryland.  His mother, Brenda Black, works in the home where she occasionally makes and sells crafts.  Mr. Black's younger sister, Bethany Ione Black, works at Olive Garden.  His uncle, Walter Parrish, is a maintenance man who lives in another apartment in the same building.  Mr. Black has never been convicted of a single criminal offense.

On November 17, 2020, a grand jury returned a nine-count indictment charging Mr. Black with three offenses relating to an alleged kidnapping resulting in death.  [Docket No. 25]. The United States accuses Mr. Black, along with two co-defendants, of assaulting and kidnapping Jonathan Riddle after a party in Westminster on March 17, 2020.  The United States further accuses Mr. Black and the two co-defendants of traveling with Mr. Riddle to a wooded area near Rippon, West Virginia, where Mr. Riddle's body was alleged removed from the vehicle and burned.  Mr. Black denies all charges.  Mr. Black did not kill Mr. Riddle.  Mr. Black

000128

did not drive a car to West Virginia and, most certainly, Mr. Black did not burn Mr. Riddle's body.[1]

Mr. Black appeared on November 20, 2020, for an initial appearance.  The government filed a standardized motion for detention, checking multiple boxes with an "X" to allege that this case is eligible for detention.  [Docket No. 39].  A detention hearing was held on January 4, 2021, before the Honorable U.S. Magistrate Robert W. Trumble.  The next day, Magistrate Judge Trumble issued a Detention Order.  [Docket No. 82].  This Court should vacate the Magistrate Court's Detention Order and release Mr. Black to his family's home in Maryland.

### III.    Argument

Pursuant to 18 U.S.C. §3145(b), if a person is ordered detained by a magistrate or by a person other than a judge of a court having original jurisdiction over the offense and other than a federal appellate court, that person may file with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order.  The motion shall be determined promptly.  "When a defendant seeks review of a magistrate judge's order of detention, the district court is bound to review the matter *de novo* and undertake a complete review of the matter for the purpose of arriving at its own 'independent conclusion.'"  *United States v. Williams*, 753 F.2d 329, 331 (4th Cir. 1985).

Title 18 U.S.C. §3142(e) of the Bail Reform Act, which governs release or detention, requires the Court to hold a hearing to make findings as to whether a defendant should be released or detained.  The factors to be considered in determining whether to release a defendant

---

[1] Defense Counsel have analyzed this case as being divisible into two phases.  "Phase I" of the case involves the alleged beating and kidnapping of Mr. Riddle and encompasses the first three counts of the indictment—the only counts charging Mr. Black.  "Phase II" involves the remaining counts of the indictment—the counts that do not charge Mr. Black.  "Phase II" of the indictment alleges that the co-defendants in this case murdered potential witnesses to the alleged assault, kidnapping, and death of Mr. Riddle.  **The Court should note that Mr. Black had absolutely no involvement in this "Phase II" of the crime, nor has the United States made any allegation that Mr. Black participated in, or had any knowledge of, "Phase II."**

are set forth in 18 U.S.C. §3142(g) and include: (1) the nature and circumstances of the offenses

charged; (2) the weight of the evidence against the person; (3) the history and characteristics of

the person, including family ties, the person's character, ties to the community, and criminal

history; and (4) the nature and seriousness of the danger to any person or the community that

would be posed by the person's release.

A defendant shall be detained pending trial only if the court "finds that no condition or

combination of conditions will reasonably assure" either (1) "the appearance of the [defendant]

as required" or (2) "the safety of any other person and the community." 18 U.S.C. § 3142(e); *see

also United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001) (per curiam). If the rebuttable

presumption under 18 U.S.C. § 3142(e)(2) does not apply, then, "[w]ith regard to the risk of

flight as a basis for detention, the government must prove by a preponderance of the evidence

that no combination of conditions will reasonably assure the defendant's presence at future court

proceedings." *Stewart*, 19 F. App'x at 48 (citing *United States v. Hazime*, 762 F.2d 34, 37 (6th

Cir. 1985)). "The structure of the [bail reform] statute mandates every form of release be

considered before detention may be imposed." *United States v. Orta*, 760 F.2d 887, 892 (8th Cir.

1985); *see also United States v. Hansen*, 108 F. App'x 331, 332 (6th Cir. 2004).

### A.  The Rebuttable Presumption does <u>not</u> apply.

 At the detention hearing on January 4, 2021, the United States argued that the rebuttable

presumptions found in 18 U.S.C. §§ 3142(e)(2) and (e)(3) applied to this case. Undersigned

counsel did not challenge the United States' assertion during the hearing, believing that the

rebuttable presumption did apply. However, following the hearing and in consultation with the

Magistrate Court, all parties and the Court agreed that the rebuttable presumption does not apply

in this case. Although Count 2 of the Indictment in this case carries a maximum sentence of life

imprisonment or death, Mr. Black has obviously not yet been convicted of that offense or any other offense list in § 3142(f)(1) (*See* § 3142(e)(2)(A)); he is not alleged to have committed the offense while on release for any other offense (*See* § 3142(e)(2)(B)); nor has less than five years elapsed since his release from prison following a conviction for a § 3142(f)(1) offense (*See* § 3142(e)(2)(C)).  Furthermore, Mr. Black has not been charged with, or convicted of, any offenses listed in § 3142(e)(3), nor has the Magistrate Judge found probable cause to believe that Mr. Black has committed any such offense.

### B.  Mr. Black's ties to the community.

Regarding Mr. Black's ties to the community, the Magistrate Judge concluded that Mr. Black is not a serious risk of flight by a preponderance of the evidence.  [Docket No. 82 at page 2].  We agree.  Mr. Black has significant ties to his home in Carroll County, Maryland, where he has lived for his entire life prior to his incarceration.[2]  Upon release, Mr. Black can reside with his mother and father at Taneytown, Maryland address listed on page 2 of the Pretrial Services Report.  This is an environment free of drugs and firearms.  The family can arrange for electronic monitoring.[3]  Mr. Black has identifiable employment opportunities in the area, and we are informed that there is a position as a maintenance worker nearly guaranteed by the family's landlord.  [*See* Exhibit 2].  The family will provide transportation to and from work and to all court hearings in this district.[4]  The drive takes about one hour.

### C.  Weight of the evidence.

Mr. Black objects to the conclusion in the Detention Order that the weight of the evidence against Mr. Black is strong.  [Docket No. 82 at p. 2].  This is not a case involving overwhelming evidence of guilt.  The case agent testified that Mr. Black was present during a

---

[2] *See* Transcript of January 4, 2021, Detention Hearing (hereinafter identified as "Tr.") at page 46.
[3] Tr. at pages 59-60.
[4] Tr. at page 59.

000131

fight at the home of codefendant David Sanford.[5]   According to the agent, David Sanford and

codefendant Monroe Merrell fought with Jonathan Riddle.[6]   The case agent testified that Mr.

Black joined in the fight and assaulted Mr. Riddle.[7]   The case agent testified that after Mr. Riddle

was beaten and stabbed, Mr. Black and Mr. Merrell transported Mr. Riddle in the trunk of Mr.

Riddle's car to Rippon, West Virginia.[8]   Finally, the case agent suggested that Mr. Black helped

move Mr. Riddle to a wooded area where his body was burned.[9]

However, it is evident that the allegations against Mr. Black were crafted mainly based

upon the unsworn statements of cooperating individuals[10] who are wildly culpable, by their own

admissions,[11] and who have all received the extraordinary benefit of avoiding an indictment and

arrest.[12]   All three cooperators had previously used illegal drugs and were drinking and using

drugs on the night of the incident.[13]   One of the cooperators "provided a very brief non-truthful

statement prior to their cooperation."[14]   Another cooperator "omitted a few things early in an

interview" with law enforcement.[15]   The third cooperator remained at Mr. Sanford's home after

the fight and "began cleaning the apartment."[16]   This is a euphemism for removing blood and

other evidence of the fight, thereby obstructing of the same investigation he/she later assisted.

At the detention hearing, the case agent provided no testimony indicating there was any

audio or video evidence linking Mr. Black to the crimes charged.   She did, however, admit that

---

[5] Tr. at page 7.
[6] Id.
[7] Id.
[8] Tr. at page 8
[9] Id.
[10] Tr. at pages 10, 26.
[11] Tr. at page 31.
[12] Tr. at page 34.
[13] Tr. at pages 28-29.
[14] Tr. at page 30.
[15] Id.
[16] Tr. at page 35.

there was no physical evidence linking Mr. Black to the crimes charged.[17]  She further testified that footprint impressions were taken in the woods, but those were not linked to Mr. Black.[18]  Lastly, the case agent testified that there was no DNA evidence or clothing fibers linking Mr. Black to the crimes charged in the indictment.[19]  In fact, as discussed, the weight of the evidence amounts to nothing more than the unsworn statements of three unindicted co-defendants, two of whom have trouble with the truth, and all of whom were impaired on the night of the crime.  Therefore, with these purported witnesses and no physical evidence, it seems this will not be an easy case for the government to prove beyond a reasonable doubt.  Contrary, to the findings of the Magistrate Court, the weight of the evidence is not strong.

### D.  Alleged danger to the community.

Mr. Black objects to the conclusion that he would be a danger to the community by clear and convincing evidence.  [Docket No. 82 at p. 3].  Frankly, it is shocking that Mr. Black is currently before this Court.  Nobody who knew Mr. Black prior to his arrest could have ever imagined that this unassuming young person from an ordinary town, with a normal family, and no prior criminal convictions could be associated with a federal indictment charging serious felonies.  [*See* additional family photos at Exhibit 3].

To the contrary, the witnesses appearing on his behalf at the detention hearing described Mr. Black as loving, caring, helpful and family oriented.[20]  He does not have a reputation for violence in the community.[21]  Mr. Black gets along with his neighbors.[22]  He is quiet, kind, and

---

[17] Tr. at page 22.
[18] Tr. at page 21.
[19] Tr. at page 24.
[20] Tr. at pages 46-47.
[21] Tr. at pages 54, 66, 81.
[22] Tr. at page 57.

000133

considered to be non-confrontational.[23]  Mr. Black makes valuable connections with people.[24]

He reads the Bible extensively.[25]  Mr. Black is a member of Bethel Assembly of God, in

Littlestown, Pennsylvania.  [*See* pastor's letter at Exhibit 4].  Mr. Black wants to become a youth

pastor and become more involved in his church.[26]  He wants to continue education in video

productions and looks forward to working again.[27]

      As indicated, Mr. Black has never been convicted of a criminal offense, much less a

violent felony.  As for the charges in the indictment, he denies all of them.  Yet, even taking the

evidence in the light most favorable to the government, Mr. Black had a minor role.  While we

fully recognize that Mr. Black is accused of doing very dangerous things that had incredibly

serious consequences, the alleged conduct occurred on one day.  It is not representative of his life

or lifestyle.  We respectfully submit that Mr. Black can be released and that the risk of danger

and the risk of any further difficulties with the legal system are low.

      **E.  Prior drug use.**

      Mr. Black objects to the reliance upon prior drug use as a basis for detention in this case.

[Docket No. 82 at p. 2].  Mr. Black has used marijuana.  There were periods where he used it

recreationally.  At the time of his arrest, he used marijuana daily, while simultaneously suffering

from a serious anxiety disorder according to the pretrial services report.  The Detention Order

failed to credit Mr. Black for not using drugs for months and finding other ways to manage his

anxiety.  To be sure, there are no drugs in Mr. Black's home.  If he is released, Mr. Black will be

working with his uncle, Walter Parrish, doing maintenance work at properties belonging to their

---

[23] Tr. at page 57.
[24] Tr. at page 65.
[25] Tr. at pages 66, 82.
[26] Tr. at pages 57, 67, 82.
[27] Tr. at page 57.

000134

landlord.[28]  Mr. Parrish has pledge to supervise Mr. Black, counsel him, and, if necessary, report any drug use to undersigned counsel and the U.S. Department of Probation.[29]  What's more, Mr. Black's family plans to coordinate necessary treatment for Mr. Black.[30]  We will help too. Undersigned counsel has recruited a staff member in our law office with experience connecting clients with mental health professionals and drug treatment professionals in this district and in other districts.  With all this support for Mr. Black from a substance abuse and mental health perspective, the risk of drug use upon release is low.

### F.  Mr. Black's history of employment.

Mr. Black objects to the conclusion that he does not have stable employment.  [Docket No. 82 at p. 2.]  This is not supported by the evidence.  According to the pretrial services report, Mr. Black worked at McDonalds Restaurant in Taneytown, Maryland.  Mr. Black worked for Kohls in Edgewater Maryland, and Valo Biomedia, in Taneytown.  Mr. Black worked for Penguin Random House, in Westminster, where his father works, as well as a tree cutting company.

For a very young person, this is a substantial work history.  More critically, it is nearly certain that Mr. Black can work as a maintenance man along with his uncle, Walter Parrish, for their landlord.  [*See* Exhibit 2].  Mr. Parrish testified that he secured a position with the landlord and that Mr. Black will clean apartments, conduct repairs, and assist with plumbing, electrical, dry wall and carpentry[31].

### G.  Mr. Black's physical health is at risk at the Eastern Regional Jail.[32]

---

[28] Tr. at page 71.
[29] Tr. at page 72.
[30] Tr. at page 58.
[31] Tr. at page 71.
[32] At the January 4, 2021, detention hearing, Mr. Black did not raise his physical health as an issue for the Magistrate Court to consider for purposes of pre-trial release.  However, since the January 4th hearing, the condition

The Eastern Regional Jail (ERJ) appears incapable of properly safeguarding Mr. Black's physical health and addressing his medical needs.  Mr. Black advises counsel that he was diagnosed with COVID-19 at the end of 2020 as the virus swept through the ERJ.  Staff and inmates at the ERJ are frequently unmasked and have no ability to social distance.  In addition, Mr. Black suffers from an inner ear condition that requires surgery.  He is supposed to be administered ear drops daily but has frequently gone months without any.  Mr. Black advises that his left ear began to bleed last December.  In September 2020, Mr. Black was taken to Ruby Memorial Hospital for an ear examination.  Mr. Black advises that the doctor directed him to return in two weeks for a hearing test and evaluation for surgery.  Mr. Black was not returned to Ruby Hospital until January 2021 and then only for the hearing test.  He was again directed to return in two weeks for a CT scan and surgery evaluation.  Mr. Black anticipates at least another 5-month delay in treatment.

## IV.    Conclusion

Based upon the foregoing, this Court should reverse the decision of the Magistrate Judge set forth in the Detention Order and release Mr. Black to his home in Taneytown, Maryland, while awaiting trial.

Respectfully submitted,

**JOHN WESTLEY BLACK, III**,
By Counsel

---

of Mr. Black's ears appears to have deteriorated.  Counsel believes it is now appropriate for the District Court to consider this issue as part of Mr. Black request for pre-trial release.

000136

By:    <u>s/ L. Richard Walker</u>
        L. Richard Walker
        WV State Bar No. 9580
        Attorney for the Defendant
        Federal Public Defender Office
        230 West Pike Street, Suite 360
        Clarksburg, West Virginia 26301
        Tel. (304) 622-3823
        E-Mail: Richard_Walker@fd.org


By:    <u>s/ *Nicholas J. Compton*</u>
        Nicholas J. Compton
        Attorney for Defendant
        WV State Bar ID 11056
        Federal Public Defender Office
        651 Foxcroft Avenue, Suite 202
        Martinsburg, West Virginia 25401
        Tel. (304) 260-9421
        Fax. (304) 260-3716
        E-Mail. Nicholas_Compton@fd.org

## CERTIFICATION OF SERVICE

I hereby certify that on February 11, 2021, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to the

following:

Kimberley Crockett, AUSA
Office of the United States Attorney
217 West King Street, Suite 400
Martinsburg, WV 25401

By:    s/ L. Richard Walker
       L. Richard Walker
       WV State Bar No. 9580
       Attorney for Defendant
       Federal Public Defender Office
       230 West Pike Street, Suite 360
       Clarksburg, West Virginia 26301
       Tel. (304) 622-3823
       Fax. (304) 622-4631
       E-Mail: Richard_Walker@fd.org

By:    s/ Nicholas J. Compton
       Nicholas J. Compton
       Attorney for Defendant
       WV State Bar ID 11056
       Federal Public Defender Office
       651 Foxcroft Avenue, Suite 202
       Martinsburg, West Virginia 25401
       Tel. (304) 260-9421
       Fax. (304) 260-3716
       E-Mail. Nicholas_Compton@fd.org

000138





AO386-B

**DEFENDANT'S EXHIBIT**

CASE NO. 3:20CR46-4

EXHIBIT NO. 000189



USCA4 Appeal: 21-4   Doc: 7-2   Filed: 03/19/2021   Pg: 142 of 192



USCA4 Appeal: 21-4   Doc: 7-2   Filed: 03/19/2021   Pg: 143 of 192



USCA4 Appeal: 21-4    Doc: 7-2    Filed: 03/19/2021    Pg: 144 of 192

| From: | Richard Walker |
|---|---|
| To: | Nicholas Compton |
| Cc: | Elizabeth Kaylor |
| Subject: | FW: John Black |
| Date: | Wednesday, December 30, 2020 9:52:17 AM |

**From:** Al Kutcher <al.kutcher@gmail.com>
**Sent:** Tuesday, December 29, 2020 10:32 AM
**To:** Richard Walker <Richard_Walker@fd.org>
**Subject:** John Black

Hello, I'm sorry it took so long to get this to you. I had surgery & a fire. John's family have rented from me for about 10 years. They are good tenants & good people from all my dealings with them. John's father & uncle help me working on my rental Properties & I'll probably have John help with that when he gets home. I hope this helps.



AO386-B

DEFENDANT'S
EXHIBIT

CASE
NO.  3:20CR46-4

EXHIBIT
NO.  2



AO386-B

**DEFENDANT'S EXHIBIT**

CASE NO.  3:20CR46-4

EXHIBIT NO.  000144



000145



USCA4 Appeal: 21-4    Doc: 7-2    Filed: 03/19/2021    Pg: 148 of 192

000146



USCA4 Appeal: 21-4   Doc: 7-2   Filed: 03/19/2021   Pg: 149 of 192

000147



USCA4 Appeal: 21-4   Doc: 7-2   Filed: 03/19/2021   Pg: 150 of 192

000148



USCA4 Appeal: 21-4   Doc: 7-2   Filed: 03/19/2021   Pg: 151 of 192



USCA4 Appeal: 21-4   Doc: 7-2   Filed: 03/19/2021   Pg: 152 of 192

000150



USCA4 Appeal: 21-4   Doc: 7-2   Filed: 03/19/2021   Pg: 153 of 192



000152



USCA4 Appeal: 21-4   Doc: 7-2   Filed: 03/19/2021   Pg: 155 of 192



USCA4 Appeal: 21-4   Doc: 7-2   Filed: 03/19/2021   Pg: 156 of 192



USCA4 Appeal: 21-4   Doc: 7-2   Filed: 03/19/2021   Pg: 157 of 192



USCA4 Appeal: 21-4   Doc: 7-2   Filed: 03/19/2021   Pg: 158 of 192



USCA4 Appeal: 21-4   Doc: 7-2   Filed: 03/19/2021   Pg: 160 of 192





My Son
John Westley
Black III



000160



Johnny
with
grandmom
Dorothy

000161



**Real Relationship with Church, Community, and Christ**

December 7, 2020

Nicolas J. Compton, Esquire
651 Fox Croft Avenue, Suite 202
Martinsburg, West Virginia 25401

RE:   John Black

Dear Attorney Compton,

My name is Richard Ritenour and I have been an ordained minister with the Assemblies of God for 35 years and have served at Bethel Assembly of God as its lead Pastor since March 2014.

Between that time and approximately 2016 John attended church with his family. I had numerous personal interactions with him, and he appeared to be navigating things that young men his age navigate.  He seemed restless and he gravitated to relationships with people that I do not know much about.  There were rough patches and after 2016 I did not see John in church. When I did communicate John was courteous to me and it was apparent that he was searching for something.

As a pastor, I believe that all that has transpired will unquestionably change his life. The church is here to assist John in making positive life changes. I believe that John is not a lost cause or scorched earth. The church would certainly offer mentorship, relational support, and guidance to John as he seeks to build a respectable life moving forward.

He has a very loving family and I believe that the positive entities church and family can partner in helping this young man to redirect his life if he wants that. If needed, please feel free to contact me at one of the numbers below for additional information.

Thank you for your service to the Black family and to those in need of professional representation.

Blessings,

*Richard O. Ritenour*

Rev. Richard O. Ritenour
(717) 359-4675 Office
(724) 833-8446 Cell



AO386-B
**DEFENDANT'S EXHIBIT**

CASE NO.   3:20CR46-4

EXHIBIT NO.   4

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### MARTINSBURG

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Criminal Action No. 3:20-CR-46** |
| **JOHN WESTLEY BLACK, III,** <br> **Defendant.** | **(Judge Groh)** |

### <u>United State's Response to Mr. Black's Motion for Review of the Detention Order</u>

The United States of America and William J. Powell, United States Attorney for the Northern District of West Virginia, by Assistant United States Attorneys Kimberley Crockett and Jeffrey A. Finucane, hereby respond to Defendant John Westley Black, III's Motion for Review of the Detention Order.

### I. Background

On November 17, 2020, an indictment was filed against the Defendant charging him in count one (1) with conspiracy to commit kidnapping, in violation of Title 18, United States Code, Section 1201(c); in count two (2) with aiding and abetting kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a)(1) and 2; in count three (3) with aiding and abetting corrupt destruction of object, in violation of 18 U.S.C. § 1512(c)(1) and 2. ECF 25. On January 4, 2021, the parties conducted a detention hearing before the Honorable Magistrate Judge Trumble, pursuant to the Bail Reform Act, set forth in 18 U.S.C. § 3142(f). On January 5, 2021, the Court issued a detention order in which it considered the factors in 18 U.S.C. § 3142(g) to determine whether there were conditions of release that would reasonably assure the appearance of the Defendant and the safety of any other person and the community. ECF No. 82. The Court found (1) the rebuttable presumption did not apply; (2) the Defendant was not a serious risk of flight by a preponderance of the evidence; (3) the weight of the evidence against

the defendant is strong, Defendant is subject to life in prison or death if convicted, and Defendant is a regular drug user and does not have stable employment; (4) the nature and circumstances of his alleged involvement in the case show that he would be a danger to the community by clear and convincing evidence; and (5) no bond conditions could be set to reasonably ensure the appearance of Defendant and the safety of the community. *Id.* at 2-3.

## II. Argument

On February 11, 2021, Defendant filed a motion for review of the Detention Order pursuant to 18 U.S.C. § 3145(b). ECF No. 90. The District Court reviews the order of detention of the magistrate court *de novo*. *United States v. Williams*, 753 F.2d 329, 331 (4th Cir. 1985). The Court found, and the parties agree, that the rebuttable presumption of detention found in 18 U.S.C. § 3142(e)(2) and (e)(3) does not apply in this case. ECF No. 82 at 2. The Court also found, and the Government does not contest, that Defendant is not a serious flight risk by a preponderance of the evidence. *Id.*[1]

### A. Weight of the Evidence

The Court found "[t]he weight of the evidence against the defendant is strong and Defendant is subject to life in prison or death if convicted. Defendant is a regular drug user and does not have stable employment." ECF No. 82 at 2. Defendant does not dispute the Court's finding that the maximum penalty for the offense alleged is life in prison or death. Defendant does not dispute that at "the time of his arrest, he used marijuana daily," but objects to the Court's "reliance upon prior drug use as a basis for detention." ECF No. 90 at 8. Defendant primarily objects to the portion of the Court's third finding stating that the "weight

---

[1] In subsection B, Defendant argues that he has strong ties to the community, which supports the Court's conclusion that Defendant is not a serious flight risk. The Government does not oppose this conclusion but notes that the possibility of life in prison or a penalty of death if convicted creates an incentive to flee. ECF No. 87, Tr. at 88.

of the evidence against the defendant is strong."

Defendant's challenge to the weight of the evidence primarily relates to the potential testimony of eyewitnesses and a perceived lack of physical evidence. *Id.* at 6-7. With regard to witnesses, Defendant argues that they "have all received the extraordinary benefit of avoiding indictment and arrest," "had previously used illegal drugs and were drinking and using drugs on the night of the incident," one "provided a very brief non-truthful statement," and another " 'omitted a few things early in an interview' with law enforcement." *Id.* at 6. Defendant additionally challenges that there was not "any audio or video evidence linking Mr. Black to the crimes charged . . . [and] there was no physical evidence linking Mr. Black to the crimes charged." *Id.* at 6-7. In sum, counsel argues "the weight of the evidence amounts to nothing more than the unsworn statements of three unindicted co-defendants, two of whom have trouble with the truth, and all of whom were impaired on the night of the crime." *Id.* at 7. However, these arguments largely omit that significant portions of the case that are not disputed, including by statements of the Defendant himself.

Defendant is accused of conspiring with others and aiding and abetting during an assault and stabbing of victim Jonathan Riddle during the late hours of March 17, 2020 and into the early morning hours of March 18, 2020, which culminated in the kidnapping, transportation, and the ultimate killing of Jonathan Riddle. As an initial matter, defense counsel does not dispute that Mr. Black partied with the co-conspirators on March 17, 2020, or that he retired to the home of David Sanford where Jonathan Riddle was assaulted and stabbed multiple times. Defense counsel does not dispute that after the altercation, Mr. Black and a co-conspirator transported Mr. Riddle in his own vehicle across state lines to a wooded area in

Rippon, West Virginia and that Mr. Riddle was set on fire in those woods.[2]

Defendant argues that the weight of the evidence that he stabbed Mr. Riddle at the party is not strong. At the Detention Hearing, FBI Special Agent Duffy answered counsel's questions concerning that issue as follows:

Q: And emphatically, you know, I would like to know, Mr. Black did not stab Mr. Riddle.
A: I'm sorry.  Are you asking me if he stabbed Mr. Riddle?
Q: Yeah.  Is that right.
A: He told two witness that he did stab Riddle.
. . .
Q: Okay. So that was sort of a statement that was attributed to him after the fact?
A: Yes. Two witnesses advised that Mr. Black told them that he had stabbed Mr. Riddle. One witness specifically said he had stabbed him four times. The other witness didn't identify the number of stab wounds that Mr. Black had done.  ECF No. 87, Tr. at 14.

The Court had before it undisputed evidence that Defendant was present at the Sanford home, that Mr. Riddle was stabbed in the home, and that Mr. Riddle's body was driven in a vehicle in which Defendant was the passenger to a wooded area in Rippon, West Virginia where the body of Jonathan Riddle was burned. While counsel thoroughly described the portions of events Defendant denied, counsel also elicited testimony from Agent Duffy regarding Defendant's admissions. Specifically, Defendant admits that he was present in Rippon, West Virginia when Mr. Riddle's body was burned in the woods but denies that he went into the woods and burned the body. Agent Duffy testified:

Q: Okay. And he told you he was never in the woods with anyone else and certainly didn't inflict any harm or damage on Mr. Riddle's body, much less burn the body in the woods?
A: I believe his statement was that he was standing near the other vehicle that was parked at the scene at the time. *Id.*, Tr. at 20-21.

---

[2] Defense counsel mischaracterized the testimony of the agent that J.R. was transported in the trunk of the car.  The testimony was merely that he was transported within the car, not within the trunk.

Based on the undisputed facts and Agent Duffy's description of the witness testimony and Defendant's admissions, the Court had a sufficient basis to find that the weight of the evidence in this case was strong against the Defendant.

### B. Danger to the Community

Defendant called four witnesses to provide testimony that he was not a danger to the community. Defendant's mother initially provided testimony, to which the Government did not cross examine. The Court heard testimony from Defendant's middle school principal. The witness testified positively about his experiences with Defendant, including, as counsel notes, that he "made valuable connections with the adults in the program" and "recently he asked for a Bible which [he] provided." *Id.*, Tr. at 65-66.  But the witness also testified that he had not had any contact with Defendant for at least eight or nine years, since Defendant was a child in middle school. *Id.*, Tr. at pp. 67-68. Defendant's uncle also testified positively noting that Defendant and he were close, and he was a good kid, and he could work alongside him for their landlord.   *Id.*, Tr. at 70-71. But Defendant's uncle also provided testimony that Defendant's behavior had changed after the incident before he was arrested.  When asked about his demeanor during that time, he stated:

A: He seemed upset. Maybe – you know, just about it. Like I said, I never asked him why he was upset because that – to me I don't ask. If they come to me, then, you know . . .

Q: And having known him and seen him almost every day, would you say he was more upset or just kind of consistently, you know, moody like a young person.

A: A little bit more upset than usual, yeah.

Q: A little bit more upset than usual?

A: Yeah.

Q: Okay. And he never asked you anything or asked you –

A: No.

Q: the problems he was having?

A: And I understood why, and he told me why.  He told me just . . .

Q: I'm sorry. Could – I didn't get – I didn't understand.

A: He didn't want our family to be hurt which I understand. *Id.*, Tr. at 76-77.

….

Q: And did you take that to mean anything?

A: Well, I just – he was in some kind of trouble. I didn't know what. You know, like I said, he's – there's some things he doesn't talk about and I understand. *Id.*, Tr. at p. 77.

Defendant also called a friend of his parents who attended his church. The witness testified positively that Defendant did not seem like a violent person and that since his incarceration he has expressed ambition to become a youth pastor. *Id.*, Tr. at 81-82. But the witness also testified that in the years leading up to March 17, 2020, he had not spoken to the Defendant on a regular basis or about matters beyond him possibly looking for a job. *Id.*, Tr. at 85.

The Court heard evidence, however, that the Defendant is easily led by his peers. For example, the friend of Defendant's parents testified:

Q: And earlier we heard from [his middle school principal] who described Mr. Black as easily led by his peers. Is that – would that be consistent with your assessment of him?

A: Yes. *Id.*, Tr. at 84-85.

The witnesses did nothing to offset the heinousness of Defendant's actions in the assault and kidnapping that resulted in the death of Jonathan Riddle. Two of the defense witnesses had not communicated with the Defendant in years. His uncle, in fact, confirmed that Defendant was acting more upset than usual following the murder. Moreover, while not central to the Government's case, two witnesses confirmed the Defendant's susceptibility to influence. This fact could have raised, in the Court's reasoning, an additional concern about his danger to the community.

As counsel laid out in detail in his cross examination of Agent Duffy, the evidence suggests that prior to March 17, 2020, it appears Defendant did not know Mr. Riddle. It appears

he did not bring a weapon to the Sanford home or arrive with the intent to harm Jonathan Riddle. Yet, once the assault began, which lasted over a period of four hours, Defendant proceeded to participate in and stab Jonathan Riddle multiple times. Defendant participated in hog-tying Mr. Riddle and helped place him inside his own vehicle. Defendant participated in the transportation of Mr. Riddle across stateliness into West Virginia, while Mr. Riddle lay stabbed and bleeding in the car while his co-defendant drove to a secluded wooded area where Mr. Riddle's body was set on fire. Then, to eliminate evidence inside the vehicle, Defendant participated in destroying Mr. Riddle's car. All, as counsel pointed out, with limited apparent knowledge of the Defendant.

### C. Employment History

In its third finding, the Court found that Defendant "does not have stable employment." ECF No. 82 at 2. The Court accepted the pretrial services report prepared by the U.S. Probation Office and the witnesses testified largely consistent with its report. The Defendant was employed prior to his incarceration at McDonald's in Taneytown, Maryland, but would not return to that job if released. The Defendant indicated he worked at Kohl's in Edgewood for 3 months, he worked at Valo Biomedia in Taneytown for two months, for a tree company for three months and has worked off and on at various warehouses. He also indicated that he worked at Random House in Westminster for six months in 2016. Defendant argued that upon release he would have a job assisting his landlord with maintenance on apartments working with his uncle. The Court heard the evidence and made a factual finding that Defendant did not have stable employment.

### D. Conclusion

The Court considered the evidence presented at the January 4, 2021 detention hearing

and accepted by proffer the pretrial services report. The Court considered the factors in 18 U.S.C. § 3142(g) and determined Defendant would be a danger to the community by clear and convincing evidence and that no bond conditions could be set to reasonably ensure the appearance of the defendant and the safety of the community. As such, the Court ordered that the Defendant remain incarcerated pending trial.

The United States respectfully requests the District Court conduct a *de novo* review of the matters presented and affirm the decision of the Magistrate Court.

Respectfully submitted,

WILLIAM J. POWELL
UNITED STATES ATTORNEY

By: /s/ Kimberley Crockett
Kimberley Crockett
Assistant United States Attorney
Jeffrey A. Finucane
Assistant United States Attorney
217 West King Street, Suite 400
Martinsburg, WV 25401
Phone: 304-262-0590

# CERTIFICATE OF SERVICE

I, Jeffrey A. Finucane, Assistant United States Attorney, for the Northern District of West Virginia, certify that on February 18, 2021, the foregoing *United States' Response to Mr. Black's Motion for Review of the Detention Order* was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Richard Walker, Esq.
Federal Defender Office
230 W. Pike Street, Suite 360
Clarksburg, West Virginia 26301

Nicholas Compton, Esq.
Federal Defender Office
651 Foxcroft Avenue, Suite 202
Martinsburg, WV 25401

*Counsel for John Black*

Respectfully submitted,

WILLIAM J. POWELL
UNITED STATES ATTORNEY


By:     /s/ Jeffrey A. Finucane
         Assistant United States Attorney

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### AT MARTINSBURG

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**V.**                             **CRIMINAL NO. 3:20-CR-46-4**
                                          **(JUDGE GROH)**

**JOHN WESTLEY BLACK, III,**

        **Defendant.**

## MR. BLACK'S REPLY IN SUPPORT OF A
### *DE NOVO* REVIEW OF THE DETENTION ORDER

### I.      Introduction

The Defendant, John W. Black, III, by his counsel, L. Richard Walker, Esq., and Nicholas Compton, Esq., respectfully files this reply to the government's response concerning his request for review of the Detention Order. [Docket No. 94]. As we originally stated, this is a serious case, without a doubt. Yet, Mr. Black makes a most sincere request for release, which is supported by the unique facts of this case. Unlike many defendants charged with crimes of violence in federal court, Mr. Black has ties to the community, no prior criminal convictions, a stable living environment, and a good job waiting for him. Furthermore, the weight of the evidence is not strong, and Mr. Black's role, if any, in the conspiracy as it is alleged, was minor. Accordingly, Mr. Black respectfully requests that this Court overrule the Detention Order [Document 82] and release Mr. Black to his family's home in Carroll County, Maryland.

000172

## II.    Argument

### A.  Weight of the evidence.

This is not a case involving overwhelming evidence of guilt.  In response to Mr. Black's direct critique of the unsworn statements of the witnesses upon which the government's case rests, the government refers this Court to "undisputed facts," Mr. Black's alleged admissions, and the case agent's "description of the witness testimony."  [Document 94, at p. 5].  The government's approach is not persuasive.

First, almost all the material facts are in dispute.  Mr. Black did not know the decedent, Jonathan Riddle.[1]  Mr. Black did not have a quarrel with Mr. Riddle.[2]  Mr. Black did not plan to harm Mr. Riddle.[3]  Mr. Black did not know there would be a fight involving Mr. Riddle in a co-defendant's home.[4]  The only incriminating evidence about the fight is derived from the unsworn statements of three other people present who either admitted to participating in an assault on Mr. Riddle or obstructed justice by cleaning up the crime scene.  Mr. Black did not stab Mr. Riddle.[5]  Mr. Black did not hog-tie Mr. Riddle.[6]  Mr. Black did not place Mr. Riddle in Mr. Riddle's car and Mr. Black did not drive Mr. Riddle to West Virginia.[7]  Mr. Black did not place Mr. Riddle's body in a wooded area in West Virginia and he did not burn his body.[8]  The government has a theory and we reject that theory.  No common ground between the parties supports the finding in the Detention Order that the weight of the evidence is strong.

---

[1] *See* Transcript of January 4, 2021, Detention Hearing (hereinafter identified as "Tr.") at page 12.
[2] Tr. at page 14.
[3] Tr. at page 12.
[4] Tr. at page 14.
[5] Tr. at page 20.
[6] Id.
[7] Id.
[8] Tr. at page 21.

000173

Second, Mr. Black denies that he ever made an admission about stabbing Mr. Riddle. Admissions used in federal prosecutions are normally made by defendants to members of law enforcement. Here, on the other hand, the case agent testified that "[t]wo witnesses[9] advised that Mr. Black told them that he stabbed Mr. Riddle. One witness specifically said he stabbed him four times. The other witness didn't identify the number of stab wounds that Mr. Black had done." [Document 94, at p. 4]. We contend that the unsworn statements of these cooperators and unindicted co-conspirators are not credible. These individuals used drugs.[10] They are wildly culpable in the alleged conspiracy.[11] Two of them gave less than truthful statements and another obstructed justice by cleaning up the crime scene.[12] They related Mr. Black's alleged admission to law enforcement while they were being interrogated and under the threat of prosecution. Under the circumstances, this alleged admission is a far cry from strong evidence.

Finally, the case agent's description of the statements of witnesses does not support a finding that the evidence against Mr. Black is strong. In a case where there is no video capturing the assault against Mr. Riddle, and no forensic evidence linking Mr. Black to the crime scene in a wooded area near Rippon, West Virginia,[13] the case agent can only understand the critical particulars of the case based upon what the three cooperating witnesses told law enforcement. Again, given that the cooperating witnesses are not credible, in our view, there is little value in the agent's description of their unsworn statements or the theory the case agent created based upon these statements.

**B.  Alleged danger to the community.**

---

[9] The Court should note that these two witnesses referenced here do not appear to be two additional witnesses, but rather two of the three unindicted co-conspirators who have provided unsworn statements upon which the United States bases its case against the Defendant.

[10] Tr. at pages 28-29.

[11] Tr. at page 31.

[12] Tr. at pages 30-31; 35.

[13] Tr. at page 24.

000174

Mr. Black contends he is not a danger to the community by clear and convincing evidence. Rather than point to independent evidence that Mr. Black is a danger to the community, the government's response briefly criticizes some of the witnesses who testified about Mr. Black's law-abiding and peaceful presence in the community and then the government reverts to its one-sided description of the alleged facts. [Document 94, at p. 5-7].

Our law office conducted an appropriate investigation in anticipation of the detention hearing. The witnesses called to testify about Mr. Black were representatives. There are other witnesses who are willing and able to testify favorable about Mr. Black's personal characteristics and background, but we selected a few of the witnesses who have known Mr. Black well in different environments and at different times so this Court could have a complete picture of how Mr. Black lived over time. No single witness has a complete knowledge of Mr. Black, but collectively they establish that he is loving, caring, helpful and family oriented. He does not have a reputation for violence in the community and Mr. Black has never been convicted of a criminal offense, much less a violent felony.[14]

The government suggests that Mr. Black is susceptible to the influence of others and, therefore, might be a danger to the community. [Document 94, at p. 6]. We disagree. Mr. Black comes from a normal working-class family.[15] There are no drugs in the home. There are no firearms in the home. If released, Mr. Black will live with his mother and father and work alongside his uncle repairing and cleaning properties for their landlord.[16] Mr. Black and his parents plan to attend their church and Mr. Black will pursue all educational and rehabilitative opportunities available. Mr. Black will not be surrounded by criminals. Rather, he will spend

---

[14] Tr. at page 42.
[15] Tr. at pages 46-47.
[16] Tr. at pages 50-51.

000175

his time with the people who love him and the people willing to guide and support Mr. Black, not lead him astray.

The bottom line is that this case is not representative of Mr. Black's life or lifestyle. We respectfully submit that Mr. Black can be released and that the risk of danger and the risk of any further difficulties with the legal system are low.

### C. Mr. Black's history of employment.

The government defends the Detention Order's conclusion that Mr. Black does not have stable employment. [Document 94, at p. 7]. Mr. Black has been incarcerated for months. Yet, with his family's help, he has been able to line up a job as a maintenance man along with his uncle, Walter Parrish, working for their landlord. Mr. Parrish testified that he confirmed a position with the landlord and that Mr. Black will clean apartments, conduct repairs, and assist with plumbing, electrical, dry wall and carpentry.[17] Clearly, this is pro-social activity that weighs in favor of release. What's more, this opportunity will benefit Mr. Black because if he can learn a trade, then he will be able to rely upon these new skills to support himself and provide services for others for many years. There are no negatives relative to his employment.

### III.    Conclusion

Based upon the foregoing, this Court should reverse the decision of the Magistrate Judge set forth in the Detention Order and release Mr. Black to his home in **Taneytown, Maryland,** while awaiting trial.

Respectfully submitted,

**JOHN WESTLEY BLACK, III**,
By Counsel

---

[17] Tr. at page 71.

000176

By:    <u>s/ L. Richard Walker</u>
L. Richard Walker
WV State Bar No. 9580
Attorney for the Defendant
Federal Public Defender Office
230 West Pike Street, Suite 360
Clarksburg, West Virginia 26301
Tel. (304) 622-3823
E-Mail: <u>Richard_Walker@fd.org</u>


By:    <u>*s/ Nicholas J. Compton*</u>
Nicholas J. Compton
Attorney for Defendant
WV State Bar ID 11056
Federal Public Defender Office
651 Foxcroft Avenue, Suite 202
Martinsburg, West Virginia 25401
Tel. (304) 260-9421
Fax. (304) 260-3716
E-Mail. <u>Nicholas_Compton@fd.org</u>

000177

## CERTIFICATION OF SERVICE

I hereby certify that on February 22, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

**Kimberley D. Crockett, AUSA**
**U.S. Attorney's Office**
**217 W. King Street, Suite 400**
**Martinsburg, WV  25401**

By:    s/ L. Richard Walker
       L. Richard Walker
       WV State Bar No. 9580
       Attorney for Defendant
       Federal Public Defender Office
       230 West Pike Street, Suite 360
       Clarksburg, West Virginia 26301
       Tel. (304) 622-3823
       Fax. (304) 622-4631
       E-Mail: Richard_Walker@fd.org

By:    s/ Nicholas J. Compton
       Nicholas J. Compton
       Attorney for Defendant
       WV State Bar ID 11056
       Federal Public Defender Office
       651 Foxcroft Avenue, Suite 202
       Martinsburg, West Virginia 25401
       Tel. (304) 260-9421
       Fax. (304) 260-3716
       E-Mail. Nicholas_Compton@fd.org

000178

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**


**v.**                                  **CRIMINAL ACTION NO.: 3:20-CR-46-4
(GROH)**


**JOHN WESTLEY BLACK, III,**

      **Defendant.**


**<u>ORDER AFFIRMING DETENTION ORDER</u>**

On February 11, 2021, John Westley Black, III ("Defendant"), filed a Motion for Review of the Detention Order. ECF No. 90. The Defendant moved this Court, pursuant to 18 U.S.C. § 3145(b), to revoke or amend the detention order entered by Magistrate Judge Robert W. Trumble on January 5, 2021. After reviewing the record, transcript, and applicable law, this Court affirms Magistrate Judge Trumble's detention order.

**I.  BACKGROUND**

On November 17, 2020, a Northern District of West Virginia Grand Jury returned an indictment against the Defendant, and an arrest warrant was issued by Magistrate Judge Trumble. On November 20, 2020, the Defendant made his initial appearance; the Government moved to detain the Defendant, and he was temporarily detained pending a hearing. On December 3, 2020, the Defendant was arraigned, and an initial scheduling order was entered. On January 4, 2021, Magistrate Judge Trumble held a detention

1

hearing.    During the hearing, Magistrate Judge Trumble heard testimony from the Defendant's mother, uncle, and middle school principal, as well as the Government's case agent.    Judge Trumble also considered the pretrial services report and heard arguments from both parties.    Magistrate Judge Trumble granted the Government's motion to detain the Defendant and entered his detention order the following day.

## II.    APPLICABLE LAW

This Court reviews *de novo* a magistrate judge's decision to detain a defendant pending trial, and this Court "must make an independent determination of the proper pretrial detention or conditions of release."  See United States v. Stewart, 19 F. App'x 46, 48 (4th Cir. 2001). The Bail Reform Act, which governs release or detention pending trial, provides that if the court finds no "condition or combination of conditions will reasonably assure the appearance of the person as required, and the safety of any other person and the community," then the court shall order the detention of the person before trial. 18 U.S.C. § 3142(e).

There are several factors the Court must consider in determining whether there are any conditions of release that will reasonably assure the appearance of Defendant or the safety of other persons and the community. 18 U.S.C. § 3142(g).  Specifically, the Court must consider the (1) nature and circumstances of the offenses charged; (2) weight of the evidence against the person; (3) history and characteristics of the person, including family ties, the person's character, ties to the community, and criminal history; and (4) nature and seriousness of the danger to any person or the community that would be posed by the person's release.  Id.

2

000180

## III.   ANALYSIS

The Court has reviewed the Defendant's Motion, Government's Response, and the Defendant's Reply, as well as the indictment, pretrial services report, detention order and a transcript of the detention hearing.   Upon this Court's independent review and consideration, the Court affirms Magistrate Judge Trumble's Detention Order.

To impose pretrial detention on a defendant, the Court must find a lack of reasonable assurance of either the defendant's appearance or the safety of others or the community.  Stewart, 19 F. App'x at 48.  The Court is not required to find a lack of both. Id.  To use risk of flight as a basis for detention, the Court must find by a preponderance of the evidence that no combination of conditions will reasonably assure the defendant's presence at future court proceedings.  Id.; see also Wright & Miller § 766 3B Fed. Prac. & Proc. Crim. (4th ed.) (noting that the statute is silent regarding the standard of proof for pretrial detention based upon the grounds that no condition or combination of conditions will reasonably assure the person's appearance for trial, but several circuits have held that the burden of proof on this issue is by a preponderance of the evidence).  To use the danger to other persons and the community as a basis for detention, the Court must find, by clear and convincing evidence, that no condition or combination of conditions will reasonably assure the safety of any other person and the community.   18 U.S.C. § 3142(f)(2).

As an initial matter, the Court notes that the Government did not argue, and the underlying detention order did not find, that the Defendant poses a serious risk of flight by a preponderance of the evidence.  Accordingly, the Court's focus is whether the Defendant poses a danger to any person in the community.  In applying the four factors

provided in 18 U.S.C. § 3142(g), the Court finds that no condition or combination of conditions will reasonably assure the safety of any other person or the community.

The first factor, nature and circumstances of the offense charged, weighs heavily against the Defendant.  Despite defense counsel's best efforts to portray the Defendant as a minor participant in only one "phase" of the criminal activity charged within the indictment, the crimes he is charged with are of the most serious nature. To wit, conspiracy to commit kidnapping, aiding and abetting kidnapping resulting in death, and aiding and abetting corrupt destruction of object.  To be clear, these charges involve the death of another person. Even assuming the Defendant played a "minor role" as counsel suggests, a minor role in another person's allegedly horrendous death is a charge of the most serious nature. Furthermore, the circumstances are equally disturbing.  The counts in which this Defendant is charged involve beating, kidnapping, and lighting another person on fire.

The second factor is the weight of the evidence against the person.  The weight of evidence against the Defendant was sufficient for a grand jury to indict him on the aforementioned charges. Further, the case agent testified that three witnesses described some of the Defendant's involvement in this case. Witnesses said that the Defendant beat the victim, assisted in burning his car, rode with a co-defendant in the victim's car—while the victim was in the trunk—and told two witnesses that he stabbed the victim.  What's more, the Defendant, during a second interview by law enforcement, admitted that the was present at the scene of the victim's beating and kidnapping. The case agent also testified that the Defendant burned some of his clothing.

4

The third factor, the history and characteristics of the person, including family ties, the person's character, ties to the community, and criminal history, also weighs in favor of detaining Defendant.  Although the Defendant does have ties to his community in Carroll County, Maryland, he has no ties to any community within the Northern District of West Virginia.  Additionally, the Defendant's employment history is incredibly sporadic. The Defendant's lacking employment history is exacerbated by regular drug use; the Defendant is a habitual marijuana user.  The Defendant's family ties were apparent from the testimony of his mother and uncle. However, the Court is unpersuaded by counsel's arguments regarding the Defendant's character.

Although the Defendant's prior criminal history is minimal, the Defendant's actions after a fire at his residence are concerning.  The Defendant apparently knew the individual who he believed intentionally started the fire. Upon seeing this person who was standing near a police officer, the Defendant punched him. The Court understands defense counsel's argument about the circumstances and certainly takes that into account.  What makes this incident so troubling to the Court is the repeated references to the Defendant just being a "follower." The notion that the Defendant is a "follower" who is accused of going along with a beating, kidnapping, murder, body burning, and destruction of evidence, is troubling.  Particularly where co-defendants are charged with intimidating and murdering witnesses.  Stated another way, the Court is concerned about the safety of others who may have information about this case—including those who have provided information about this Defendant—and whether the Defendant would be easily influenced to intimidate or otherwise cause them harm.  This concern is heightened considering the Defendant's poor and violent judgment in the face of another stressful situation.  Indeed,

000183

rather than reporting the suspected arsonist to a nearby police officer, the Defendant chose to punch him instead.  If released, what reaction should the Court anticipate the Defendant will have toward the witnesses who have implicated him?  These witnesses' identities are apparently not safe, as defense counsel noted "we all know who they are" during the detention hearing.

The fourth factor, the nature and seriousness of the danger to any person or the community that would be posed by the person's release, is apparent from the Court's discussion in the preceding paragraph.  There are already indicted charges of witness intimidation and tampering resulting in death of more than one witness in this case. Notably, this Defendant was not charged with those crimes. However, counsel's argument that Mr. Black is just a follower, and testimony to support this argument, further convinces this Court that the Defendant poses a very real danger to other witnesses in this case and the community at large.

Having reviewed the factors, the Court turns to whether any condition or combination of conditions will reasonably assure the safety of other persons and the community.

Magistrate Judge Trumble found that the weight of evidence against the Defendant is strong and the Defendant is subject to life in prison or death if convicted.  He is a regular drug user who lacks stable employment.  Judge Trumble also found that the Defendant would be a danger to the community by clear and convincing evidence and that there are no bond conditions to reasonably ensure the safety of the community.  This Court affirms Magistrate Judge Trumble's factual findings and conclusion.  The Court finds that the nature and consequences of Defendant's alleged crimes are very serious.  However,

6

000184

most importantly, the Court finds that the fourth factor, the nature and seriousness of the danger to any person or the community that would be posed by the person's release, weighs strongly in favor of detaining Defendant. Defendant's counsel stated that "everyone knows" who the witnesses against the Defendant are. Therefore, there is a risk of danger posed to those witnesses.

Additionally, the other three factors, particularly when taken together or in conjunction with the fourth factor, reveal a danger to this community. Thus, the Court **FINDS**, by clear and convincing evidence, that no condition or combination of conditions would reasonably assure the safety of the community if the Defendant were released pending trial.

## IV.    CONCLUSION

Therefore, considering the evidence and arguments submitted by the parties and having reviewed this matter *de novo*, the Court **AFFIRMS** Magistrate Judge Trumble's Detention Order.

The Clerk of Court is **DIRECTED** to transmit copies of this Order to all counsel of record and/or *pro se* parties.

**DATED:** February 26, 2021

GINA M. GROH
CHIEF UNITED STATES DISTRICT JUDGE

7

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
## AT MARTINSBURG

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**V.**                                                    **CRIMINAL NO. 3:20-CR-46-4**
                                                         **(JUDGE GROH)**

**JOHN WESTLEY BLACK, III,**

**Defendant.**

### NOTICE OF APPEAL REGARDING DETENTION IN A CRIMINAL CASE

**NOTICE IS HEREBY GIVEN** that the defendant in the above-captioned case, John Westley Black, III, by his counsel, L. Richard Walker, Esq., seeks to appeal to the United States Court of Appeals for the Fourth Circuit from the order of the district court denying his request for bond entered on February 26, 2021, pursuant to Rule 4(b)(1)(A) and Rule 9(a) of the Federal Rules of Appellate Procedure.

Respectfully submitted,

**JOHN WESTLEY BLACK, III**,

By Counsel

By:    s/ L. Richard Walker

L. Richard Walker
WV State Bar No. 9580
Attorney for the Defendant
Federal Public Defender Office
230 West Pike Street, Suite 360
Clarksburg, West Virginia 26301
Tel. (304) 622-3823
E-Mail: Richard_Walker@fd.org

1

## CERTIFICATION OF SERVICE

I hereby certify that on March 5, 2021, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing

to the following:


**Kimberley D. Crockett, Esq.**
**U.S. Attorney's Office--Martinsburg, WV**



By:    s/ L. Richard Walker
       L. Richard Walker
       WV State Bar No. 9580
       Attorney for Defendant
       Federal Public Defender Office
       230 West Pike Street, Suite 360
       Clarksburg, West Virginia 26301
       Tel. (304) 622-3823
       Fax. (304) 622-4631
       E-Mail: Richard_Walker@fd.org

000187

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**                                  **CRIMINAL ACTION NO.: 3:20-CR-46
(GROH)**

**MONROE MERRELL,
DAVID RAY SANFORD, JR.,
JEFFREY CRAIG SMITH, JR., and
JOHN WESTLEY BLACK, III,**

        **Defendants.**

## ORDER GRANTING THE GOVERNMENT'S MOTION FOR PROTECTIVE ORDER

Now before the Court is the Government's Motion for Protective Order as to all Defendants. ECF No. 74. Defendants Merrell, Sanford and Smith do not oppose or object to the Motion. However, Defendant Black, by counsel, filed a Memorandum in Opposition to the Government's Motion. ECF No. 75. The Government filed a Reply in Support of its Motion on December 30, 2020. ECF No. 76. Accordingly, this matter is ripe for the Court's consideration, and for the following reasons, the Government's Motion is granted.

The Government's proposed protective order [ECF No. 74-1] prohibits defense counsel from giving a Defendant or anyone outside the defense team copies of discovery material that "(1) contains or summarizes statements of witnesses, (2) identifies witnesses, informants or victims and their personal data, (3) contains digital data from an electronic device or media such as cell phones and social media accounts, (4) contains personal identifying information required to be redacted by Local Rule of General

000188

Procedure 5.08(a), and (5) audio and video recordings to prevent the possibility of dissemination to other persons." Id.

In his Memorandum in Opposition, Defendant Black's "counsel is willing to agree with three of the five restrictions proposed by the government." ECF No. 75 at 2. However, Defendant Black opposes the third and fourth items in the Government's proposed protective order. Specifically, counsel for Defendant Black objects to being prohibited from giving the Defendant discovery containing digital data from an electronic device, cell phone or social media account and discovery containing personal identifying information.

This case involves allegations, against Defendant Black, of conspiracy to commit kidnapping, aiding and abetting kidnapping resulting in death, and aiding and abetting corrupt destruction of object. As the Government notes in its Reply, the concern for a protective order "is heightened as the indictment alleges that two witnesses have already been killed in this case and [Defendant Black's] co-defendants had plotted to kill a third witness." ECF No. 76 at 3. The Court also notes that no other Defendant filed a response in opposition to the Government's motion.

Upon review and consideration, the Court finds that the Government's protective order, as proposed, is appropriate in this case. The order is carefully tailored to prohibit sensitive discovery materials from being left with the Defendants, or anyone outside the defense team, and potentially being disseminated or otherwise improperly used. Accordingly, the Government's Motion for Protective Order [ECF No. 74] is **GRANTED**.

For the reasons stated herein and within the Government's Motion, this Court **ORDERS** that defense counsel is hereby **PROHIBITED** from giving to the defendant or to any person outside the defense team, copies of disclosed discovery materials which (1) contains or summarizes statements of witnesses, (2) identifies witnesses, informants or victims and their personal data, (3) contains digital data from an electronic device or media such as cell phones and social media accounts, (4) contains personal identifying information required to be redacted by Local Rule of General Procedure 5.08(a), and (5) audio and video recordings to prevent the possibility of dissemination to other persons.

It is further **ORDERED** that should any defendant have a *specific* reason to object to this Order as entered, counsel may do so and the Court will consider the motion.

This **ORDER** shall remain in effect until further Order of the Court. The Clerk of Court is **DIRECTED** to transmit copies of this Order to all counsel of record herein.

**DATED**: January 6, 2021

GINA M. GROH
CHIEF UNITED STATES DISTRICT JUDGE

3

000190